1  DAVID B. GOLUBCHIK (SBN 185520)
KRIKOR J. MESHEFEJIAN (SBN 255030)
2  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067

**Signed and Filed: June 6, 2016**

4  Telephone: (310) 229-1234
Facsimile: (310) 229-1244
5  Email: dbg@lnbyb.com; kjm@lnbyb.c

6  Attorneys for Chapter 11 Debtor and D

7                              HANNAH L. BLUMENSTIEL
UNITED STATES BANKRUPTCY COURT
8       NORTHERN DISTRICT OF CALIFORNIA
         SAN FRANCISCO DIVISION

9

10  In re:                                    ) Case No. 15-30897
                                              ) Chapter 11 Case
11  UNITED PROSPERITY GROUP, INC. dba         )
    THE PRODUCE COMPANY,                      )
12                                            ) **ORDER: (1) APPROVING SALE OF**
                                              ) **SUBSTANTIALLY ALL OF THE**
         Debtor and Debtor in Possession.     ) **DEBTOR'S ASSETS FREE AND CLEAR**
13                                            ) **OF ALL ENCUMBRANCES; (2)**
14                                            ) **APPROVING OF DEBTOR'S**
                                              ) **ASSUMPTION AND ASSIGNMENT OF**
15                                            ) **CERTAIN UNEXPIRED LEASES AND**
                                              ) **EXECUTORY CONTRACTS AND**
16                                            ) **DETERMINING CURE AMOUNTS; (3)**
                                              ) **WAIVING THE 14-DAY STAY PERIODS**
17                                            ) **SET FORTH IN BANKRUPTCY RULES**
                                              ) **6004(h) AND 6006(d); AND (4)**
18                                            ) **GRANTING RELATED RELIEF**
19                                            )
                                              ) Date:   June 2, 2016
20                                            ) Time:   10:00 a.m.
                                              ) Place:  U.S Bankruptcy Court
21                                            )           Courtroom 19
                                              )           450 Golden Gate Avenue
22                                            )           San Francisco, CA 94102
                                              ) Judge:  The Hon. Hannah L. Blumenstiel
23                                            )
24                                            )
                                              )
25  _____  )

26

27

28

Upon the motion of United Prosperity Group, Inc. dba The Produce Company, debtor and debtor in possession in the above-referenced chapter 11 case ("Debtor"), filed as docket number 223 (the "Motion")[1] for entry of this order (the "Sale Order") approving Debtor's sale of substantially all of its assets to Urban Leaf Co. ("Purchaser") in accordance with the terms of the Asset Purchase Agreement ("APA") attached as **Exhibit "1"** to the Declaration of Soo Ming Yee annexed to the Motion (the "Yee Declaration") and also as **Exhibit "1"** to this Order, or the highest or otherwise best overbidder selected at the hearing on the Motion; no auction having been held as no overbid was made; and this Bankruptcy Court having conducted a hearing on the Motion (the "Sale Hearing") to consider approval of the transfer and sale of the Assets and the other transactions contemplated by the APA (the transactions including the acquisition thereunder, collectively, the "Transactions"); upon consideration of objections to the Motion filed by the United States Trustee and the Official Committee of Unsecured Creditors; no other objections having been filed; and upon the record of the hearing to approve the Motion, and the full record in this case; and the Bankruptcy Court having determined that the relief sought in the Motion is in the best interests of Debtor, its estate, creditors and parties-in-interest, and that the legal and factual bases set forth in the Motion all other pleadings and documents filed by Debtor in support of the Motion, and presented at the Sale Hearing, establish just cause for the relief granted herein; and all objections to the Motion having been overruled; and after due deliberation and sufficient good cause appearing therefor,

**THE BANKRUPTCY COURT HEREBY FINDS AND CONCLUDES THAT:**[2]

    A.    <u>Jurisdiction and Venue.</u> The Bankruptcy Court has jurisdiction to hear and determine the Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Asset Purchase Agreement.

[2] The findings of fact and conclusions of law set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

U.S.C. § 157(b)(2). Venue is proper in this District and in the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Statutory Predicates. The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), and 365 of title 11 of the United States Code (the "Bankruptcy Code"); (ii) Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (iii) Rules 6004-1 and 6006-1 of the Bankruptcy Local Rules for the Northern District of California (the "Local Bankruptcy Rules").

C.    Final Order.    This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

D.    Notice. Debtor has provided good and sufficient notice with respect to the following: (i) the Motion and the relief sought therein, including the entry of this Sale Order and the transfer and sale of the Assets and consummation of the Transactions, (ii) the Auction and the Sale Hearing, and (iii) the assumption and assignment of leases and contracts and cure amounts (if any); and no further notice of the Motion, the relief requested therein or the Sale Hearing is required. A reasonable opportunity to object and to be heard regarding the relief provided herein has been afforded to parties-in-interest.

E.    Highest or Otherwise Best. The APA constitutes the highest or otherwise best offer for the Assets, and, based on the record before the Court, will provide a greater recovery for Debtor's estate than would be provided by any other available alternative. Debtor's determination that the APA constitutes the highest or otherwise best offer for the Assets constitutes a reasonable, valid and sound exercise of Debtor's business judgment, and is in the best interests of Debtor, its estate and its creditors. The consideration to be paid by Purchaser for the Assets is fair and reasonable, is the highest or otherwise best offer therefor, and constitutes reasonably equivalent

value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act, and the laws of the United States, any state, territory or possession thereof, the State of California or any other applicable law.

F.    Arm's Length Transaction. The APA and other documents and instruments related to and connected with the Transactions and the consummation thereof, including the Assumption and Assignment Agreement (defined below), as each may have been amended through the date hereof (the "Transaction Documents"), were negotiated, proposed and entered into by Debtor and Purchaser without collusion, in good faith and through an arm's length bargaining process. None of Debtor, Purchaser, or their respective representatives engaged in any conduct that would cause or permit the APA, any of the other documents related to the Transactions  and the Transaction Documents to be avoided under section 363(n) of the Bankruptcy Code, or have acted in any improper or collusive manner with any person.  The terms and conditions of the APA and the other Transaction Documents, including, without limitation, the consideration provided in respect thereof, are fair and reasonable, and the Transactions, including the transfer of the Assets, is not avoidable and shall not be avoided, and no damages may be assessed against Purchaser or any other party, under section 363(n) of the Bankruptcy Code.

G.    Good Faith Purchaser. Purchaser has proceeded in good faith and without collusion in all respects in connection with the sale process, in that: (i) Purchaser, in proposing and proceeding with the Transactions in accordance with the APA, recognized that Debtor was free to deal with other interested parties; (ii) Purchaser agreed to provisions in the APA that would enable the Debtor to accept a higher and better offer; (iii) all payments to be made by Purchaser and other agreements entered into or to be entered into between Purchaser and Debtor in connection with the Transactions have been disclosed; (iv) the negotiation and execution of the APA and related agreements were conducted in good faith and constituted an arm's length transaction; (v) the disclosure requirements

required by the applicable Bankruptcy Rules and Local Bankruptcy Rules have been satisfied; and (vi) the APA was not entered into, and the Transactions being consummated pursuant to and in accordance with the APA is not being consummated, for the purpose of hindering, delaying or defrauding creditors of Debtor. Purchaser is therefore entitled to all of the benefits and protections provided to a good-faith purchaser under section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of such transaction or Purchaser's status as a "good faith" purchaser.

H. <u>Justification for Relief</u>. Good and sufficient reasons for approval of the APA and the other Transaction Documents and the Transactions including the transfer and sale of the Assets have been articulated to the Bankruptcy Court in the Motion and at the Sale Hearing, and the relief requested in the Motion and set forth in this Sale Order is in the best interests of Debtor, its estate, creditors and other parties-in-interest in this case. Debtor has demonstrated through the Motion and other evidence submitted in support of the Motion and at the Sale Hearing both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the transfer and sale of the Assets as provided in the APA outside the ordinary course of business, and before, and outside of, a plan of reorganization, and such action is an appropriate exercise of Debtor's business judgment and in the best interests of Debtor, its estate and creditors.

I. <u>Property of the Estate</u>. The Assets constitute property of Debtor's estate and title thereto is vested in Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code. Accordingly, Debtor has or will have as of the date of the closing all right, title and interest to and in the Assets that may be required to implement and effectuate the Transactions in the manner contemplated by the APA and the other Transaction Documents.

J.      <u>Free and Clear</u>. In accordance with sections 363(b) and 363(f) of the Bankruptcy Code, the consummation of the Transactions pursuant to the Transaction Documents will be a legal, valid, and effective transfer and sale of the Assets and will vest in Purchaser, through the consummation of the Transactions, all of Debtor's right, title, and interest in and to the Assets, free and clear of all liens, claims, charges, encumbrances, assessments, security and other interests, leases, licenses, and restrictions of any kind or character (the "<u>Liens</u>"), except as expressly set forth in the APA. Debtor may sell the Assets free and clear of all Liens against Debtor, its estate, or any of the property being sold to Purchaser, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Liens against Debtor, its estate or any of the property being sold to Purchaser, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. All other holders of Liens (except as otherwise provided herein and in the APA) are adequately protected by having their interests, if any, in each instance against Debtor, its estate or any of the property being sold to Purchaser attach to the net proceeds of the sale ultimately attributable to the property being sold to Purchaser, in which such creditor or claimant alleges a Lien, in the same order of priority, with the same validity, force and effect that such Lien had prior to the sale, without further order of the Court, subject to any claims and defenses Debtor and its estate may possess with respect thereto, and based upon the facts presented before the Court at the Sale Hearing and the entirety of the record of this case, Purchaser is entitled to the protections of controlling authority regarding successor liability and has taken no actions to destroy or curtail any remedies of any holder of any claim against or interest in Debtor. Debtor has demonstrated that the standards set forth in section 363(f) of the Bankruptcy Code have been satisfied.

K. <u>No Successor Liability</u>. Purchaser is not a successor (or other such similarly situated party) under any theories of successor liability, vicarious liability or otherwise, to Debtor or the Assets (provided that Purchaser shall assume the Assumed Liabilities as defined in the APA and any obligations arising under the Designated Contracts (defined below) from and after the Closing as expressly stated in the APA and the Transaction Documents) and is not deemed to be or found to have merged with or into Debtor

L. <u>Condition of the Transactions</u>. Purchaser would not have entered into the APA and would not consummate the transactions contemplated thereby if the Transactions, including the transfer and sale of the Assets as provided therein, were not free and clear of all Interests, or if Purchaser would, or in the future could, be liable for any of such Interests.

M. <u>Prompt Consummation</u>. Debtor has demonstrated good and sufficient cause to waive the stay requirement under Bankruptcy Rules 6004(h) and 6006(d). Time is of the essence in consummating the Transactions, including the transfer and sale of the Assets as provided in the APA and the other transactions contemplated by the Transaction Documents, and it is in the best interests of Debtor and its estate to consummate such transactions immediately.

N. <u>Assumption of Executory Contracts and Unexpired Leases</u>. Without in any way limiting any Lease or Contract counterparty's rights under section 365 of the Bankruptcy Code, and subject to the terms and conditions contained in the Assumption and Assignment Agreement, the (i) transfer of the Assets to Purchaser and (ii) assignment to Purchaser of the Leases and Contracts, will not subject the Purchaser to any liability whatsoever prior to the closing date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, except as otherwise set forth in the APA or the Transaction Documents. Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Leases

and Contracts to Purchaser in connection with the consummation of the Transactions, and the assumption and assignment of the Leases and Contracts is in the best interests of Debtor, its estate, and its creditors. The Leases and Contracts being assigned to Purchaser are an integral part of the Assets being purchased by Purchaser and, accordingly, such assumption and assignment of the Leases and Contracts is reasonable, enhances the value of Debtor's estate, and does not constitute unfair discrimination.

O. <u>Inclusion of Additional Contract In Schedule 1.2.1 of the APA</u>. Debtor is authorized to assume and assign to Purchaser: (1) Equipment Lease Agreement No. 079L232, (together with Schedule A-1 and all other schedules, amendments and supplements thereto, including XTRA Lease's Standard Terms and Conditions, the "<u>XTRA Lease Agreement</u>"), pursuant to which XTRA Lease LLC ("<u>XTRA</u>") leases Unit No. Q62235 (collectively, the "XTRA <u>Lease Equipment</u>") to Debtor; and (2) Equipment Rental Agreement Nos. 079077171, 079077375, and 079077545 (together with all schedules, amendments and supplements thereto, including XTRA Lease's Standard Terms and Conditions, collectively, the "<u>XTRA Rental Agreements</u>" and, together with the XTRA Lease Agreement, the "<u>XTRA Agreements</u>"), pursuant to which XTRA rents Unit Nos. F60076, U66089, and U67786 (collectively, the "<u>XTRA Rental Equipment</u>" and, together with the XTRA Lease Equipment, the "<u>XTRA Equipment</u>") to Debtor, in accordance with the upon the terms of this Sale Order and the Assumption and Assignment Agreement attached hereto as **Exhibit "2"**[3] (the "<u>Assumption and Assignment Agreement</u>"). Schedule 1.2.1 of the APA is amended to include the XTRA Agreements as Designated Contracts. Nothing in this Sale Order shall modify any of Purchaser's duties and obligations under the Assumption and Assignment Agreement.

---

[3] Attached hereto is a copy of the Assumption and Assignment Agreement with XTRA without exhibits thereto. A complete copy of the Assumption and Assignment Agreement with all relevant exhibits has been filed concurrently herewith and incorporated herein by this reference.

P. <u>Cure/Adequate Assurance</u>. Either Debtor or Purchaser has (i) cured, or has provided adequate assurance of cure upon the closing, of any default existing prior to the date of the closing under any of the Leases, Contracts, or XTRA Agreements (collectively, the "<u>Designated Contracts</u>"), within the meaning of 11 U.S.C. § 365(b)(1)(A), by payment of the amounts set forth in Schedule 1.2.1 of the Motion, and in the case of XTRA, the sum of $8,929.66 in accordance with the Assumption and Assignment Agreement, and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date of the closing under any of the Designated Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). Pursuant to 11 U.S.C. § 365(f), the Designated Contracts to be assumed and assigned under the APA and this Sale Order shall be assigned and transferred to, and remain in full force and effect for the benefit of, Purchaser notwithstanding any provision in such contracts or other restrictions prohibiting their assignment or transfer.

Q. <u>Legal and Factual Bases</u>. The legal and factual bases set forth in the Motion, in the documents and pleadings filed in support of the Motion, and at the Sale Hearing, establish just cause for the relief granted herein.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The relief requested in the Motion is GRANTED and APPROVED in all respects to the extent provided herein.

2. All objections with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein, and all reservation of rights included in such objections, are overruled on the merits with prejudice.

3. Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Transactions, including the transfer and sale of the Assets on the terms set forth in the APA, is

approved in all respects, and Debtor is authorized and directed to consummate the Transactions in accordance with the APA, including, without limitation, by executing all documents (including, without limitation, the Transaction Documents) and taking all actions necessary and appropriate to effectuate and consummate the Transactions (including the transfer and sale of the Transferred Assets) in consideration of the Purchase Price upon the terms set forth in the APA, including, without limitation, assuming and assigning to Purchaser the Designated Contracts.

4.    As of the closing of the Transactions in accordance with the APA(the "Closing"), (i) the Transactions set forth in the APA shall effect a legal, valid, enforceable and effective transfer and sale of the Assets to Purchaser free and clear of all Liens, as further set forth in the APA and this Sale Order; and (ii) the APA, and the other Transaction Documents, and the Transactions related thereto and the consummation of such Transactions shall be enforceable against and binding upon, and not subject to rejection or avoidance by, Debtor, any successor thereto, including a trustee or estate representative appointed in this case, and all other persons and entities.

5.    Subject to the fulfillment of the terms and conditions of the APA, this Sale Order shall, as of the Closing, be considered and constitute for all purposes a full and complete general assignment, conveyance, and transfer of the Assets and/or a bill of sale transferring all of Debtor's rights, title and interest in and to the Assets.  Consistent with, but not in limitation of the foregoing, each and every federal, state, and local governmental agency or department is hereby authorized and directed to accept all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA and approved in this Sale Order.

6.    Any person or entity that is currently, or on the Closing date may be, in possession of some or all of the Assets is hereby directed to surrender possession of such Assets either to (a) Debtor before the Closing or (b) to Purchaser or its designee upon the Closing.

7. The transfer of the Assets pursuant to the Transaction Documents is a legal, valid, and effective transfer and shall, in accordance with sections 105(a) and 363(f) of the Bankruptcy Code, and upon consummation of the Transactions, including, without limitation, payment of the Purchase Price to Debtor, vest Purchaser with all right, title, and interest in the Assets, free and clear of all Liens.

8. Following the Closing, no holder of any claims against Debtor or the Assets shall interfere with Purchaser's respective rights in, title to or use and enjoyment of the Assets. All Liens against the Assets which are not assumed by Purchaser under the terms of the APA shall attach to the Cash Portion of the Purchase Price in the order of priority, and with the same validity, force and effect, which such Liens had against such Assets as of the filing of this case, subject to (i) any rights, claims and defenses Debtor, its estate or any trustee appointed in this case, as applicable, may possess with respect thereto and (ii) any limitations on the use of such proceeds pursuant to any provision of the APA or this Sale Order.

9. Purchaser is not acquiring or assuming any of the Liens or any other claims against or other interests in Debtor, except as specifically set forth in the APA, which include the following secured claims:

a. Claim of Umpqua Bank, secured by a perfected first priority lien in and to the Purchased Assets (with the exception of any existing purchase-money liens on existing equipment), in accordance with the terms set forth in **Exhibit "3"** hereto;

b. Claims of Wise Worth Consultants, Ldt., secured by a perfected second priority lien in and to the Purchased Assets (with the exception of any existing purchase-money liens on existing equipment).

10.    Purchaser has given substantial consideration under the APA, which consideration shall constitute valid and valuable consideration for protections afforded by Section 363(f) of the Bankruptcy Code.

11.    Except for the holders of any Assumed Liabilities (and then only as and to the extent expressly permitted by the APA), all persons and/or entities asserting claims against Debtor are hereby forever estopped, permanently enjoined, and precluded from taking any action, in any manner and in any place whatsoever, that does not conform to or comply with the provisions of this Sale Order.  After the Closing, holders of Assumed Liabilities shall hold no further claims or right to payment against the Debtor or its bankruptcy estate.  All persons or entities holding claims against or interests in Debtor who seek to assert claims against Purchaser related in any way to their claims against or interests in Debtor must first seek leave of this Court and relief from this Sale Order to prosecute such claims against Purchaser.

12.    This Sale Order (i) shall be effective as a determination that, on the Closing, all Liens of any kind or nature whatsoever existing as to the Assets before the Closing, have been unconditionally released, discharged and terminated, and that the transfers and conveyances described herein have been effected, except as otherwise set forth in the APA and (ii) shall be binding upon and shall govern the acts of all persons and entities.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Liens in the Assets whose Liens are not Assumed Liabilities shall not have delivered to Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens which the person or entity has with respect to the Assets, then Purchaser and/or Debtor are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Assets.

12

13.     Upon the Closing, Debtor is authorized and directed to assume, assign and/or transfer to Purchaser each of the Designated Contracts, and Debtor is authorized to execute and deliver to Purchaser such documents or other instruments as may be reasonably necessary to assign and transfer the contracts to Purchaser.

14.     The cure amounts set forth in the Motion, APA, the Assumption and Assignment Agreement, this Sale Order, or as otherwise agreed in the record with any non-debtor party to such Designated Contracts are deemed the necessary and sufficient amounts to "cure" all "defaults" with respect to the Designated Contracts under section 365(b) of the Bankruptcy Code.  The payment of the applicable cure amounts (if any) to any third-party counterparty (a "Counterparty") to each of the Designated Contracts shall (i) effect a cure of all defaults existing thereunder, and (ii) compensate such Counterparty for any actual pecuniary loss resulting from any such default. Purchaser shall then have assumed the Designated Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by Debtor of such Designated Contracts shall not be a default thereunder.  After the payment of the relevant cure amounts, neither Debtor nor Purchaser shall have any further liabilities to the Counterparties other than Purchaser's obligations under the Designated Contracts that accrue and become due and payable on or after the Closing date.  Any party having the right to consent to the assumption or assignment of the Designated Contracts that has failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment, as required by section 365(c) of the Bankruptcy Code.

15.     Each non-Debtor party to a Designated Contract hereby is forever barred, estopped, and permanently enjoined from raising or asserting against Debtor or Purchaser, or the property of any of them, any assignment fee, default, breach, or claim of pecuniary loss, or condition to assignment, arising under or related to the Designated Contracts, existing as of the date of the Sale Hearing, or arising by reason of the consummation of the transactions contemplated by the APA,

including, without limitation, the Transactions and the assumption and assignment of the Designated Contracts. Any party that may have had the right to consent to the assignment of a Designated Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Designated Contract.

16. There shall be no rent accelerations, assignment fees, increases, or any other charges charged to Purchaser or Debtor as a result of Debtor's assumption and assignment to Purchaser of the Designated Contracts, and the validity of such assumption and assignment shall not be affected by any dispute between Debtor or its affiliates and any Counterparty, and including any order (i) confirming any plan of reorganization; (ii) converting this case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in this case; or (iv) dismissing this case. The terms and provisions of this Sale Order, as well as the rights granted under the Transaction Documents, shall continue in full force and effect and are binding upon any successor, reorganized Debtor, or chapter 7 or chapter 11 trustee applicable to Debtor, notwithstanding any such conversion, dismissal or order entry. Nothing contained in any chapter 11 plan confirmed in this case or in any order confirming such a plan, nor any order dismissing this case or converting this case to a case under chapter 7 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the APA, any documents or instruments executed in connection therewith, or the terms of this Sale Order.

17. This Sale Order shall be binding upon and shall govern the acts of all Persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to

report or insure any title or state of title in or to any of the Assets. The terms and provisions of the APA and all other Transaction Documents, the Transactions (including the transfer and the sale of the Assets), and this Sale Order shall be binding in all respects upon Debtor, its estate, and all creditors of (whether known or unknown), and holders of equity interests in, Debtor, Purchaser and their respective affiliates, successors and assigns, and all third parties, notwithstanding the subsequent appointment of any trustee in this case under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions shall likewise be binding. Such persons shall be and are forever barred from asserting, prosecuting or otherwise pursuing such person's or entity's claims or interests against Purchaser or its property with respect to the assets and shall not interfere with Purchaser's title to or use and enjoyment of the assets transferred pursuant to the transaction contemplated by the APA, based on or related to such claims or interests.

18.     The provisions of this Sale Order and any actions taken pursuant hereto shall survive any conversion or dismissal of this case and the entry of any other order that may be entered in this case, including any order (i) confirming any plan of reorganization; (ii) converting this case from chapter 11 to chapter 7; (iii) appointing a trustee or examiner in this case; or (iv) dismissing this case.

19.     The Transactions contemplated by the APA and other Transaction Documents are undertaken by Purchaser without collusion and in "good faith," as that term is defined in section 363(m) of the Bankruptcy Code. Purchaser is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. Accordingly, the reversal or modification on appeal of the authorization provided herein by this Sale Order to consummate the Transactions shall not affect the validity of the sale of the Assets to Purchaser.

20.     The consideration provided by Purchaser for the Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, including the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance, or any law of similar import and any such jurisdiction.

21.     The failure to specifically include any particular provision of the APA or the other Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Bankruptcy Court that the Transactions, the APA and the other Transaction Documents be authorized and approved in their entirety. Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.

22.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014, if applicable, or any other Local Bankruptcy Rule or otherwise, this Sale Order shall not be stayed for 14-days after the entry hereof, but shall be effective and enforceable immediately upon entry pursuant to Bankruptcy Rule 6004(h).  Time is of the essence in approving the Transactions (including the transfer and the sale of the Assets).

23.     The automatic stay pursuant to section 362 is hereby lifted with respect to Debtor to the extent necessary, without further order of the Bankruptcy Court, to (i) allow Purchaser to deliver any notice provided for in the APA and Transaction Documents and (ii) allow Purchaser to take any and all actions permitted under the APA and Transaction Documents in accordance with the terms and conditions thereof.

24.     Nothing in this Sale Order shall modify or waive any closing conditions or termination rights in the APA, and all such conditions and rights shall remain in full force and effect in accordance with their terms.

25.     Unless otherwise provided in this Sale Order, to the extent any inconsistency exists between the provisions of the APA and this Sale Order, the provisions contained in this Sale Order shall govern.

26.     The Bankruptcy Court shall retain exclusive jurisdiction to interpret, construe, and enforce the provisions of the APA, ancillary agreements, other related agreements, and this Sale Order in all respects, including, without limitation, to (i) hear and determine all disputes between Debtor and/or Purchaser, as the case may be, and any other non-Debtor party to, among other things, the Designated Contracts concerning, among other things, assignment thereof by Debtor to Purchaser and any dispute between Purchaser and Debtor as to their respective obligations with respect to any asset, liability, or claim arising hereunder; (ii) compel delivery of the Assets to Purchaser free and clear of Liens, except as set forth in the APA; (iii) compel the delivery of the Purchase Price or performance of other obligations owed to Debtor; (iv) interpret, implement, and enforce the provisions of this Sale Order; and (v) hear and determine, with respect to, Purchaser (A) any claims made related to any of the Excluded Liabilities, (B) any claims of any kind or nature whatsoever, including, without limitation, claims of successor or vicarious liability (or similar claims or theories) related to Debtor, the Assets or the Designated Contracts, or (C) any collateral attack on this Sale Order of any kind or nature whatsoever. Purchaser shall have standing to request that this Court enforce this Sale Order.

27.     Although the Debtor has represented that all of its executory contracts and unexpired leases have been assumed and assigned to Purchaser and, therefore, deemed to be Designated Contracts, in the event that certain executory contracts and unexpired leases remain unassumed, all such executory contracts and unexpired leases are deemed rejected as of the Closing Date.

28.     Purchaser agrees that Purchaser is not acquiring as part of the Assets or otherwise any of Debtor's or its estate's claims and causes of action against insiders of the Debtor, including

avoidance actions (i.e., actions arising under, among others, sections 544, 545, 547, 548 and 550 of the Bankruptcy Code) (collectively, the "Insider Claims"), and all such Insider Claims and any rights and recoveries obtained therefrom shall remain assets of Debtor and its bankruptcy estate following the Closing.

29.     Debtor is authorized to (a) execute and deliver, and perform under, consummate and implement the APA, (b) execute and deliver, and perform under, all ancillary documents to the APA, and (c) take all further actions as may be reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser the assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA and this Sale Order;

**\* \* \* END OF ORDER \* \* \***

APPROVED AS TO FORM ONLY:

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

_____
Merle C. Meyers
Meyers Law Group, P.C.

Attorneys for Official Committee of Unsecured Creditors

UMPQUA BANK

 /s/ *Spencer Scheer* (authorized 6/6/16)_____
Spencer Scheer
Scheer Law Group, LLP
Attorneys for Umpqua Bank

avoidance actions (i.e., actions arising under, among others, sections 544, 545, 547, 548 and 550 of the Bankruptcy Code) (collectively, the "Insider Claims"), and all such Insider Claims and any rights and recoveries obtained therefrom shall remain assets of Debtor and its bankruptcy estate following the Closing.

29.     Debtor is authorized to (a) execute and deliver, and perform under, consummate and implement the APA, (b) execute and deliver, and perform under, all ancillary documents to the APA, and (c) take all further actions as may be reasonably requested by Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to Purchaser the assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA and this Sale Order;

**\* \* \* END OF ORDER \* \* \***

APPROVED AS TO FORM ONLY:

OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Merle C. Meyers
Meyers Law Group, P.C.

Attorneys for Official Committee of Unsecured Creditors

UMPQUA BANK

Spencer Scheer
Scheer Law Group, LLP
Attorneys for Umpqua Bank

18

1  WISE WORTH CONSULTANTS, LTD.

2   /s/ *Gary M. Gitlin*  (authorized 6/6/16)

3  Gary M. Gitlin
   Gary M. Gitlin, APLC

4  Attorneys for Wise Worth Consultants, Ltd.

5  TRACY HOPE DAVIS
   United States Trustee for Region 17

6

7   /s/ *Julie M. Glosson* (authorized 6/6/16)
   Julie M. Glosson

8  Trial Attorney

9  XTRA LEASE, LLC

10   /s/ *David Unseth* (authorized 6/6/16)

11  David Unseth
   Sharon Weiss

12  Bryan Cave
   Attorneys for XTRA Lease, LLC

13

14  JUANA CHAVEZ, LUIS CABRERA AKA LUIS REA,
   MARTIN CALAMATEO CRUZ, JOSE HERNANDEZ,

15  AS INDIVIDUALS AND ON BEHALF OF THE CERTIFIED CLASS

16   /s/ *Iain A. Macdonald*  (authorized 6/6/16)
   Iain A. Macdonald

17  Macdonald | Fernandez LLP
   Attorneys for Juana Chavez et al.

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (the "**Agreement**") is made and entered into as of April 21, 2016 (the "**Effective Date**") by and between United Prosperity Group, Inc., a California corporation, the debtor and debtor in possession (the "**Debtor**," "**Seller**" or the "**Company**") under chapter 11 of title 11 of the United States Code, as may be amended from time to time (the "**Bankruptcy Code**"), on the one hand, and Urban Leaf Co., a California corporation (the "**Buyer**"), on the other hand, with reference to the following facts:

A. On July 13, 2015 (the "**Petition Date**"), Seller filed in the United States Bankruptcy Court, Northern District of California, Los Angeles Division (the "**Bankruptcy Court**") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which was assigned Case No. 15-30897 (the "**Bankruptcy Case**"), and which Bankruptcy Case is presently pending;

B. Seller's business includes, without limitation, the processing of fresh cut produce (fruits & vegetables) to manufacturers (to use as ingredients for other products) and distributors (for further distribution to entities such as restaurants, hotels, hospitals and airline carriers) (collectively, the "**Business**").

C. Buyer is an entity formed by Soo Ming Yee and Wayman Wong, who are insiders of the Seller as that term is defined in the Bankruptcy Code.

D. Substantially all assets of the Seller are pledged as collateral to Umpqua Bank and Wise Worth Consultants LTD (collectively, the "Secured Creditors").

E. Substantially all assets of the Seller are subject to the claims and rights of produce suppliers under the Perishable Agricultural Commodities Act ("PACA Creditors").

F. In addition to the foregoing, the Seller is a party to numerous unexpired leases and executory contracts related to real and personal property utilized in the Business (the "Leases and Contracts").

G. Seller desires to sell to Buyer (pursuant to, among other things, Section 363 of the Bankruptcy Code), and Buyer desires to purchase from Seller, substantially all of its assets which comprise the Business, on the terms and subject to the conditions set forth in this Agreement.

**NOW, THEREFORE**, in consideration of the foregoing facts, the promises and of the covenants made herein and of the mutual benefits to be derived herefrom, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## 1. PURCHASE AND SALE OF ASSETS

1.1 **Purchase and Sale of Assets**. At the Closing, as defined in Section 1.7, and subject to all of the terms and conditions of this Agreement, Seller shall sell, assign, convey, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all of the Assets (as that terms is further defined in Section 1.2), free and clear of any and all liens, claims,

charges, encumbrances, assessments, security and other interests, leases, licenses, and restrictions of any kind or character (the "**Liens**") except as expressly set forth hereinbelow.

This Agreement is contingent upon entry of an order of the Bankruptcy Court issued pursuant to Section 363(f) and (m) of the Bankruptcy Code, et seq., in a form acceptable to Buyer, stating that any and all assets are being transferred to Buyer free and clear of any and all liens, claims, interests, or encumbrances except as otherwise set forth herein.

1.2    **Description of Assets**.

1.2.1   **Assets**. Except as **SPECIFICALLY** set forth herein, the Assets to be sold to Buyer under this Agreement consist of all of the Seller's interests in and to substantially all of the assets of Seller which comprise the Business (the "**Assets**") as of the Closing Date, including, without limitation, all of Seller's interests in and to those tangible and intangible assets as set forth in Debtor's Schedule B filed with the Bankruptcy Court. Without limiting the generality of the foregoing, Assets shall include, by way of illustration and not of limitation, the following:

(a)    All cash in the Seller's debtor in possession accounts as of the Closing.

(b)    All machinery, equipment, raw materials, office furniture, fixtures and equipment, computer hardware, computer-related equipment, and software and product inventory, including, without limitation, work in process inventory;

(c)    All accounts receivable as of the Closing Date;

(d)    All customer deposits;

(e)    All permits, licenses, authorizations and approvals relating to the Business, to the extent such right, title and interest can be legally sold;

(f)    Designs (including, without limitation, designs and intellectual property rights with respect to production used in the Business), all of Seller's rights with respect to the mark "Produce Company", any and all of Seller's other intellectual property rights (the "**Intangibles**");

(g)    All of Seller's rights in the Leases and Contracts listed in **Schedule 1.2.1** hereto, including and not limited to the fixtures and equipment associated therewith;

(h)    All domain names, emails and telephone numbers for the Business, including, without limitation, any telephone numbers utilized for any facsimile machines or computers; and

(i)    All books and records relating to any of the foregoing Assets; provided, however, that Seller may, upon reasonable request, have reasonable access and be permitted to make copies of any such books and records.

2

1.2.2 **Excluded Property**. The Assets shall not include all recoveries and rights of recovery of the Debtor's bankruptcy estate under applicable federal, state or local law, including, without limitation, Section 5 of the Bankruptcy Code, other than recoveries related to accounts receivable and business operations.

1.3 **Liabilities**.

1.3.1 For purposes hereof, "**Assumed Liabilities**" shall mean the following liabilities of Seller listed below, with additional creditor detail in **Schedule 1.3.1** hereto, which Buyer agrees, upon the consummation of, and effective as of, the Closing to assume:

(a) any obligation or liability of Seller which obligation or liability arose from and after the Petition Date, including, without limitation, all post-petition operating expenses of Seller (including, without limitation, all Taxes (as defined below) due in connection therewith), excluding any liability to professionals employed by Seller's bankruptcy estate as set forth in Section 1.3.2 below;

(b) any obligation or liability of Seller to the PACA Creditors, whether such obligation or liability arose before or after the Petition Date; and

(c) any obligation or liability of Seller to the Secured Creditors.

1.3.2 Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement, Buyer shall not assume or otherwise be responsible for any liabilities or losses of Seller or its Affiliates of whatever nature, whether presently in existence or arising hereafter, which are not Assumed Liabilities (collectively, the "Excluded Liabilities"). Seller shall be responsible for the Excluded Liabilities. Without limiting the foregoing, Excluded Liabilities shall include the following Liabilities:

(a) all Liabilities of Seller to the extent arising out of the operation or conduct by Seller of any business other than the Business or relating to the operation or conduct of the Business prior to the Closing;

(b) all Liabilities arising from a breach, failure to perform, warranty, default or other violation by Seller prior to the Closing, other than cure costs for the Leases and Contracts which Buyer shall be obligated to pay;

(c) any Liabilities of Seller arising out of any Excluded Asset, including any liabilities related to any claim of breach of contract or any successor liability, tortious interference, fraudulent conveyance or other claim related thereto, whether brought against Seller or any affiliate of Seller or against any other person or entity, including Buyer or any of its affiliates;

(d) accounts payable of Seller or otherwise arising from the conduct of the Business prior to the Petition Date;

3

(e)     any fees or expenses incurred by or on behalf of Seller in connection with this Agreement, any of the related agreements, or the sale transactions contemplated by Seller;

1.4     **Allocation**. The parties agree that, prior to the Closing Date, or such other date as agreed to by the parties hereto, they or their representatives shall in good faith allocate the Purchase Price (as defined below) among the Assets in conformity with Section 1060(b) of the Internal Revenue Code of 1986, as may be amended from time to time (the "**Tax Code**") and the regulations promulgated thereunder. Seller agrees to cooperate in good faith in filing all information required by Section 1060(b) of the Tax Code and the regulations thereunder, and to take no position on any income tax return, report or filing inconsistent with, such allocation.

1.5     **Taxes**. All transfer, documentary, sales, use, registration, value-added and other similar taxes and related fees (including, without limitation, any penalties, interest and additions to taxes) (collectively, the "**Taxes**") imposed by any governmental body or authority in any jurisdiction in connection with the transaction contemplated herein or in connection with this Agreement, to the extent not exempt under Section 1146(c) of the Bankruptcy Code or as otherwise provided in the Approval Order (as defined below) with respect to expressly relieving Buyer from any such liability, arising from and after the Petition Date and related to the shall be assumed by and paid by Buyer. Seller and Buyer shall cooperate in timely making all filings, returns, reports and forms as may be required to comply with the provisions of all laws relating to such Taxes.

1.6     **Purchase Price; Consideration**. The purchase price for the Assets (the "**Purchase Price**") shall consist of a cash component and an assumption of debt component. As discussed above, upon Closing, Buyer shall assume all the Assumed Liabilities set forth in Section 1.3 above. In addition to the foregoing, upon Closing, Buyer shall pay to seller, in cash or cash equivalent, the sum of TWO HUNDRED THOUSAND DOLLARS ($200,000) (the "**Cash Portion**"). At the Closing, the Cash Portion of the Purchase Price shall be paid by Buyer in immediately available funds by wire transfer to the attorney client trust account of Levene, Neale, Bender, Yoo & Brill L.L.P., bankruptcy counsel to the Seller pursuant to such wire instructions as may be provided by Seller to Buyer from time to time;

1.7     **Closing and Closing Date**. The consummation of the transaction contemplated in this Agreement (the "**Closing**") shall take place at the law offices of Levene, Neale, Bender, Yoo & Brill, 10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067, or at such location as designated by Seller to Buyer in writing, which Closing shall occur within three (3) business days following the Bankruptcy Court's entry of the Approval Order (the "**Closing Date**"), unless an order is entered staying the enforceability of the Approval Order.

1.8     **Transactions and Documents at Closing**. At the Closing:

1.8.1   **Seller Deliveries**.

(a)     Seller shall convey to Buyer all of Seller's right, title and interest in and to the Assets and, in furtherance thereof, Seller shall deliver to Buyer (i) a duly executed copy of the Agreement, (ii) a duly executed General Assignment and Bill of Sale in

4

customary form for transactions of this type (the "**Bill of Sale**"), (iii) a duly executed Assumption and Assignment Agreement (the "**Assumption and Assignment Agreement**"), and (iv) such other consents, certificates of title, documents and other instruments of transfer and conveyance as Buyer and its legal counsel may reasonably request.

(b)     In addition, Seller shall deliver to Buyer, in form and substance reasonably satisfactory to Buyer, the Approval Order entered by the Bankruptcy Court. For purposes hereof, the "**Approval Order**" is a final order entered by the Bankruptcy Court, in form and substance acceptable to Buyer, and pursuant primarily to Sections 363 and 365 of the Bankruptcy Code, approving the sale of the Assets to Buyer and the assumption by Buyer of the Assumed Liabilities, as set forth in this Agreement, as such schedules may be revised, supplemented or modified prior to the hearing to approve the Approval Order. The Approval Order shall, by way of illustration and not of limitation, (i) approve the sale of the Assets to Buyer on the terms and conditions set forth in this Agreement and authorize Seller to proceed with the transaction contemplated in this Agreement, (ii) include a specific finding that Buyer is a good faith buyer of the Assets under Section 363(m) of the Bankruptcy Code, and (iii) state that the sale of the Assets to Buyer shall be free and clear of all Liens under Section 363(f) of the Bankruptcy Code except the Assumed Liabilities.

1.8.2   **Buyer Deliveries.**  Buyer shall deliver to Seller (i) a duly executed copy of this Agreement, (ii) a duly executed Bill of Sale, (iii) a duly executed copy of the Assumption and Assignment Agreement, (iv) the Cash Portion of the Purchase Price pursuant to Section 1.6 above, and (v) such other consents, certificates of title, documents and other instruments of transfer and conveyance as Seller and its legal counsel may reasonably request.

1.9     **Asset Transfer; Passage of Title; Delivery.**

1.9.1   **Title Passage.**  Upon the Closing, title to all of the Assets shall pass to Buyer, and Seller shall make available to Buyer possession of all of the Assets.

1.9.2   **Delivery of Assets.**  On the Closing Date, Seller shall make available to Buyer possession of the Assets at Buyer's sole cost and expense (including, without limitation, the costs of retrieving, removing and transferring the Assets as applicable).

1.10    **Costs and Expenses.**  Except as set forth herein, each party shall be responsible for its own attorneys' fees and costs.

2.      **ADDITIONAL AGREEMENTS.**

2.1     **Buyer's Access To and Knowledge of Seller.**     Buyer expressly acknowledges and agrees that, by reason of the knowledge of the principals of Buyer due to their positions with the Seller, prior to the Closing, Buyer has had full and intimate knowledge of, and full access to, the Business, the ownership and operations of Seller and the Assets conveyed hereunder.

2.2     **Cooperation; Bankruptcy Court Approvals.**

5

2.2.1 **Cooperation**. The parties shall use good faith efforts to assist the other party and cooperate with its respective legal counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement (including, without limitation, the obtaining of the approval of the Bankruptcy Court for the transactions contemplated herein), and all parties shall use their good faith efforts to consummate the transactions contemplated herein and to fulfill their obligations hereunder. Each of Buyer and Seller agree to use its best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper, or advisable to satisfy the conditions to the other party's obligation to consummate and make effective the transactions contemplated by this Agreement; provided, however, that nothing contained herein shall represent a covenant or guaranty of approval, completion or success with respect to any or all such procedures.

2.2.2 **Case Administration**. By way of illustration and not of limitation, Buyer, including, without limitation, Soo Ming Yee, will provide such reasonable assistance, including, without limitation, reviewing, executing and delivering such documentation as reasonable and appropriate, in connection with Seller's administration of the Bankruptcy Case with respect to any claims objections, prosecution of avoidance actions, and preparation of the plan of reorganization, disclosure statement and other filing requirements of Seller.

2.2.3 **Corrections**. By way of illustration and not of limitation, from and after the date hereof until the earlier of (i) the Closing or (ii) the termination of this Agreement, the parties hereto expressly acknowledge and agree that Buyer and Seller's Counsel shall have the opportunity to review and correct language in this Agreement or in the agreements, instruments, documents and certificates to be entered into and/or delivered pursuant to this Agreement for purposes of removing duplication of language, conflicting language, and errors and omissions; provided, however, that such corrections shall not affect the economics or execution of any Seller or Buyer obligations pursuant to this Agreement.

2.3 **Brokers**. Each party hereto represents and warrants to the other party that no broker or finder has acted on its behalf in connection with this Agreement or the transaction contemplated herein or, alternatively, that if such broker or finder has been retained by Seller or Buyer, it shall be the sole responsibility of Seller or Buyer, as applicable, to compensate the broker or finder.

2.4 **Seller Employees**. Buyer is hereby authorized to contact any employee of Seller after the Effective Date hereof to discuss such employee's potential employment with Buyer following the Closing; provided, however, that the parties acknowledge and agree that Buyer shall have no obligation to offer employment to any officer or employee of Seller following the Closing.

## 3. REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Buyer to enter into this Agreement and to purchase the Assets, Seller represents and warrants to Buyer (which representations and warranties shall expire on the Closing Date) that:

6

3.1 **Authorization, Binding Obligation**. This Agreement has been duly and validly executed and delivered by Seller. Subject to the Approval Order, each of this Agreement and the Transaction Documents (as defined below) constitutes the valid and legally binding obligations of Seller, and is enforceable against Seller in accordance with its terms. For purposes hereof, "**Transaction Documents**" means this Agreement, the Bill of Sale, the Assumption Agreement, and all other agreements, instruments, documents and certificates to be executed and/or delivered pursuant to this Agreement or in connection with the transaction contemplated hereby as to which Seller is a party.

3.2 **Corporate Organization**. Seller is a corporation duly organized and validly existing under the laws of the State of California. Seller has all requisite power and authority to own the Assets and to take the actions provided for herein, subject to the Approval Order.

3.3 **Completeness of Transfer**. Seller is transferring hereunder any and all of its rights in and to the Assets, free and clear of any Lien, subject to the Approval Order.

3.4 **No Other Representations**.

**3.4.1 IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSETS, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.**

**3.4.2 BUYER ACKNOWLEDGES AND AGREES THAT UPON CLOSING SELLER SHALL SELL AND CONVEY TO BUYER AND BUYER SHALL ACCEPT THE ASSETS "AS IS, WHERE IS, WITH ALL FAULTS." BUYER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN. BUYER ALSO ACKNOWLEDGES THAT THE PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."**

**3.4.3 BUYER ACKNOWLEDGES TO SELLER THAT BUYER WILL HAVE THE OPPORTUNITY TO CONDUCT PRIOR TO CLOSING SUCH INSPECTIONS AND INVESTIGATIONS OF THE ASSETS AS BUYER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ASSETS AND ITS ACQUISITION THEREOF. BUYER FURTHER WARRANTS AND REPRESENTS TO SELLER THAT BUYER WILL RELY SOLELY ON ITS OWN REVIEW AND OTHER INSPECTIONS AND INVESTIGATIONS IN THIS TRANSACTION AND NOT UPON THE INFORMATION PROVIDED BY OR ON BEHALF OF SELLER, OR ITS**

7

AGENTS, EMPLOYEES OR REPRESENTATIVES WITH RESPECT THERETO. BUYER HEREBY ASSUMES THE RISK THAT ADVERSE MATTERS INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS, ADVERSE PHYSICAL OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN REVEALED BY BUYER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS.

4. **REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer represents and warrants to Seller (which representations and warranties shall survive the Closing) that:

4.1 **Authorization, Binding Obligation**. This Agreement has been duly and validly executed and delivered by Buyer. Subject to the Approval Order, no other action is necessary to make this Agreement a valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms. This Agreement has been duly and validly executed and delivered by Seller. Subject to the Approval Order, this Agreement constitutes the valid and legally binding obligations of Buyer, and is enforceable against Buyer in accordance with its terms.

4.2 **Corporate Organization**. Buyer has the corporate power and authority to take the actions provided for herein, subject to the Approval Order.

4.3 **Buyer's Independent Investigation**. Buyer has made an investigation of the Business and the Assets prior to entering into this Agreement and is entering into this transaction, and shall close this transaction, solely in reliance upon Buyer's independent investigations and knowledge of such matters, and the limited representations and warranties of Seller expressly set forth herein, in the transaction documents and the filings with the Bankruptcy Court in the Bankruptcy Case. Notwithstanding anything to the contrary herein, Buyer agrees and acknowledges that Seller makes no representation or warranty as to the future performance of the Assets or the Business. Buyer further acknowledges that Buyer (and/or Buyer's employees, offices, and affiliates) have substantial experience and expertise in operating the Business.

4.4 **No Violation**. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated hereby will not, to the best of Buyer's knowledge: (a) violate any court order, injunction, stay, or similar matter to which Buyer is subject or by which Buyer is bound or (b) violate any statute or law or any judgment, decree, order, regulation, rule, or ordinance of any federal, state, or local government, agency, board, or court which has jurisdiction over Buyer.

4.5 **Ability to Fund**. Buyer has the financial ability to fund the acquisition of the Assets in connection with this Agreement. Buyer acknowledges that the foregoing warranties and representations are being relied upon by the Seller in reaching its decision to enter into this Agreement to sell the Assets to Buyer.

Case: 15-30897   Doc# 246   Filed: 06/06/16   Entered: 06/07/16 08:59:36   Page 29 of 89

## 5. COVENANTS

**5.1 Further Assurances.** Each party hereto shall execute and deliver such instruments and take such other actions as the other party or parties, as the case may be, may reasonably require in order to carry out the intent of this Agreement. After the Closing, Buyer and Seller shall from time to time, at the request of the other party, execute and deliver such other instruments of conveyance and transfer and take such other actions as may be necessary to consummate the transactions contemplated by this Agreement and assist Debtor in the administration of its estate in connection with the Bankruptcy Case.

**5.2 Preservation of Assets.** Seller shall use good faith commercially reasonable efforts to preserve the Assets in the ordinary and usual course of business, consistent with prior practices.

**5.3 Employment.** Buyer shall have the right to interview and to offer employment to any employee of Seller, such right being conditioned upon Buyer being the Buyer of the Assets; provided that Buyer shall have no obligation to offer employment to any employee of Seller prior to the Closing. If Buyer elects to offer employment to any employee of Seller, it shall be upon such terms and conditions as Buyer, in its sole discretion, shall reasonably determine; and nothing implied by this Agreement shall confer upon employees of Seller, or any legal representative thereof, any rights or remedies, including any right to employment, or for any specified period, of any nature or kind whatsoever, pursuant to this Agreement, with respect to their employment prior to the Petition Date.

## 6. CONDITIONS TO OBLIGATIONS OF BUYER

All obligations of Buyer under this Agreement are subject to the fulfillment and satisfaction of each and every of the following conditions on or prior to the Closing, any or all of which may be waived in whole or in part by Buyer:

**6.1 Representations and Warranties.** The representations and warranties of Seller contained in this Agreement and in any certificate, instrument, agreement, or other writing delivered by or on behalf of Seller pursuant to this Agreement shall, to Seller's knowledge, be true, correct, and complete as of the Effective Date hereof.

**6.2 Compliance with Covenants.** Seller shall have reasonably performed and complied with all material covenants and agreements required by this Agreement to be performed by Seller prior to or on the Closing Date.

**6.3 Ownership of Assets.** Subject to applicable provisions of the Bankruptcy Code, Seller shall continue to own and have all rights, powers, and authority necessary to transfer all of its rights, title, and interest in and to, the Assets, free and clear of the Liens other than the Assumed Liabilities.

## 7. CONDITIONS TO OBLIGATIONS OF SELLER

9

All of the obligations of Seller under this Agreement are subject to the fulfillment and satisfaction of each and every of the following conditions on or prior to the Closing, any or all of which may be waived in whole or in part by Seller.

7.1 **Representations, Warranties and Covenants**. The representations, warranties and covenants of Buyer contained in this Agreement shall be true, correct, and complete as of the date when made and, except where such representations and warranties are made with specific reference to a particular date, and then as to such particular date, shall (i) be deemed to be made again at and as of the Closing Date and (ii) be true, correct, and complete at and as of such time, except when such representations and warranties are made with specific reference to a particular date, and then as to such particular date. As of the Closing Date, Buyer shall have performed, and not be in breach of, its covenants contained in this Agreement.

7.2 **Compliance with Agreements and Conditions**. Buyer shall have performed and complied with all covenants, agreements and conditions required by this Agreement.

7.3 **Payment of Cash Portion of the Purchase Price**. Buyer shall have paid the Cash Portion of the Purchase Price in accordance with Section 1.6 hereto.

8. **TERMINATION.**

8.1 **Termination for Certain Causes**.

8.1.1 **THIS AGREEMENT MAY BE TERMINATED AT ANY TIME PRIOR TO OR ON THE** Closing Date as follows:

(a) By mutual written consent of all of the parties hereto;

(b) By either party, if the transaction contemplated by this Agreement is enjoined, restrained, or prohibited by a court or governmental agency;

(c) By Buyer if the Approval Order is not received; or

(d) By Seller, if Buyer breaches in any material respect, its representations or warranties or fails to perform in any material respect its covenants or agreements set forth in this Agreement, subject to prior written notice and a 10 calendar day cure period, if and only if such breach is subject to cure.

8.1.2 Subject to Section 8.2, upon termination of this Agreement, without limiting any rights or remedies the parties hereto may have, whether under contract, at law or in equity, Buyer shall have no further obligation whatsoever to consummate the transactions contemplated herein.

8.2 **Remedies for Default**.

**BUYER AND SELLER AGREE THAT IT WOULD BE EXTREMELY DIFFICULT AND IMPRACTICABLE TO DETERMINE THE AMOUNT AND EXTENT OF DETRIMENT**

10

TO SELLER SHOULD BUYER FAIL OR REFUSE TO CONSUMMATE THE PURCHASE AND SALE TRANSACTION HEREIN PROVIDED FOR WITHIN THE TIME AND IN THE MANNER SET FORTH HEREIN.

IF THE PURCHASE AND SALE TRANSACTION DESCRIBED HEREIN FAILS TO CLOSE WITHIN THE TIME AND IN THE MANNER SET FORTH HEREIN SOLELY BY REASON OF ANY DEFAULT BY SELLER, AND PROVIDED BUYER SHALL NOT BE IN DEFAULT UNDER THIS AGREEMENT, BUYER SHALL BE ENTITLED, AS ITS/THEIR SOLE AND EXCLUSIVE REMEDY, EITHER (A) TO TERMINATE THIS AGREEMENT, OR (B) TO BRING A SUIT FOR SPECIFIC PERFORMANCE OF THIS AGREEMENT IN THE BANKRUPTCY COURT. BUYER EXPRESSLY WAIVES ITS RIGHTS TO SEEK DAMAGES IN THE EVENT OF SELLER'S DEFAULT HEREUNDER. BUYER SHALL BE DEEMED TO HAVE ELECTED TO TERMINATE THIS AGREEMENT IF BUYER FAILS TO FILE SUIT FOR SPECIFIC PERFORMANCE AGAINST SELLER ON OR BEFORE THIRTY (30) DAYS FOLLOWING THE ENTRY OF THE APPROVAL ORDER BY THE BANKRUPTCY COURT.

BUYER AND SELLER AGREE THAT THE TERMS, WAIVERS AND PROVISIONS OF THIS SECTION 8.2 ARE OF THE ESSENCE OF THIS AGREEMENT AND BUT FOR SUCH TERMS, WAIVERS AND PROVISIONS, SELLER WOULD NOT HAVE ENTERED INTO THIS AGREEMENT. TO SIGNIFY THEIR AWARENESS AND AGREEMENT TO BE BOUND BY THE TERMS, WAIVERS AND PROVISIONS OF THIS SECTION 8.2, BUYER AND SELLER, THROUGH THEIR AUTHORIZED REPRESENTATIVES, HAVE SEPARATELY INITIALED THIS SECTION 8.2.

BUYER'S INITIALS:

SELLER'S INITIALS:

9. **BANKRUPTCY COURT APPROVAL.**

Buyer hereby acknowledges and agrees that because Seller has filed a bankruptcy petition commencing the Bankruptcy Case, Seller must seek approval of this Agreement and the sale of the Assets from the Bankruptcy Court. Buyer also acknowledges that Seller may be required to seek the sale of the Assets subject to qualified overbids.

10. **MISCELLANEOUS PROVISIONS**

10.1 **Entire Agreement**. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings with respect thereto.

10.2 **Modification: Exhibits; Notices**. Subject to the provisions hereof involving approval by the Court, this Agreement may be modified or waived only by a separate writing signed by Buyer and Seller expressly modifying or waiving this Agreement. Any notices, consents, offers, acceptances, demands and other communications required or provided by this

11

Agreement shall be in writing and shall be deemed to have been made or given (i) when personally served, (ii) deposited in the U.S. mail, postage prepaid, registered or certified, return receipt requested and properly addressed as set forth below with a copy as indicated below, or (iii) one day after having been sent by telegram or facsimile transmission as follows:

**To the Seller**:    United Prosperity Group, Inc.
60 Airport Blvd.
South San Francisco, Ca 94080
Attn: Soo Ming Yee

**With a copy to**:    Levene, Neale, Bender, Yoo & Brill, L.L.P.
10250 Constellation Blvd., Suite 1700
Los Angeles, CA 90067
Attention: David B. Golubchik

**To the Buyer**:    Urban Leaf Co.
60 Airport Blvd.
South San Francisco, Ca 94080
Attn: Soo Ming Yee

Notice of a change of address shall be given by written notice in the manner set forth above.

10.3    **Governing Law; Jurisdiction; Venue; Service of Process**.    This Agreement is made under and will be construed in accordance with and governed by the laws of the State of California, without giving effect to the principles of conflicts of law. All parties consent to the jurisdiction and venue of the United States Bankruptcy Court, Northern District of California, San Francisco Division, for the purpose of resolving any disputes which may arise under this Agreement. If for any reason the Court declines to accept or cannot exercise such jurisdiction, then the parties will be deemed to have consented to the jurisdiction of California courts and to venue in San Francisco, California. All parties waive personal service of any and all process upon them and consent that all such service of process will be made by certified mail directed to the party at the address stated above.

10.4    **Section Headings, Construction**.    The headings of Paragraphs, Articles, Sections and Subsections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement unless otherwise specified. All words used in this Agreement will be construed to be of such gender or number, as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

10.5    **Assignment**.    This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, but neither of the parties may sell, assign, pledge, or hypothecate or otherwise transfer all or any portion of their interest in this Agreement to any third party without the prior written consent of the other party.

12

10.6 **Counterparts**. This Agreement may be executed and delivered by facsimile and in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same Agreement.

10.7 **No Third Party Beneficiaries**. Except as may be specifically provided herein to the contrary, no third party shall be the express or implied beneficiary of this Agreement or any of its provisions, no such party may bring any action in law or in equity with respect hereto.

10.8 **Severability**. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had never been contained herein.

10.9 **Additional Acts**. Except as otherwise provided herein, in addition to the acts, agreements, and instruments recited herein and contemplated to be performed, executed, and/or delivered by Seller to Buyer, Seller and Buyer hereby agree to perform, execute, and/or deliver at the Closing any and all such further acts, instruments, and assurances as Buyer or Seller, as the case may be, may reasonably require to consummate the transactions contemplated by this Agreement.

10.10 **Expenses; Attorneys' Fees**. Except as otherwise provided herein, whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto will pay its own expenses incurred by it or on its behalf in connection with this Agreement or any transaction contemplated by this Agreement. If any legal action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default, or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which it or they may be entitled. Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.

10.11 **Waiver of Compliance**. Any failure of Seller on the one hand, or Buyer, on the other hand, to comply with any obligation, agreement, or condition herein shall be effective only if expressly waived in writing by Buyer or Seller, respectively, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement, or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.12 **Time of Performance**. Time is of the essence.

10.13 **No Construction Against Preparer**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party by any court or other

13

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 34 of 89

governmental or judicial authority by reason of such party's having or being deemed to have prepared or imposed such provision.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed as of the day and year first written above.

("SELLER")                          ("BUYER")

UNITED PROSPERITY GROUP, INC.       URBAN LEAF CO.

By: _____         By: _____
    Soo Ming Yee                        Soo Ming Yee
    Its President                        Its President

14

# SCHEDULE 1.2.1
## Schedule of Unexpired Leases and Executory Contracts
## To Be Assumed and Assigned

| Lessor | Subject matter of contract | Cure, if any, to assume contract |
|---|---|---|
| Isuzu Finance of America, Inc. 7865 Solution Center Chicago, IL 60677-7008 | Automobile lease – Isuzu NQR 2011 | $0.00 |
| Landsberg Co. PO Box 101144 Pasadena, CA 91189-1144 | Business equipment – Rotary table heat sealing machine | $3,290.02 |
| NHMG Financial Services P.O. Box 643749 Pittsburgh, PA 15264-3749 | Business equipment – 2 forklifts (Hyster 201) 4 Hyster pallet jacks | $0.00 |
| Toyota Financial Services PO Box 60116 City of Industry, CA 91716-0116 | Automobile lease – 2013 Toyota Prius | $0.00 |
| Umpqua Financial Pacific Leasing P.O. Box 749642 Los Angeles, CA 90074-9642 | Business equipment – 2 Potato peelers (WSP) Peeler infeed convey 2 Melon peelers 3 spin dryers Diversacut sprint dicer | $0.00 |
| Kahn Enterprises, LLC 1200 Gough Street, Suite 900 San Francisco, CA 94109 | Real property lease for nonresidential real property located at 60 Airport Blvd., South San Francisco, CA 94080 | Per order to assume lease, entered on March 15, 2016 [Doc. 204], the total cure amount is $143,596.92 to be paid over time, the payments of which will be assumed by the Buyer |

15

# SCHEDULE 1.3.1
## Schedule of Claims/Obligations
## To Be Assumed

A.    **Secured Obligations**

1. Umpqua Bank – Claim No. 15-1 -  Approx. $300,000 plus accrued interest, fees & costs
2. Wise Worth Consultants Ltd. - Scheduled – Approx. $100,000 plus accrued interest, fees & costs

B.    **P.A.C.A. Obligations/Creditors – Amounts vary daily**

1. Bay Area Herb&Specialities LLC
2. Brunos Quality Produce
3. C. B. Edulis
4. Classic Salads
5. Coast Tropical
6. Earthquake Produce
7. Franzella Distributing
8. Franzella Produce
9. Garcia Farms Proudce, Inc.
10. General Produce Co., Ltd.
11. Grant J. Hunt Company
12. Green Wave Farms, LLC.
13. Greenfield Fresh, Inc.
14. GreenLeaf
15. Guan's Mushroom
16. Interfresh
17. J.C. Cheyne & Co.
18. Millard Sales
19. Ratto Bros., Inc
20. Redwood Produce, Inc.
21. Rigo's Produce
22. S&S Marketing and Sales Inc.
23. SanFrancisco Specialty
24. Sequoia Sales Produce
25. Shasta Produce
26. Twin Peaks Distributing, Inc.
27. Veritable Vegetable
28. What a Tomato
29. Yang Wei Xi Produce

C.     **Ch. 11 Administrative Obligations**

All post-petition obligations related to operation of business including, without limitation, payroll, tax, vendor obligations but excluding all obligations to professionals employed by order of the Court and quarterly fees due and owing to the Office of the United States Trustee.

Case: 15-30897     Doc# 246     Filed: 06/06/16     Entered: 06/07/16 08:59:36     Page 38 of
89

# EXHIBIT "2"



## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is dated as of June 10, 2016, among United Prosperity Group, Inc. d/b/a The Produce Company, a California corporation, with an address of 60 Airport Blvd., South San Francisco, CA 94080 ("Assignor"), Urban Leaf Co., a California corporation, with an address of 60 Airport Blvd., South San Francisco, CA 94080 ("Assignee"), and XTRA Lease LLC, a Delaware limited liability company with an address of 7911 Forsyth Blvd., Suite 600, St. Louis, Missouri 63105 ("Lessor"). The foregoing parties are collectively referred to as the "Parties."

WHEREAS, Assignor and Lessor are the parties to Equipment Lease Agreement No. 079L232, a copy of which is attached hereto as <u>Exhibit A</u> (together with Schedule A-1 and all other schedules, amendments and supplements thereto, including the Terms and Conditions (defined below), the "Lease Agreement"), pursuant to which Lessor leases Unit No. Q62235 (the "Lease Equipment") to Assignor;

WHEREAS, Assignor and Lessor are the parties to Equipment Rental Agreement Nos. 079077171, 079077375, and 079077545, copies of which are attached hereto as <u>Exhibit B</u> (together with all schedules, amendments and supplements thereto, including the Terms and Conditions (defined below), collectively, the "Rental Agreements" and, together with the Lease Agreement, the "Agreements"), pursuant to which Lessor rents Unit Nos. F60076, U66089, and U67786 (collectively, the "Rental Equipment" and, together with the Lease Equipment, the "Equipment") to Assignor;

WHEREAS, Assignee and Assignor agree that XTRA Lease's Standard Terms and Conditions attached hereto as <u>Exhibit C</u> (the "Terms and Conditions") are incorporated into and made a part of the Agreements;

WHEREAS, on July 13, 2015 (the "Petition Date"), Assignor commenced a Chapter 11 bankruptcy case, Case No. 15-30897 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court");

WHEREAS, on April 22, 2016, Assignor filed its <u>Notice of Motion and Motion for an Order: (1) Approving Sale of Substantially All of the Debtor's Assets Free and Clear of All Encumbrances; (2) Approving of Debtor's Assumption and Assignment of Certain Unexpired Leases and Executory Contracts and Determining Cure Amounts; (3) Waiving the 14-Day Stay Periods Set Forth in Bankruptcy Rules 6004(h) and 6006(d); and (4) Granting Related Relief; Memorandum of Points and Authorities; Declarations of Soo Ming Yee; Adam Meislik and Brian Weiss in Support Thereof</u> (the "Sale Motion"), seeking entry of an order approving the sale (the "Sale") of substantially all of its assets, including assumption and assignment of certain executory contracts and unexpired leases, to Assignee;

WHEREAS, although the Sale Motion did not seek authority to assume and assign the Agreements to Assignee, Assignor desires to assume and assign the Agreements to Assignee in connection with the Sale, and Assignee desires to accept such assignment and to assume all of Assignor's duties and obligations under the Agreements, effective as of the Effective Date (defined below); and

WHEREAS, Assignor and Assignee each acknowledge and agree that the amount necessary to cure the payment defaults existing under the Agreements as of the Petition Date is $8,929.66 (the "Cure Amount").

NOW THEREFORE, in consideration of the mutual covenants and agreements herein set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      All of the foregoing recitals and statements are hereby affirmed by Assignee and Assignor as true statements of fact and may be used as binding admissions in a court of law or equity, or other judicial or non-judicial proceedings.

2.      This Assignment shall not be effective unless and until each of the following conditions is satisfied (the date upon which all such conditions have been satisfied being the "Effective Date"):

        a.      An order, in form and substance acceptable to Lessor, that approves the assumption and assignment of the Agreements to Assignee in accordance with Section 365 of the Bankruptcy Code (the "Sale Order") has been entered in the Bankruptcy Case;

        b.      A fully-executed copy of this Assignment (together with all Exhibits) is delivered to and accepted by Lessor; and

        c.      Assignee has delivered to Lessor (i) payment in full of the Cure Amount by wire transfer, and (ii) a Certificate of Insurance, in a form acceptable to Lessor, as required by the terms of the Agreements.

3.      This Assignment, along with Assignor's assignment of the Agreements and the Equipment, and Assignee's acceptance of the assignment of the Agreements and the Equipment, shall automatically terminate, without further action or instrument, and shall be of no further force and effect in the event that each of the conditions contained in Section 2 above is not satisfied by June 10, 2016 at 5:00 P.M. (St. Louis Time).

4.      Effective as of Effective Date, the Parties agree that all of Assignor's right, title and interest in the Agreements and the Equipment shall be assigned, transferred, and conveyed to Assignee.

5.      Effective as of the Effective Date, the Parties agree that Assignee shall have accepted the assignment, transfer and conveyance of all of Assignor's right, title and interest in and to the Agreements and the Equipment and shall have agreed to assume, discharge, pay, perform and be bound by all of the terms, provisions, covenants and conditions of, and to perform all of Assignor's duties and obligations under, the Agreements, from the original date of each Agreement, as though Assignee was the original lessee of each unit of Equipment, including, without limitation, any and all duties and obligations under the Agreements attributable to the period prior to the Effective Date.

6.      From and after the Effective Date, Assignee agrees that its liability shall be direct and absolute to Lessor, and Assignee shall perform all duties and obligations as required and set forth in the Agreements. Assignee's address listed above is Assignee's address for sending any billings and notices

sent pursuant to this Assignment or the Agreements. **ASSIGNEE ACKNOWLEDGES AND AGREES THAT ASSIGNEE SHALL BE SOLELY RESPONSIBLE TO LESSOR FOR THE PAYMENT OF ANY AND ALL SUMS OWED UNDER THE AGREEMENTS, REGARDLESS OF WHEN SUCH SUMS ACCRUED OR BECAME DUE AND PAYABLE (E.G., REGARDLESS OF WHETHER THEY ARE ATTRIBUTABLE TO THE PERIOD OF TIME PRIOR TO THE EFFECTIVE DATE), INCLUDING, WITHOUT LIMITATION, ALL RENTAL PAYMENTS, CHARGES FOR THE LOSS OF OR DAMAGE TO ANY OF THE EQUIPMENT, AND CHARGES FOR MAINTENANCE, MILEAGE, TIRE WEAR, AND BRAKE WEAR.**

ASSIGNEE'S INITIALS

7. In consideration of Assignor's and Assignee's agreements set forth above, upon the occurrence of the Effective Date, Lessor consents to the assignment of the Agreements and the Equipment to Assignee.

8. This Assignment shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, successors, personal representatives and permitted assigns.

9. This Assignment may be executed in two or more counterparts, and signature pages may be exchanged by facsimile or other electronic communication. All such counterparts together shall constitute one instrument.

10. This Assignment shall be governed by the internal substantive laws of the State of Missouri, without regard to conflicts of law provisions. The Parties hereby agree to submit, to the fullest extent permitted by law, to the jurisdiction of the Circuit Court of St. Louis County, Missouri for purposes of adjudicating any action arising out of this Assignment, and hereby waive, to the fullest extent permitted by law, any objection to the laying of venue of any action arising out of this Assignment. Any action arising out of this Assignment may, to the fullest extent permitted by law, be properly filed in the Circuit Court of St. Louis County, Missouri; however, Lessor reserves its right to bring suit in any other appropriate jurisdiction.

11. This Assignment and the Agreements supersede all prior agreements, whether written or oral, between Lessor, Assignor and/or Assignee with respect to the assignment of Assignor's rights and obligations in and to the Agreements and the Equipment, and constitute a complete and exclusive statement of the terms of the agreement between the Parties with respect to the Agreements and the Equipment.

[signature page follows]

THE AGREEMENTS ASSIGNED PURSUANT TO THIS ASSIGNMENT REQUIRE ASSIGNEE TO LEASE THE EQUIPMENT SPECIFIED THEREIN FOR THE ENTIRE ORIGINAL TERM AS SET FORTH IN THE AGREEMENTS. IN ADDITION TO ANY OTHER REMEDIES AVAILABLE TO LESSOR, IN THE EVENT OF LESSEE'S BREACH OF ANY AGREEMENT, LESSOR HAS THE RIGHT TO DECLARE THE ENTIRE BALANCE OF THE REMAINING RENTAL PAYMENTS FOR THE ORIGINAL TERM OF SUCH AGREEMENT IMMEDIATELY DUE AND PAYABLE BY ACCELERATION AND RECOVER SUCH AMOUNT AS LIQUIDATED DAMAGES, THE REASONABLENESS OF SUCH DAMAGES BEING ACKNOWLEDGED AND AGREED TO BY ASSIGNEE.

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed as of the date first above written.

UNITED PROSPERITY GROUP
dba THE PRODUCE COMPANY

By: _____

Name: _____

Title: _____

URBAN LEAF CO.

By: _____

Name: _____

Title: _____

XTRA LEASE LLC

By: _____

Name: _____

Title: _____

**THE AGREEMENTS ASSIGNED PURSUANT TO THIS ASSIGNMENT REQUIRE ASSIGNEE TO LEASE THE EQUIPMENT SPECIFIED THEREIN FOR THE ENTIRE ORIGINAL TERM AS SET FORTH IN THE AGREEMENTS. IN ADDITION TO ANY OTHER REMEDIES AVAILABLE TO LESSOR, IN THE EVENT OF LESSEE'S BREACH OF ANY AGREEMENT, LESSOR HAS THE RIGHT TO DECLARE THE ENTIRE BALANCE OF THE REMAINING RENTAL PAYMENTS FOR THE ORIGINAL TERM OF SUCH AGREEMENT IMMEDIATELY DUE AND PAYABLE BY ACCELERATION AND RECOVER SUCH AMOUNT AS LIQUIDATED DAMAGES, THE REASONABLENESS OF SUCH DAMAGES BEING ACKNOWLEDGED AND AGREED TO BY ASSIGNEE.**

IN WITNESS WHEREOF, the Parties have caused this Assignment to be executed as of the date first above written.

UNITED PROSPERITY GROUP
dba THE PRODUCE COMPANY

By: _____

Name: _____

Title: _____


URBAN LEAF CO.

By: _____

Name: _____

Title: _____


XTRA LEASE LLC

By: _____

Name: _John Pomilio_____

Title: _Vice President_____

# EXHIBIT A

**(Lease Agreement)**



079L232

**Equipment Lease Agreement No.: 079L232**

EQUIPMENT LEASE AGREEMENT
Between
XTRA LEASE LLC, 7911 FORSYTH  BLVD, SUITE 600, SAINT LOUIS, Missouri 63105-3860
and
**UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**
**60 AIRPORT BLVD**
**SOUTH SAN FRANCISCO, CA 94080-6515**

**XTRA Lease LLC,** a Delaware limited liability company and **UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY,** a **California Corporation ("Lessee"),** agree that **XTRA Lease** will provide to **Lessee** the Equipment described on each Schedule A attached hereto and made a part hereof. As used herein, each piece of Equipment referred to on a Schedule A shall be referred to as a "Unit", and together may be referred to as the "Units" or "Equipment". **Lessee** does accept and lease such Equipment upon the following terms and conditions:

A.     **TERM:** This Equipment Lease Agreement shall be effective as of the date of each Schedule A and shall continue for the Original Term provided in each Schedule A attached hereto and made a part hereof, as each such Schedule A may be amended or supplemented from time to time. If, upon or after expiration of the Original Term of a Schedule A **Lessee** maintains possession of the Equipment, **XTRA Lease,** in its sole discretion, may (a) upon thirty (30) days written notice to **Lessee** unilaterally change any term or provision hereof, including, without limitation, the Use Charges to be paid hereunder, or (b) demand **Lessee's** immediate return of the Equipment.

B.     **EQUIPMENT DESCRIPTION/USE CHARGES:** The Equipment covered hereby, and the Use Charges payable to **XTRA Lease** for the use of such Equipment and the Communication Services, including, without limitation any mileage, tire tread wear, brake wear, refrigeration, estimated or other charges, if any, are set forth on each Schedule A attached hereto and made a part hereof. Such Use Charges shall commence with respect to each Unit on the date such Unit is made available for delivery to or pickup by **Lessee.**

C.     **EQUIPMENT DELIVERY/PICKUP:** The Equipment shall be made available for delivery to or pickup by **Lessee** at the locations set forth on each Schedule A attached hereto or at such other locations(s) which may be mutually agreed upon.

D.     **PAYMENT TERMS: Lessee** shall be invoiced in advance for all Use Charges hereunder and shall pay all invoices within ten (10) days from date of invoice. Additional Use Charges for Communications Services in excess of the monthly plan selected by Customer shall be billed to **Lessee** in arrears and shall be payable within ten (10) days from date of invoice. Use Charges shall be computed on a pro-rata daily basis for any Unit which is in **Lessee's** possession or control for any partial billing period, provided however, that **Lessee,** upon termination, shall continue to be responsible for and pay to **XTRA Lease** the Use Charges for the full billing period during which a Unit is redelivered to **XTRA Lease.**

E.     **EQUIPMENT TERMINATION/DROPOFF: Lessee** shall redeliver each Unit, at **Lessee's** expense and subject to applicable restrictions and dropoff charges, if any, and in accordance with the Standard Terms and Conditions, to the Return Location set forth on the Unit's Equipment Rental

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 46 of
89

Agreement, or to such other location which may be agreed to by **XTRA Lease**.

F.   **STANDARD TERMS AND CONDITIONS: Lessee's** lease of Equipment under any Schedule A entered into under this Equipment Lease Agreement shall be subject to XTRA Lease's Standard Terms and Conditions, as amended and in effect as of the date of the Schedule A, as posted on XTRA Lease's Web Site at: http://www.xtralease.com/legal.aspx (the "Standard Terms and Conditions"). All capitalized terms used herein and not specifically defined shall have the meaning set forth in the Standard Terms and Conditions.

**LESSEE'S LEASE OF EQUIPMENT PURSUANT TO A SCHEDULE A ENTERED UNDER THIS EQUIPMENT LEASE AGREEMENT SHALL BE SUBJECT TO THE STANDARD TERMS AND CONDITIONS IN EFFECT AS OF THE DATE OF THE SCHEDULE A. THIS EQUIPMENT LEASE AGREEMENT, TOGETHER WITH ALL SCHEDULES A HERETO, AS SUCH SCHEDULES MAY BE AMENDED OR SUPPLEMENTED FROM TIME TO TIME, AND THE STANDARD TERMS AND CONDITIONS, TOGETHER CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SUPERSEDES ALL OTHER AGREEMENTS AND UNDERSTANDINGS. IN THE EVENT OF AN IRRECONCILABLE CONFLICT, DISCREPANCY, ERROR, OR OMISSION, WITHIN THE LEASE TERMS APPLICABLE TO THE EQUIPMENT, THE FOLLOWING DESCENDING ORDER OF PRECEDENCE SHALL GOVERN:  (A) AN AMENDMENT TO THE SCHEDULE A; (B) THE SCHEDULE A; (C) THIS EQUIPMENT LEASE AGREEMENT; (D) THE STANDARD TERMS AND CONDITIONS.**

**IN WITNESS WHEREOF,** the parties hereto have caused this Equipment Lease Agreement to be executed by an officer thereunto duly authorized, each pursuant to due corporate authority.

**XTRA Lease LLC**

(Lessor)

By:   _Todd Feigenbaum_
Title:   Risk Services Manager

Date:   _3/4/14_

Form ELA (OTR) (7/12)

**UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**

(Lessee)

By:   _____

Print:   _Soo Ming Yee_

Title:   _CFO_

Date:   _2/13/14_



079L232001

Equipment Lease Agreement No.:079L232

# SCHEDULE A-1

**TERM:** Shall be either 36 Months from the date the last Unit is made available for delivery or pick-up by **Lessee** or the date this Schedule A is executed by **XTRA Lease** as set forth below, whichever is later (the "Original Term"). **Lessee** shall accept delivery or pick-up, as the case may be, of each Unit promptly following **XTRA Lease** making it available to **Lessee** for delivery or pick-up.

**EQUIPMENT DESCRIPTION/TRANSACTION CHARGES:** Each rate below is charged per Unit leased. Each rate is charged per billing cycle, unless a different measure of time is stated on the individual charge description.

| EQUIPMENT TYPE #1 |
|---|

## Equipment Type
REEFER, 48-0, A-RIDE, OHD, FF

## Model Years
2010 - 2010

## Quantity
1

## Lease Terms (Per Unit)
Rental
Mileage
Estimated Miles
Reefer Hours - Actual
Est. Reefer Hours

## Rates/Billing Period (or as specified)
$ 1,090.0000 / Month
$ 0.0400 / Mileage
3,000.0000 / Billing Period
$ 1.2500 / Hour
100.0000 / Billing Period

## Designated Unit(s)

| Count | Unit Number | Delivery Date | Delivery Location | CARB IDN & Compliance Thru Date |
|---|---|---|---|---|
| 1-1 | To Be Determined | To Be Determined | To Be Determined | |

# TOTAL NUMBER OF UNITS (all types): 1

If Units have not been assigned at the time of execution of this Schedule A, a list of actual Units will be sent to **Lessee** under separate cover after all the Units have been made available for delivery or pickup by **Lessee**.

4KH3G - UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY

Date of Schedule A-1 : 2/12/2014

## ESTIMATED CHARGES

**Lessee** shall pay to **XTRA Lease** estimated charges for Use Charges that would otherwise be payable at the end of the Lease ("Estimated Charges") as specified in this Schedule A. **XTRA Lease** shall have the right at any time to commence charging **Lessee** Estimated Charges under this Schedule A, even if an obligation to pay Estimated Charges is not specified above, or from time to time to increase Estimated Charges payable pursuant to this Schedule A, if **XTRA Lease** deems it necessary, in its sole discretion, in order to ensure **Lessee's** full performance of its obligation to pay any Use Charges pursuant to the terms of the Lease. **XTRA Lease** shall provide **Lessee** with written notice of its intent to initiate charging or increase Estimated Charges, and **Lessee** shall be required to pay the Estimated Charges as specified in such notice from the start of the then current billing cycle in which said notice was provided. **Lessee** shall pay **XTRA Lease** the amount of any shortfall, or **XTRA Lease** shall pay **Lessee** the amount of any overpayment, between the total Estimated Charges for Use Charges paid by **Lessee** during the Lease and the final amount of the Use Charges as determined upon redelivery of the Units.

## MAINTENANCE SERVICE AGREEMENT (Preventative Maintenance Package - California)

Maintenance Services Provided by **XTRA Lease**: For the Units subject to this Schedule A, **XTRA Lease** agrees to:

- provide at its expense, replacement tires and brakes worn due to normal wear, as determined by **XTRA Lease**, at an **XTRA Lease** location or a **Lessee** location within twenty-five (25) miles of an **XTRA Lease** location during normal business hours (Monday through Friday);

- perform preventative maintenance and conduct DOT inspections of the Units at six (6) month or twenty five thousand (25,000) mile intervals, and perform California B.I.T. inspections of the Units on alternating three (3) month intervals between preventative maintenance and DOT inspections, in each case upon **Lessee** making the Units available during normal business hours at either an **XTRA Lease** location or a **Lessee** location within twenty-five (25) miles of an **XTRA Lease** location; and

- provide, at its expense lights, lubricants and any other parts determined by **XTRA Lease** at the time of inspection to be worn due to normal wear, as needed.

Maintenance Responsibilities of **Lessee**: For the Units subject to this Schedule A, **Lessee** agrees to:

**4KH3G - UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**

- maintain the Units in accordance with **XTRA Lease's** Standard Terms and Conditions, in good condition, free from known defects and fit for their designated purpose;

- reimburse **XTRA Lease** for expenses related to any replacement tires, brakes, lights or any other parts which are inoperable or worn for reasons other than normal wear, as determined by **XTRA Lease**;

- perform all daily pre-trip inspections and safety inspections of the Units required by the DOT or any Applicable Law; and

- return the Units to **XTRA Lease** in the same condition as when received, normal wear excepted.

Any tires replaced other than at an **XTRA Lease** location or by **XTRA Lease** at a **Lessee** location within twenty-five (25) miles of an **XTRA Lease** location, must be returned to **XTRA Lease** within thirty (30) days of such replacement. Upon failure to do so, **XTRA Lease** will invoice **Lessee** for the full cost of such tires, including all labor costs and any drayage and road service charges, and **Lessee** shall be responsible therefore. If a Unit is equipped with radial tires, **Lessee** shall return the Unit with radial tires of equal quality, as determined by **XTRA Lease**, in its sole discretion. Upon failure to do so, **XTRA Lease** will install radial tires of equal quality on such Unit, and **Lessee** shall be responsible for the full cost of such replacement, including all labor costs and road service charges, if any. **Lessee** must notify **XTRA Lease** promptly of any potential mechanical failure or problem.

This language supersedes the language in the Lease describing the maintenance service commitment of **XTRA Lease** (currently described in Section 8(e) of **XTRA Lease's** Standard Terms and Conditions).

## STANDARD MAINTENANCE SERVICE AGREEMENT-REFRIGERATION UNIT(S)

**XTRA Lease** agrees to conduct on behalf of **Lessee**, at an **XTRA Lease** branch facility or an **XTRA Lease** designated supplier location, periodic refrigeration unit maintenance inspections. **Lessee** agrees to make the Unit(s) available at such locations every 1500 engine hours or once a year, whichever comes first. On intervals of 1500 engine hours, **XTRA Lease** will perform a full inspection of the refrigeration unit(s) and provide, at its expense, any parts worn due to normal wear, as needed. On intervals of 3000 engine hours, in addition to performing the 1500 engine hour inspection, **XTRA Lease** will change the operating fluids in the refrigeration unit(s), including oil and lubricants. **Lessee** shall be responsible for all damages to the refrigeration unit(s), performing any daily pre-trip and safety inspections, properly maintaining the operating fluids in the refrigeration unit (s), and fueling the refrigeration unit(s) with diesel fuel as needed. **Lessee** must notify **XTRA Lease** promptly of any potential mechanical failure or problem. **XTRA Lease** shall have no obligation to

4KH3G - **UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**

Equipment Lease Agreement No.:079L232          Date of Schedule A-1 : 2/12/2014

inspect, provide any replacement parts for, or otherwise perform maintenance on, and **Lessee** shall be solely responsible for the cost of all maintenance and service calls to repair, any refrigeration unit on a Unit which **Lessee** has not made available to **XTRA Lease** as specified above, or with respect to which **Lessee** has failed to promptly advise **XTRA Lease** as to any potential mechanical failure or problem.

## ROADWATCH® (RoadWatch® Full Service)

**XTRA Lease** will provide its RoadWatch® service to **Lessee** to coordinate emergency repairs to the Units subject to this Schedule A. This service entitles **Lessee** or **Lessee's** Agents to call **XTRA Lease's** RoadWatch® 800 number to report an emergency break down with any of the Units. Upon receipt of **Lessee's** call, **XTRA Lease** will promptly coordinate with a third party repair vendor to provide repair services to **Lessee**.

**XTRA Lease**, on behalf of **Lessee**, will coordinate payment of the cost of any services provided to any repair vendor dispatched as part of an incident reported to RoadWatch®. **XTRA Lease** will invoice **Lessee** for expenses for any repair services relating to replacement tires, brakes, lights, lubricants and any other parts which are broken, inoperable or worn for reasons other than normal wear, including but not limited to the action or inaction of the **Lessee**, as determined by **XTRA Lease**. **Lessee** shall pay any invoice for repair services in accordance with the payment terms of the Lease.

Lessee acknowledges and agrees that **XTRA Lease's** obligation with respect to the RoadWatch® service is limited to contacting a third party repair vendor upon **Lessee's** request in the event a Unit is in need of emergency repair. No warranty, express or implied, is made by **XTRA Lease** with respect to any services provided by a repair vendor coordinated through **XTRA Lease's** RoadWatch® service, and **Lessee** waives any and all claims against **XTRA Lease** for any loss or liability resulting from any defects or failures in any repairs provided by any repair vendor coordinated through **XTRA Lease's** RoadWatch® service.

## TRAILER TRACKING (No Trailer Tracking)

**Lessee** has declined **XTRA Lease's** Trailer Tracking service and **Lessee** will not be entitled to receive Trailer Tracking service for the Units subject to this Schedule A.

**4KH3G - UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**

## CONVERSION

For each Unit of Equipment set forth on this Schedule A that (a) prior to the execution of this Schedule A was on rent to **Lessee** pursuant to the terms of a Short-term Rental Agreement and (b) has on said Unit of Equipment as of the effective date of this Schedule A, a Trailer Tracking Unit; **Lessee** shall have thirty (30) days from the execution date of the Schedule A to return each said Unit of Equipment to an **XTRA Lease** branch for removal of the Trailer Tracking Unit. If **Lessee** fails to return the Unit of Equipment having a Trailer Tracking Unit thereon as herein provided, then **Lessee** shall be responsible for and pay **XTRA Lease** as an additional Use Charge $19.95 per month per Trailer Tracking Unit until such time that the Trailer Tracking Unit is returned to **XTRA Lease**.

## STANDARD TERMS AND CONDITIONS: Notwithstanding anything to the contrary in the terms of the Equipment Lease Agreement identified above, **Lessee's** lease of the Equipment pursuant to this Schedule A is subject to **XTRA Lease's** Standard Terms and Conditions in effect as of the date of this Schedule A set forth above, which Standard Terms and Conditions are available on **XTRA Lease's** Web Site at: http://www.xtralease.com/legal.aspx (the "Standard Terms and Conditions"). The Standard Terms and Conditions are incorporated into this Lease by this reference, and shall apply in all respects to **Lessee's** lease of Equipment pursuant to this Schedule A, except to the extent the same may have been specifically modified in this Schedule A. All capitalized terms used herein and not specifically defined shall have the meaning set forth in the Standard Terms and Conditions. **Lessee** acknowledges it has reviewed and agrees to comply with the Standard Terms and Conditions.

**THE LESSEE OF THIS BOX-TYPE TRAILER UNDERSTANDS THAT WHEN USING A HEAVY-DUTY TRACTOR TO PULL A 53-FOOT OR LONGER BOX-TYPE TRAILER ON A HIGHWAY WITHIN CALIFORNIA, THE BOX-TYPE TRAILER MUST BE COMPLIANT WITH SECTIONS 95300-95311, TITLE 17, CALIFORNIA CODE OF REGULATIONS, AND THAT IT IS THE RESPONSIBILITY OF THE LESSEE TO ENSURE THIS BOX-TYPE TRAILER IS COMPLIANT. THE REGULATIONS MAY REQUIRE THIS TRAILER TO HAVE LOW ROLLING RESISTANCE TIRES AND AERODYNAMIC TECHNOLOGIES THAT ARE U.S. ENVIRONMENTAL PROTECTION AGENCY VERIFIED SMARTWAY TECHNOLOGIES PRIOR TO CURRENT OR FUTURE USE IN CALIFORNIA.**

**4KH3G - UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY**

Equipment Lease Agreement No.:079L232                    Date of Schedule A-1 : 2/12/2014

THIS SCHEDULE A IS HEREBY MADE A PART OF AND INCORPORATED INTO, AND THE USE OF THE EQUIPMENT DESCRIBED HEREIN IS SUBJECT TO, THE EQUIPMENT LEASE AGREEMENT IDENTIFIED ABOVE AND THE STANDARD TERMS AND CONDITIONS. IN THE EVENT OF AN IRRECONCILABLE CONFLICT, DISCREPANCY, ERROR, OR OMISSION, WITHIN THE LEASE TERMS APPLICABLE TO THE EQUIPMENT, THE FOLLOWING ORDER OF PRECEDENCE SHALL GOVERN: (A) AN AMENDMENT TO THIS SCHEDULE; (B) THIS SCHEDULE A; (C) THE EQUIPMENT LEASE AGREEMENT; (D) THE STANDARD TERMS AND CONDITIONS.

THIS LEASE REQUIRES LESSEE TO LEASE THE EQUIPMENT SPECIFIED HEREIN FOR THE ENTIRE ORIGINAL TERM AS SET FORTH IN THE FIRST PARAGRAPH OF THIS SCHEDULE A. IN ADDITION TO ANY OTHER REMEDIES AVAILABLE TO XTRA LEASE, IN THE EVENT OF LESSEE'S BREACH OF THIS LEASE, XTRA LEASE HAS THE RIGHT TO DECLARE THE ENTIRE BALANCE OF THE REMAINING RENTAL PAYMENTS FOR THE ORIGINAL TERM OF THE LEASE IMMEDIATELY DUE AND PAYABLE BY ACCELERATION AND RECOVER SUCH AMOUNT AS LIQUIDATED DAMAGES, THE REASONABLENESS OF SUCH DAMAGES BEING ACKNOWLEDGED AND AGREED TO BY LESSEE.

IN WITNESS WHEREOF, the parties hereto have caused this Schedule A to be executed by an officer thereunto duly authorized, each pursuant to due corporate authority.

XTRA Lease LLC                          UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY

(Lessor)                                (Lessee)

By: _Todd Feigenbaum_                   By: _____
Title: _Risk Services Manager_          Print: _Sam Mtg Yee_

Date: _3/4/14_                          Title: _CFo_
Form 07/12
                                        Date: _2/17/14_

4KH3G - UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY



## Lease Equipment Delivery Schedule

| | |
|---|---|
| Customer: | **UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY** |
| Account #: | **4KH3G** |
| Lease / Schedule A: | **079L232 - 1** |

Equipment Type: **REEFER, 48-0, A-RIDE, OHD, FF**

| <u>Trailer ID</u> | <u>Rental ID</u> | <u>Rental Start</u> |
|---|---|---|
| Q62235 | 695185236 | 02/25/2014 |

Number of trailers of this type delivered pursuant to Schedule A-1:  1

Number of trailers of all types delivered pursuant to Schedule A-1:  1

03/18/2014



# EQUIPMENT RENTAL AGREEMENT #079073066

3600 DEPOT ROAD, HAYWARD, CA 94545 Phone #:(510)670-0181

**Return Location**
HAYWARD(79)
3600 DEPOT ROAD
HAYWARD, CA 94545
Phone #: (510)670-0181

Lessee's rental, lease, acceptance, possession, or use of this Equipment or any other XTRA LEASE Equipment and all of Lessee's transactions and dealings with XTRA LEASE are governed by the XTRA LEASE Standard Terms & Conditions

| Lessee Name & Address | Garage/Stored At |
|---|---|
| UNITED PROSPERITY GROUP, INC DBA THE<br>60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080-6515 | 60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080- |

Phone #: (650)871-2505  Fax #: (650)871-2507
Customer #: 4KH3G

**Equipment Utilized For**
Over the Road

**Insurance Information**
Agent:  POLARIS RISK GROUP

| Unit #: | OTRT Q62235 |
|---|---|
| VIN #: | 3H3V482CXAT 196004 |
| License Plate #: | 2418105 |
| Plate State: | ME |
| Unit Description: | REEFER, 48-0, A-RIDE, OHD, FF<br>2010 HYUNDAI |
| Reefer Serial #: | 6001059013 |
| CARB IDN: | 10142566X |
| CARB Compliance Thru Date: | 12/31/2017 |
| Unit Last DOT Inspection: | 12/2012 |

Expires:  9/17/2013

**Lessee shall pay for leased unit at a rate of**

| | | |
|---|---|---|
| Reefer Hours - Actual | 1.5000 | / Hour |
| Rental | 90.0000 | / Day |
| Rental | 450.0000 | / Week |
| Rental | 1400.000 | / 4 Week |
| Mileage | 0.0400 | / Mileage |
| Estimated Miles | 2200.00 | / Billing Period |
| Est. Reefer Hours | 140.0000 | / Billing Period |

**Miscellaneous Rates**

P.O. #
Auth By:  Wayman Wong

Minimum Term of  1 Day

## CDW/FTW Options
Lessee's election to accept or decline the Collision Damage and Fire/Theft waiver("CDW") offered by XTRA LEASE is as indicated herein.

**Collision Damage:**  $5.00 Daily Charge        **Fire/Theft:**  Included
Lessee shall be liable for the first $1,500 for each occurence of damage to or loss of any unit (or the first $6,000 in the case of refrigerated or specialty Equipment). Notwithstanding Lessee's election to accept or decline CDW, upon ten(10) days prior written notice, XTRA LEASE, in its sole discretion, may discontinue providing CDW to Lessee.

| Outbound Inspection    Inspector: DOHERTY, DANIEL | |
|---|---|
| Date Out: | 05/02/2013 12:19 |
| Registration: | PRESENT |

**Tires**

| | | | |
|---|---|---|---|
| LOF | YOKO 9/32 | LOR | YOKO 7/32 |
| LIF | YOKO 9/32 | LIR | YOKO 7/32 |
| ROF | YOKO 10/32 | ROR | YOKO 8/32 |
| RIF | YOKO 10/32 | RIR | YOKO 8/32 |
| Size | 295/75R 22.5 | | |

**Brakes**  FA 5/8 5/8    RA 5/8 5/8

| Hubodometer Out: | 63205 |
|---|---|
| Trailer Tracking MSN: | N/A |

**Reefer Information**

| | |
|---|---|
| Fuel Level: | 8/8 Full |
| Engine Hours: | 9987 |
| Elect. S. Hours Protected: | 12142 |

**California B.I.T. Inspection**

| | | | |
|---|---|---|---|
| Brake Adjustment: | P | Brake System: | P |
| Suspension: | P | Tires & Wheels: | P |
| Vehicle Connection Device: | P | | |

**Driver Signature**

| | |
|---|---|
| Name: | J RAVANELL |
| License #: | C3274642 CA |

## DAILY OR PRE-TRIP LESSEE/DRIVER SAFETY CHECK LIST

1. Maintain tire air pressure as indicated on tire side wall. Check for and repair flat tires. Check wheels and rims for damage. Torque lug nuts on all disc wheels to 450-500 foot pounds every 1,500 miles

2. Check all brakes including trailer brake connections. Properly adjust brakes.

3. Check and maintain oil level on axles and hydraulic goosenecks.

4. Check all lighting devices, reflectors and other emergency equipment.

5. Check all coupling devices. Check that all safety pins, slider pins and connecting locks are in the locked position.

6. Every six months, torque U-bolts on air ride equipped trailers to 750 foot pounds and spring rides to 360-400 foot pounds.

7. Check forward bulkheads on flatbed trailers.

8. On refrigeration units:

   a) Check thermostat temperature at least every 4 hours during use.

   b) Maintain sufficient fuel in supply tank for continued operation.

   c) Check engine oil level and maintain at full mark.

   d) Start engine to charge battery at least every week for a minimum of two hours.

9. The last DOT Inspection was performed on the date indicated hereon next to the "Unit Last DOT Inspection" designation. DOT Inspection are due to be performed annually on or before the last day of the same month.

10. Inform XTRA LEASE     promptly if unit is lost, stolen or involved in an accident.

---

UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY (4KH3G)        Page 1 of 2        Equipment Rental Agreement # 079073066        

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 55 of 89

B=Bent  BR=Broken  C=Cut  CA=Check/Adjust  H=Hole  M=Missing  O=Other  P=Patch  S=Scrape  SEC=Section



| View | Zone | Condition | View | Zone | Condition | View | Zone | Condition |
|---|---|---|---|---|---|---|---|---|
| Front | | No Damage | Undr Crg | | No Damage | Int Floor | | No Damage |
| Left Side | Running Gear | O1-Other | Int Doors | | No Damage | Int Front | Front Wall | B1-Bent |
| Right Side | | See Above | Int Right | | No Damage | Int Roof | | No Damage |
| Rear | | No Damage | Int Left | | No Damage | | | |

**Note(s)/Comment(s)**

Left Side O1 - cut in tread rir

**Miscellaneous**



Case: 15-30897   Doc# 246   Filed: 06/06/16   Entered: 06/07/16 08:59:36   Page 56 of 89



## STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions apply to all transactions with XTRA Lease, including, without limitation, all leases or rentals of XTRA Lease Equipment, whether pursuant to a long-term Equipment Lease Agreement, National Account Agreement, Short-term Rental Agreement, Equipment Rental Agreement or any other agreement. THE STANDARD TERMS AND CONDITIONS CONTAIN A JURY TRIAL WAIVER WHICH MAY BE ENFORCED IN THE EVENT OF A DISPUTE BETWEEN XTRA LEASE AND LESSEE.

### 1. DEFINITIONS.

(a) "Applicable Law" means any federal, state, local or foreign law, statute, rule, regulation, order, judgment, opinion or ordinance applicable to the use, possession, operation or control of the Equipment, including, without limitation, the HDV Regulations and the TRU Regulations (both as defined in Section 17).

(b) "Casualty Loss Value" shall be equal to the present value of a unit of Equipment as determined by XTRA Lease in its sole discretion on the first day of the month during which the loss or destruction occurs.

(c) "Communication Services" means the two-way wireless tracking and mobile information management services provided to Lessee by or through XTRA Lease that utilize the communications network provided by third-party licensors of XTRA Lease.

(d) "Default" has the meaning as set out in Section 21.

(e) "Equipment" means the XTRA Lease semi-trailer, chassis, refrigerated trailer, or other over-the-road, cartage, or storage equipment together with the attached Trailer Tracking Unit and related sensors, if applicable.

(f) "Equipment Lease Agreement" means a true lease agreement between Lessee and XTRA Lease for the leasing of XTRA Lease Equipment by Lessee for a specified Lease Term and at specified Use Charges.

(g) "Equipment Rental Agreement" means the agreement provided to Lessee by XTRA Lease, in electronic or other format, whenever a unit of Equipment is picked up from or returned to an XTRA Lease location by Lessee or Lessee's Agent.

(h) "Estimated Charges" means periodic estimated payments of Use Charges which are payable at the end of the Lease.

(i) "Intellectual Property" has the meaning as set out in Section 23.

(j) "Lease" means any and all arrangements or agreements whereby Lessee leases or rents Equipment from XTRA Lease, including, without limitation, long-term Equipment Lease Agreements, National Account Agreements, Short-term Rental Agreements and Equipment Rental Agreements. All Leases are subject to and are deemed to incorporate the Standard Terms and Conditions, as amended from time to time.

(k) "Lease Term" means the agreed upon term of the Lease contained in an Equipment Lease Agreement or the agreed upon minimum rental term of a Short-term Rental Agreement as listed on the Equipment Rental Agreement.

(l) "Lessee" means the individual or entity that enters into a Lease with XTRA Lease. Where appropriate the term Lessee shall be deemed to include the term Lessee's Agent.

(m) "Lessee's Agent" means the driver or other representative who picks up, inspects, takes possession of, or returns a unit of Equipment on behalf of Lessee to an XTRA Lease location or to a designated cartage vendor, and/or who executes a Lease document on behalf of Lessee.

(n) "National Account Agreement" means a rate agreement between Lessee and XTRA Lease for the renting of Equipment by Lessee at specified Use Charges.

(o) "Repair Standards" means XTRA Lease's current repair standards which provide the requirements for repairs to Equipment, a copy of which can be obtained at http://www.xtralease.com.

(p) "Short-term Rental Agreement" means an agreement between Lessee and XTRA Lease for the renting of Equipment by Lessee at a specified rate and rental term as listed on the Equipment Rental Agreement.

(q) "Software" means (i) the software code that is embedded within the Trailer Tracking Unit, (ii) any other software provided to Lessee relating to the Trailer Tracking Unit directly or through Internet access, (iii) any user documentation provided to Lessee, and (iv) any subsequent versions or upgrades of software which XTRA Lease elects to provide to Lessee.

(r) "Standard Terms and Conditions" means the XTRA Lease Standard Terms and Conditions contained in this document, as amended by XTRA Lease from time to time.

(s) "Trailer Tracking Unit" means the product created by XTRA Lease's third-party licensor, which provides mobile communication, tracking, and other Equipment management services.

(t) "Use Charges" means the required payments to be made by Lessee to XTRA Lease for every day (including Saturdays, Sundays, and Holidays) Equipment is on lease or rent to Lessee whether or not such Equipment is in the use, possession, control or operation of Lessee. Use Charges shall include the rental rate set forth in the Lease plus any and all other charges, fees and all other amounts required to be paid by Lessee pursuant to the Lease.

(u) "written" or "in writing" shall mean in print copy format or in electronic format.

(v) "XTRA Lease" as used herein shall mean XTRA LLC, a Maine limited liability company (formerly known as XTRA, Inc.), XTRA Lease LLC, a Delaware limited liability company (formerly known as XTRA Lease, Inc. which was formerly known as Strick Lease, Inc.), GTR Rental LLC, a Delaware limited liability company (formerly known as CitiCapital Trailer Rental, Inc. and Associates Rental Systems, Inc., among others), AJF Warehouse Distributors, Inc., an Illinois corporation, Rentco Trailer Corporation, a Delaware corporation, as applicable, depending upon which entity holds title to the Equipment leased hereunder.

(w) "XTRA Web Sites" has the meaning as set out in Section 24.

### 2. EQUIPMENT COVERED, TERM AND OWNERSHIP.

The specific Equipment covered by the Lease and the Lease Term shall be as set forth in the Lease. Upon expiration of the Lease Term, if Lessee maintains possession of the Equipment, XTRA Lease, in its sole discretion, may (a) upon thirty (30) days written notice to Lessee change any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease, as specified in such notice, or (b) demand Lessee's immediate return of the Equipment. Lessee's responsibilities under the Lease, including, without limitation, the payment of Use Charges, shall continue until all of the Equipment is returned to XTRA Lease. The Lease shall terminate upon the return of all Equipment subject to the Lease, except with respect to provisions contained in the Lease or the Standard Terms and Conditions intended to survive the termination of the Lease, including, without limitation, limitations of liability, indemnity, confidentiality, payment and billing, damage and repairs to Equipment, choice of law, venue, and jury trial waiver. Notwithstanding any other language contained herein or therein, neither the Lease nor any agreement that results therefrom conveys any ownership rights to Lessee and all right, title and interest in and to the Equipment is and shall remain with XTRA Lease.

### 3. AUTHORITY & ACCEPTANCE.

By submitting or completing an XTRA Lease customer application, entering into a Lease with XTRA Lease, taking possession of Equipment from XTRA Lease, executing an Equipment Rental Agreement, completing payment of any invoices to XTRA Lease or completing any other transaction with XTRA Lease, Lessee and Lessee's Agents represent and warrant that they are authorized on behalf of Lessee and, if applicable, on behalf of those companies identified in a National Account Agreement as "Lessee's Affiliates Authorized to Rent Equipment", to enter such agreements and transactions with XTRA Lease and expressly acknowledge receipt and on-going acceptance of XTRA Lease's Standard Terms and Conditions as such Standard Terms and Conditions may be amended from time-to-time.

### 4. DELIVERY, RECEIPT & DROPOFF.

(a) As a condition precedent to Lessee's pick-up or return of Equipment at any XTRA Lease location, Lessee's Agent must (i) provide proof of identification to XTRA Lease in the form of a valid commercial driver's license, and (ii) sign XTRA Lease's Equipment Rental Agreement. Lessee acknowledges that Lessee's Agent has been authorized to pick-up from, return Equipment to, and/or accept delivery of Equipment from, XTRA Lease, and that the signature of Lessee's Agent on XTRA Lease's Equipment Rental Agreement shall bind Lessee to the terms of such Equipment Rental Agreement and the Standard Terms and Conditions, as amended from time to time.

(b) By taking possession of the Equipment, Lessee accepts the Equipment in the condition noted in the Equipment Rental Agreement and acknowledges receipt of the Equipment in good repair and working condition. Lessee shall have exclusive possession, control and use, and assumes complete responsibility for the condition, operation, inspection and maintenance of the

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 57 of 89

Equipment during the Lease. **Lessee** shall return the Equipment to **XTRA Lease** in the same condition noted in the Equipment Rental Agreement, normal wear excepted.

(c) If **Lessee** has requested **XTRA Lease** to arrange for a unit of Equipment to be delivered to or picked up from a location designated by **Lessee**, as a condition precedent to such delivery or pick-up, **Lessee's Agent** must sign **XTRA Lease's** Equipment Rental Agreement and/or other documentation provided by the cartage vendor. In the event of delivery of a unit of Equipment to **Lessee**, **XTRA Lease's** inspection of the Equipment at **XTRA Lease's** branch location prior to delivery of the Equipment to **Lessee** shall be conclusive evidence of the condition of the Equipment at the time of commencement of the Lease, and in the event of pick-up of Equipment from **Lessee**, **XTRA Lease's** inspection of the Equipment following delivery of the Equipment to **XTRA Lease's** branch location shall be conclusive evidence of the condition of the Equipment upon redelivery.

(d) **Lessee** shall redeliver a unit of Equipment at **Lessee's** expense to the Return Location specified in the unit's Equipment Rental Agreement, unless otherwise provided in the Lease. If **Lessee** returns a unit of Equipment to a branch other than its designated Return Location, **Lessee** shall pay **XTRA Lease's** then applicable drop fee as compensation for the costs associated with the failure to return the unit to its Return Location.

**5. COMMUNICATION SERVICES.** If a Trailer Tracking Unit is installed on a unit of Equipment rented or leased by **Lessee** from **XTRA Lease**, **XTRA Lease** hereby grants to **Lessee** a non-exclusive, non-transferable and limited sub-license to use the Software subject to the conditions and restrictions of the Lease and the Standard Terms and Conditions solely for the purpose of utilizing the Trailer Tracking Unit and related Communication Services to monitor Equipment leased from **XTRA Lease**. **Lessee** shall make no other use of the Software or Communications Services and shall not copy the Software or provide the Software or access to the Software to any third-party. The Software will be in object code form only, and will not include any source code or the right to use any source code. **Lessee** agrees that it will not reverse engineer, decompile, or disassemble the Trailer Tracking Unit or Software. **Lessee** agrees to use the Software only in connection with **Lessee's** use of the Communication Services. In addition, **XTRA Lease** grants to **Lessee** a non-exclusive, non-transferable, limited sub-license to access the Communication Services for use with the Trailer Tracking Unit in the United States, Mexico, and Canada. **XTRA Lease** reserves the right to terminate the Communication Services, and the sub-licenses granted pursuant to this Section 5, at any time on thirty (30) days advance notice to **Lessee**. **Lessee** acknowledges and understands that (1) it shall use all information provided via the Communication Services at **Lessee's** own risk, and (2) **Lessee** shall acquire no proprietary interest in any telephone number that may be assigned to **Lessee** for use with the Communication Services. **Lessee** acknowledges that disruption of Communication Services may occur from time to time for routine and emergency maintenance and other reasons beyond the control of **XTRA Lease**. **Lessee** shall have no remedy against **XTRA Lease**, any third-party licensor of **XTRA Lease**, or the underlying wireless services carrier, and **Lessee** hereby releases **XTRA Lease** and all of its licensors, and the underlying wireless services carrier from all liability relating to such disruption. If, and only if, Use Charges relating to the Communication Services are billed separately to **Lessee** as part of the total Use Charges for the Equipment, **Lessee's** sole remedy for any disruption or failure of the Communication Services shall be that portion of the Use Charges paid by **Lessee** for Communication Services relating to the period of service during which such failure or disruption occurred, provided that such disruption or failure is not corrected by **XTRA Lease** within thirty (30) days after receiving written notice from **Lessee** of such failure or disruption.

**6. ROADWATCH® SERVICE.** Unless otherwise specified in the Lease, **Lessee** may call **XTRA Lease's** RoadWatch® service to coordinate emergency repairs for units of Equipment subject to the Lease. Upon receiving a call from **Lessee** or **Lessee's** Agent, **XTRA Lease**, on behalf of **Lessee**, will (i) contact a third-party repair vendor to provide repair services to **Lessee**, and (ii) coordinate payment for any services provided by that third-party repair vendor to **Lessee**. Unless otherwise provided in the Lease, **XTRA Lease** will invoice **Lessee** for any repair services coordinated through the RoadWatch® service, along with a service fee. No warranty, express or implied, is made by **XTRA Lease** with respect to any services provided by a repair vendor coordinated through the RoadWatch® service, and **Lessee** hereby releases **XTRA Lease** from all liability in any way relating to the use of the RoadWatch® service, including, without limitation, any repairs provided by any repair vendor coordinated through the RoadWatch® service.

**7. PAYMENT.**
(a) **Lessee** agrees to pay all Use Charges for Equipment **Lessee** rents or leases from **XTRA Lease**. These Use Charges may include, but are not limited to:

(i) Rental Charges. **Lessee** shall pay **XTRA Lease** the rental charges for the rent or lease of a unit of Equipment, as specified in the Lease.

(ii) Mileage Charges. **Lessee** shall pay **XTRA Lease** mileage charges for actual miles traveled by a unit of Equipment as specified in the Lease. Miles traveled will be measured by a hubodometer attached to each unit of Equipment. A reading of the hubodometer will be taken by **XTRA Lease** at the time of a unit's delivery or pick-up, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit to **XTRA Lease**. In the event the hubodometer on a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a mileage charge based on the average miles traveled by similar units leased or rented by **Lessee** from **XTRA Lease** or the average miles traveled by similar units of Equipment leased or rented from **XTRA Lease** generally, as determined by **XTRA Lease** in its sole discretion.

(iii) Refrigeration Unit Charges. **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours used on any refrigerated unit of Equipment as specified in the Lease. Engine hours will be measured by an hour meter attached to each refrigerated unit of Equipment. A reading of the hour meter will be taken by **XTRA Lease** at the time of delivery to or pick-up of a unit of Equipment by **Lessee**, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. In the event the hour meter for a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours based on the average engine hours historically used on similar units of Equipment leased or rented from **XTRA Lease**, as determined by **XTRA Lease** in its sole discretion.

(iv) Tire Wear. **Lessee** shall pay **XTRA Lease** a charge for tire wear as specified in the Lease. The tread depth of each tire will be measured by **XTRA Lease** in thirty-two seconds (1/32nds) of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. Tire depth shall be measured at the lowest point of remaining tire tread.

(v) Brake Wear. **Lessee** shall pay **XTRA Lease** a charge for brake lining wear as specified in the Lease. The brake lining for each wheel end will be measured by **XTRA Lease** in one-eighth (1/8") of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**.

(b) **Lessee** shall pay Estimated Charges to **XTRA Lease** as specified in the Lease. **XTRA Lease** shall have the right to commence charging **Lessee** Estimated Charges under any Lease that does not specify an obligation of **Lessee** to pay Estimated Charges, or from time to time to increase Estimated Charges payable under a Lease, if **XTRA Lease** deems it necessary, in its sole discretion, in order to ensure **Lessee's** full performance of its obligation to pay any Use Charges pursuant to the terms of the Lease. **XTRA Lease** shall provide **Lessee** with written notice of its intent to initiate charging or increase Estimated Charges, and **Lessee** shall be required to pay the Estimated Charges as specified in such notice from the start of the billing period in which said notice was provided. **Lessee** shall pay **XTRA Lease** the amount of any shortfall, or **XTRA Lease** shall pay **Lessee** the amount of any overpayment, between the total Estimated Charges paid by **Lessee** during the Lease and the final amount of the Use Charges as determined upon redelivery of the Equipment.

(c) Use Charges shall commence on the date the Equipment is available for delivery to or pick-up by **Lessee**. Notwithstanding any other language contained in the Standard Terms and Conditions, Use Charges shall continue until the Equipment is returned to **XTRA Lease** at the Return Location set forth in the Lease, in the same condition as when received, normal wear excepted, or until payment is made of the Casualty Loss Value as provided herein.

(d) Use Charges are based on a twenty-eight (28) day billing period unless otherwise specified. Unless otherwise stated in the Lease, in the event of return of the Equipment to **XTRA Lease** prior to the expiration of the billing period in effect at the time of return, Use Charges for the final partial billing period shall be adjusted to the appropriate weekly and daily rate, as applicable.

(e) **XTRA Lease** shall periodically invoice **Lessee** for all Use Charges incurred pursuant to the Lease. **XTRA Lease** shall have the right to provide all invoices electronically via the XTRA Web Sites. **Lessee** shall pay all invoices within ten (10) days from the date of invoice.

(f) **Lessee** shall make all payments in U.S. currency to the lockbox address provided by **XTRA Lease** and **Lessee** shall not deliver payments directly to any **XTRA Lease** location. Overdue payments may be assessed interest equal to the lesser of 18% per annum or the maximum rate permitted by law. If **Lessee** provides **XTRA Lease** with a check, or authorizes **XTRA Lease** to collect payments through a pre-authorized payment, electronic payment, or any other form of payment that is returned due to insufficient funds, or payment is otherwise declined, **Lessee** shall be subject to and agrees to pay

2

XTRA Lease an additional processing fee of $100.00 for each such occurrence.

## 8. MAINTENANCE AND USE OF EQUIPMENT.

(a) Lessee is responsible for determining whether the Equipment it rents or leases from XTRA Lease is fit and sufficient for the designated purpose for which Lessee intends to utilize such Equipment.

(b) Lessee is responsible for the condition, operation, inspection and maintenance of the Equipment during the Lease. Lessee shall maintain the Equipment, at Lessee's own expense and in accordance with the Repair Standards, the Equipment in good condition, free from defects and fit for its designated purpose. Lessee shall return all Equipment to XTRA Lease in the same condition as when received, normal wear excepted.

(c) Lessee shall not (i) use the Equipment for the transportation or storage of any unprotected corrosive substances, trash, medical and/or solid waste and/or hazardous materials ("Hazardous Materials"), (ii) permit the Equipment to be contaminated by any Hazardous Materials, or (iii) violate any Applicable Law regarding the transportation of any Hazardous Materials. Lessee shall promptly notify XTRA Lease if it becomes aware of the use of the Equipment for such purposes, the contamination of the Equipment by any Hazardous Materials, or the violation of any Applicable Law regarding the transportation of any Hazardous Materials in the Equipment. If Lessee notifies XTRA Lease or XTRA Lease determines that Hazardous Materials contaminate, were placed in, or have damaged the Equipment, XTRA Lease may, in its sole discretion, (i) require Lessee to immediately pay XTRA Lease the Casualty Loss Value of the Equipment; (ii) require Lessee, at Lessee's sole expense to repair, restore and/or decontaminate the Equipment and provide proof of such repair, restoration and/or decontamination, including without limitation, methodology and pre and post decontamination sampling results and any other inspection or testing XTRA Lease deems necessary to perform; or (iii) repair, restore and/or decontaminate the Equipment, in which case Lessee shall be liable to XTRA Lease for the total estimated or actual cost to repair, restore and/or decontaminate the Equipment, as determined by XTRA Lease in its sole discretion.

(d) Lessee shall not remove, obscure, obliterate or otherwise alter any marks of identification on the Equipment. Prior to Lessee's return of the Equipment to XTRA Lease, all marks of identification or logos applied to the Equipment by or for Lessee shall be removed and the surface restored at Lessee's expense. Subject only to the provisions of Section 17(c) of the Standard Terms and Conditions, Lessee shall not make any structural alterations to the Equipment.

(e) Unless the terms of the Lease state otherwise, and except as provided below, upon Lessee making the Equipment available at an XTRA Lease location at six (6) month intervals or twenty five thousand (25,000) miles, whichever comes first, XTRA Lease agrees to conduct a periodic inspection of the Equipment in conformance with the requirements of 49 C.F.R. Part 396.17 and provide, at its expense, replacement tires, brakes, lights, lubricants and any other parts worn due to normal wear as needed; provided however, Lessee shall be responsible for all expenses relating to replacement tires, brakes, lights, lubricants and any other parts which are broken, inoperable or worn for reasons other than normal wear, including, without limitation, the action or inaction of Lessee. The foregoing shall not apply, and XTRA Lease shall have no obligation to perform periodic inspections, provide any replacement parts, or otherwise perform preventative maintenance on any units of Equipment (i) rented or leased under a Lease pursuant to which Lessee is charged for Tire Wear and Brake Wear or Lessee has assumed responsibility for performing all periodic inspections and preventative maintenance, (ii) which Lessee has not made available at an XTRA Lease location, or (iii) which are designated as storage trailers.

(f) Lessee shall return each unit of Equipment with tires of equal quality to the tires on the unit at the commencement of the Lease, as determined by XTRA Lease in its sole discretion. Lessee shall pay XTRA Lease the pro-rated value, on a replacement cost basis, of the lost remaining life, including a casing charge, for any tire returned in a damaged condition or replaced at a location other than an XTRA Lease location that is not returned to XTRA Lease. For purposes of the Standard Terms and Conditions, tire damage includes, but is not limited to, excessive wear, flat spotting, skid damage, abnormal wear due to equipment defect or improper maintenance or other damage that reduces the remaining useful life of the tire or its casing. A tire is excessively worn if its tread wear exceeds 1/32nds of an inch per ten thousand (10,000) miles traveled.

(g) Lessee is responsible for all damage to the Equipment and must notify XTRA Lease promptly of any potential mechanical failure or problem.

(h) If the Equipment provided to Lessee is designated to be utilized as a storage trailer, such Equipment is intended for storage use only and shall not be used to transport cargo, merchandise and/or freight over-the-road. If Lessee, following initial delivery of such storage trailer, operates Equipment over-the-road in violation of the preceding sentence, Lessee shall be responsible for all drayage and road service charges and Lessee shall pay XTRA Lease a mileage charge of $.10 per mile traveled by such storage trailer following initial delivery to Lessee.

(i) Upon reasonable notice from XTRA Lease, Lessee shall promptly provide XTRA Lease with the current location of each unit of Equipment Lessee rents or leases from XTRA Lease and, if requested, access to such units at a mutually acceptable time and location.

## 9. DAMAGE AND REPAIRS TO EQUIPMENT.

(a) In the case of total loss of a unit of Equipment beyond economic repair for any reason, including theft, collision, confiscation, fire, destruction, natural disaster or any other total casualty, regardless of where it may have occurred and notwithstanding any amounts which may be paid or disputed by Lessee's insurance company, Lessee is responsible for and shall promptly pay XTRA Lease the Casualty Loss Value of such unit of Equipment. XTRA Lease reserves the right to determine whether a unit of Equipment has in fact suffered an event of total loss or damage beyond economic repair. Lessee's requests for Casualty Loss Value quotes shall in no way constitute notice to XTRA Lease that Lessee has suffered a total loss of a unit of Equipment.

(b) In case of partial loss or damage to any unit of Equipment regardless of where it may have occurred (except the Trailer Tracking Unit), Lessee shall make all repairs and/or replacements at Lessee's expense in accordance with the Repair Standards. Lessee shall not attempt to repair and shall return to XTRA Lease for repair all non-functioning or damaged Trailer Tracking Units. Lessee shall be liable to XTRA Lease for the total estimated or actual cost, as determined by XTRA Lease in its sole discretion, to repair any Equipment returned to XTRA Lease in a non-functioning or damaged condition or repaired in a manner that is not in compliance with the Repair Standards. XTRA Lease reserves the right to not repair any non-functioning or damaged Equipment, in which case Lessee shall remain responsible for the estimated cost of repairs, as determined by XTRA Lease in its sole discretion, regardless of whether the damaged Equipment is actually repaired. Lessee shall not be entitled to any refund of any estimated cost of repair paid by Lessee should the actual cost of repair in fact be less.

(c) Lessee shall maintain and upon written request, provide XTRA Lease with written descriptions of all maintenance work or repairs made to the Equipment. In accordance with the Repair Standards, Lessee shall use first class materials and parts in the repair and service of the Equipment. In addition to any other applicable warranty, Lessee agrees that it will, at its own expense, rectify, repair and replace any and all known defects or other conditions to the Equipment not in compliance with the Repair Standards, arising from defective or improper materials or workmanship furnished by it or its subcontractors.

## 10. LIMITED WARRANTIES. BY TAKING POSSESSION OF THE EQUIPMENT, LESSEE ACKNOWLEDGES RECEIPT OF THE EQUIPMENT IN GOOD REPAIR AND WORKING CONDITION, AND THAT THE EQUIPMENT IS FIT AND SUFFICIENT FOR LESSEE'S INTENDED USE. XTRA LEASE IS NOT A SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED IN THE UNIFORM COMMERCIAL CODE). NO WARRANTY, EXPRESS OR IMPLIED, IS MADE BY XTRA LEASE OF THE QUALITY OF DESIGN, MANUFACTURE, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES. LESSEE WAIVES ANY AND ALL CLAIMS AGAINST XTRA LEASE FOR ANY AND ALL LOSS OR LIABILITY (INCLUDING CARGO LOSS) RESULTING FROM ANY DEFECTS OR FAILURES OF DESIGN, MATERIALS, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES, EITHER LATENT OR PATENT. LESSEE WAIVES THE PROVISIONS OF ANY APPLICABLE LAW LIMITING OR PROHIBITING A GENERAL RELEASE WITH RESPECT TO ANY RELEASE OR WAIVER IN THE LEASE OR THE STANDARD TERMS AND CONDITIONS. XTRA LEASE AGREES TO EXTEND TO LESSEE ALL WARRANTIES, IF ANY, OFFERED BY THE MANUFACTURERS OF THE EQUIPMENT, TRAILER TRACKING UNIT, AND SOFTWARE AND BY THE WIRELESS SERVICE CARRIERS UNDERLYING THE COMMUNICATION SERVICES.

XTRA LEASE DISCLAIMS, AND LESSEE WAIVES, ALL OTHER WARRANTIES WITH RESPECT TO THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES AND XTRA WEB SITES, WHETHER WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. EXCEPT FOR THE LIMITED WARRANTIES SET FORTH ABOVE IN THIS SECTION 10, THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES AND XTRA WEB SITES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT

3

REPRESENTATION OR WARRANTY OF ANY KIND, FOR USE BY LESSEE AT ITS SOLE RISK.

## 11. LESSEE'S INDEMNIFICATION OBLIGATIONS.

(A) LESSEE HEREBY AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE INDEMNIFIED PARTIES (AS DEFINED BELOW) FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITIES, OBLIGATIONS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) (COLLECTIVELY "CLAIMS"), IN ANY WAY ARISING OUT OF OR INCIDENT TO THE LEASE, OR THE USE, POSSESSION, MAINTENANCE, CONTROL OR CONDITION OF THE EQUIPMENT DURING THE LEASE, REGARDLESS OF WHETHER SUCH CLAIMS WERE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES, AND INCLUDING, WITHOUT LIMITATION, ANY AND ALL CLAIMS ARISING FROM OR INCIDENT TO: (I) THE ACTS OR OMISSIONS OF LESSEE, LESSEE'S AGENTS OR LESSEE'S ASSIGNEES; (II) THE PERFORMANCE, BREACH, OR DEFAULT OF THE LEASE BY LESSEE, OR THE ENFORCEMENT OF ANY OF THE TERMS OF THE LEASE BY XTRA LEASE; (III) THE DEATH OR INJURY TO ANY PERSON; (IV) DAMAGE TO ANY PROPERTY; (V) DAMAGE TO, OR ANY DAMAGE OR INJURY RESULTING FROM, ANY CARGO PLACED ON OR CONTAINED IN THE EQUIPMENT; (VI) THE VIOLATION OR ALLEGED VIOLATION OF ANY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, ANY FAILURE OR ALLEGED FAILURE TO USE, OPERATE, MAINTAIN OR CONTROL THE EQUIPMENT IN COMPLIANCE WITH APPLICABLE LAW; (VII) ANY TAXES AND ASSESSMENTS, INCLUDING WITHOUT LIMITATION ALL IMPORT AND CUSTOMS DUTIES AND ALL WITHHOLDING, PROPERTY, SALES AND/OR USE TAXES, AND ALL PENALTIES; (VIII) ANY FINES, TOLLS, USER FEES, TRAFFIC AND PARKING VIOLATIONS, TOWING AND STORAGE EXPENSES, AND ANY OTHER SIMILAR FINES, FEES OR CHARGES; (IX) THE USE OF THE SOFTWARE, COMMUNICATION SERVICES OR XTRA WEB SITES; AND (X) THE USE, FAILURE TO USE OR INABILITY TO USE THE TRAILER TRACKING UNIT, INCLUDING, WITHOUT LIMITATION, THE INABILITY TO USE THE ACCESS TELEPHONE NUMBER FOR THE TRAILER TRACKING UNIT.

(B) FOR PURPOSES OF THE STANDARD TERMS AND CONDITIONS, THE TERM "INDEMNIFIED PARTIES" SHALL REFER TO (I) XTRA LEASE, ITS AFFILIATES AND ITS AND THEIR SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, LICENSORS AND AGENTS, AND (II) XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING UNIT AND SOFTWARE AND THE UNDERLYING WIRELESS SERVICE CARRIER SUPPLYING SERVICES TO XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING SOFTWARE, AND THEIR AFFILIATES, SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, AND AGENTS.

(C) LESSEE SHALL NOT SETTLE OR COMPROMISE ANY CLAIM AGAINST THE INDEMNIFIED PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR WHICH LESSEE HAS ASSUMED THE DEFENSE OF THE INDEMNIFIED PARTIES, WITHOUT THE PRIOR WRITTEN CONSENT OF XTRA LEASE. LESSEE SHALL REIMBURSE THE INDEMNIFIED PARTIES FOR ANY EXPENSE INCURRED, INCLUDING ATTORNEYS' FEES, TO DEFEND ANY ACTION WHICH LESSEE IS REQUIRED TO DEFEND PURSUANT TO THE STANDARD TERMS AND CONDITIONS. THE PROVISIONS OF THIS SECTION 11 SHALL SURVIVE THE TERMINATION OF THE LEASE.

## 12. LIMITATION OF LIABILITY.

(a) Under no circumstances shall XTRA Lease or its licensors be liable for any incidental, indirect, special, consequential, exemplary or punitive damages of any kind, whether or not resulting from the negligence of XTRA Lease or its licensors, and including, without limitation, any lost profits, business failure or interruption damages, or any damages associated with lost or damaged cargo. In no event shall XTRA Lease's total liability to Lessee exceed the amount of Use Charges paid by Lessee during the three (3) months preceding the event that gave rise to the claim or action.

(b) Lessee expressly understands and agrees that it has no contractual relationship whatsoever with the underlying wireless service carrier and that Lessee is not a third-party beneficiary of any agreement with XTRA Lease's third-party Trailer Tracking licensor and/or the underlying wireless service carrier. In addition, Lessee expressly understands and agrees that the underlying wireless service carrier shall have no legal, equitable or other liability of any kind to Lessee. In any event, regardless of the form of the action, whether for breach of contract, warranty, negligence, strict liability in tort or otherwise, Lessee hereby waives any and all claims against the underlying wireless service carrier from all such liability, provided, however, that if and only if, Use Charges relating to the Communication Services are billed separately to Lessee as part of the total Use Charges for the Equipment, then Lessee's exclusive remedy and the total liability of the underlying

wireless service carrier arising in any way in connection with the Lease for any cause whatsoever including, without limitation, any failure or disruption of service provided hereunder, is limited to payment of damages in an amount equal to the portion of the Use Charges to Lessee for the services relating to the period of service during which said damages occur.

## 13. INSURANCE & CDW.

(a) Minimum levels of insurance covering the Equipment shall be maintained by Lessee, at Lessee's expense, with a licensed insurance carrier with an A.M. Best rating of not less than B+ and shall include:

(i) All risk insurance covering physical loss of or damage to the Equipment from any cause whatsoever. XTRA Lease shall be named a loss payee;

(ii) Comprehensive Automobile Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million combined single limit or $1 million bodily injury and $250,000 property damage. XTRA Lease must be shown as an additional insured; and

(iii) Comprehensive General Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, or damage to the property of any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million general aggregate or $1 million each occurrence and include contractual liability coverage and/or endorsement. XTRA Lease must be shown as an additional insured.

(b) Policies of insurance shall be valid and in force until the Equipment is returned to XTRA Lease. Lessee shall provide XTRA Lease with certificate(s) of insurance evidencing the required coverage prior to delivery or acceptance of any Equipment, and thereafter with certified copies of the insurance policies as may be requested by XTRA Lease. Such certificates shall contain a requirement that XTRA Lease receive thirty (30) days prior written notice of cancellation or material change to Lessee's insurance policies. All policies of insurance must carry deductible limits acceptable to XTRA Lease. If requested by XTRA Lease, Lessee shall file a claim with its insurance carrier for any lost or stolen units of Equipment. Insolvency or failure by Lessee's insurance carrier to provide coverage for any and all loss, claim, liability or damage arising out of the Lease shall not relieve Lessee of any of its obligations set forth in the Lease. Nothing contained in these insurance requirements is to be construed as limiting the extent of Lessee's liability under the Lease. Lessee is solely responsible for ensuring that it maintains the minimum levels of financial responsibility required by Applicable Law.

(c) The insurance requirements of this Section 13 may be satisfied in whole or in part by a self-insurance program maintained by Lessee which is acceptable to XTRA Lease, provided however XTRA Lease shall be named as an additional loss payee and/or additional insured under such program including umbrella policies, if any, which may be a part thereof. Lessee shall provide to XTRA Lease evidence of such self-insurance program upon XTRA Lease's request together with a copy of Lessee's most recent financial statements, which shall be satisfactory to XTRA Lease.

(d) Lessee can fulfill its obligation to provide the all risk insurance required in Section 13(a)(i) hereof, by purchasing the Collision Damage, Fire and Theft Waiver Options ("CDW") offered by XTRA Lease. In the event Lessee has elected the CDW option, Lessee hereby acknowledges that CDW (i) is a damage waiver program, (ii) is not an all risk insurance program covering physical loss of or damage to the Equipment for the benefit of Lessee, and (iii) is intended solely (A) to reimburse XTRA Lease for any repairs required for any unit of Equipment returned to XTRA Lease in a damaged condition, subject to applicable deductible or (B) to pay XTRA Lease the Casualty Loss Value of any unit of Equipment which was to be returned to XTRA Lease upon termination of the Lease and such unit of Equipment is a total loss by theft, confiscation, fire, destruction, damage beyond economic repair or any other total casualty; and in addition to the terms set forth therein, the benefits of such coverage will not be available to Lessee unless each of the following conditions have been met: (v) Lessee is in compliance with all terms and conditions of the Lease, including current on all payments; (w) all casualty loss or damage to the unit of Equipment must have occurred in the United States or Canada; (x) such damage or loss was not the result of Lessee's negligence and/or failure to maintain proper care and control of such unit of Equipment; (y) Lessee shall have promptly notified XTRA Lease in writing and obtained a police report of any loss or damage to any unit of Equipment as soon as practicable, and in any case, not later than 72 hours after the occurrence of such casualty loss or damage, and shall have delivered promptly to XTRA Lease a copy of the applicable police report; and (z) Lessee shall have provided to XTRA Lease any additional documentation it may request relating

4

to the casualty loss or damage and comply with any other requirements of **XTRA Lease.** Oral requests for quotes on casualty loss or damaged Equipment shall not constitute the required notice under this Section 13(d). **Lessee** shall be liable for the first $1,500 for each occurrence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). In addition, **Lessee** hereby agrees that Use Charges will continue to accrue with regard to such Equipment until **Lessee** has paid the required deductible. CDW shall terminate immediately upon any Default by **Lessee** under the Lease. **XTRA Lease**, in its sole discretion, may discontinue providing CDW to **Lessee** on ten (10) days prior written notice.

**14. SECURITY DEPOSIT.** As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, a security deposit in amount determined by **XTRA Lease**, may be required and, if required, shall be delivered to **XTRA Lease** by **Lessee** prior to **Lessee** taking possession of any Equipment. Such security deposit may be used to offset any amounts due and owing by **Lessee** to **XTRA Lease** pursuant to the Lease. The security deposit, or any balance thereof, if any, shall be returned to **Lessee** after all of the Equipment leased hereunder has been returned to **XTRA Lease** and after deduction of any amounts due and owing by **Lessee** to **XTRA Lease**, including, without limitation, all unpaid Use Charges and any repair or replacement expenses.

**15. LETTER OF CREDIT.** As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, **Lessee** may be required to obtain from a financial institution acceptable to **XTRA Lease** an irrevocable letter of credit for the benefit of **XTRA Lease** in an amount determined by **XTRA Lease**. If required, **Lessee** agrees to maintain such letter of credit in place until all of the Equipment leased hereunder shall have been returned to **XTRA Lease** and **Lessee** shall have fully complied with all of its obligations hereunder, including the payment of all Use Charges, repair or replacement expenses and any other amount due and owing to **XTRA Lease** hereunder. In addition, the failure by **Lessee** to extend the letter of credit or to provide a substitute letter of credit acceptable to **XTRA Lease** at least thirty (30) days prior to the expiration date of the letter of credit shall constitute an event of Default under the Lease and shall entitle **XTRA Lease** to immediately draw down the full amount available under the letter of credit. The letter of credit shall be issued in the form approved by **XTRA Lease**.

**16. ADEQUATE ASSURANCES.** During the term of any Lease, **XTRA Lease**, in its sole discretion, may require that **Lessee** immediately enter into reasonable security arrangements with **XTRA Lease**. Such security arrangements may include, but are not limited to, providing a security deposit, letter of credit, or the payment of Estimated Charges sufficient to protect **XTRA Lease** from all risk of loss. Failure by **Lessee** to comply with any of the terms of this provision shall constitute a Default of the Lease and **XTRA Lease** shall be entitled to all rights and remedies provided by Section 21(b) herein.

**17. LAWS, RULES AND REGULATIONS.**
(a) For each unit of Equipment, **XTRA Lease** will provide a motor vehicle registration and license plate for registration in a jurisdiction of **XTRA Lease's** choosing, together with any required renewals. **Lessee** shall be solely responsible for all other registrations, licenses, license plates, and operating permits that may be required for **Lessee** to use, possess, operate or control the Equipment during the Lease.

(b) **Lessee** shall be solely responsible for (i) complying with Applicable Law, including, without limitation, all federal and state anti-pollution and environmental, transportation compliance, safety, and inspection requirements; (ii) any modification required to be made to the Equipment to comply with Applicable Law; and (iii) any fines, tolls, user fees, traffic and parking violations, towing and storage expenses and other similar fines, fees or charges relating to the Equipment during the Lease. **XTRA Lease** shall charge **Lessee**, and **Lessee** agrees to pay **XTRA lease**, for any fines, tolls, user fees, traffic or parking violations, towing and storage expenses and other fines, fees, penalties, or charges relating to the Equipment during the Lease, plus an administrative fee.

(c) Sections 95300-95311 of Title 17 of the California Code of Regulations governs the operation of 53-foot or longer box-type trailers in the State of California (the "HDV Regulations"). **Lessee** is solely responsible for complying with the HDV Regulations, as they may be amended from time to time, in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the HDV Regulations; (ii) complying with any reporting obligations under the HDV Regulations associated with the operation of the Equipment in the State of California; and (iii) verifying that any Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the HDV Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee**

shall not permit Equipment that does not comply with the HDV Regulations to be operated in the State of California. **Lessee** shall have the right to make modifications to the Equipment to comply with the requirements of the HDV Regulations; provided, however, that (i) any modifications made to install aerodynamic devices on Equipment are made in accordance with the recommendations and standards set by the manufacturer of the aerodynamic device, and (ii) unless otherwise agreed to by **XTRA Lease**, **Lessee** shall be responsible for removing any modifications **Lessee** makes to the Equipment prior to **Lessee's** return of the Equipment to **XTRA Lease.**

**THE LESSEE OF THIS BOX-TYPE TRAILER UNDERSTANDS THAT WHEN USING A HEAVY-DUTY TRACTOR TO PULL A 53-FOOT OR LONGER BOX-TYPE TRAILER ON A HIGHWAY WITHIN CALIFORNIA, THE BOX-TYPE TRAILER MUST BE COMPLIANT WITH SECTIONS 95300-95311, TITLE 17, CALIFORNIA CODE OF REGULATIONS, AND THAT IT IS THE RESPONSIBILITY OF THE LESSEE TO ENSURE THIS BOX-TYPE TRAILER IS COMPLIANT. THE REGULATIONS MAY REQUIRE THIS TRAILER TO HAVE LOW ROLLING RESISTANCE TIRES AND AERODYNAMIC TECHNOLOGIES THAT ARE U.S. ENVIRONMENTAL PROTECTION AGENCY VERIFIED SMARTWAY TECHNOLOGIES PRIOR TO CURRENT OR FUTURE USE IN CALIFORNIA.**

(d) Section 2477 of Title 13 of the California Code of Regulations governs the operation of refrigerated units of Equipment in the State of California (the "TRU Regulations"). It is a violation of the TRU Regulations to operate any refrigerated unit of Equipment in the State of California that does not comply with the TRU Regulations, as they may be amended from time to time. **Lessee** shall be solely responsible for complying with the TRU Regulations in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the TRU Regulations; provided, that **Lessee** shall obtain **XTRA Lease's** approval prior to modifying any Equipment to comply with the TRU Regulations; (ii) complying with any reporting obligations under the TRU Regulations associated with the operation of refrigerated units of Equipment in the State of California; and (iii) verifying that any refrigerated unit of Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the TRU Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee** shall not permit a refrigerated unit of Equipment that does not comply with the TRU Regulations to be operated in the State of California.

**18. TAXES.** All taxes and assessments, including without limitation all import and customs duties and all withholding, property, sales and/or use taxes, and all penalties or other charges or fees arising out of or incident to the use, possession or control of the Equipment by **Lessee** prior to its return to **XTRA Lease**, shall be the responsibility of **Lessee**. In order to avoid the obligation to remit any applicable withholding, property, sales and/or use tax to **XTRA Lease**, **Lessee** must provide a duly authorized exemption certificate issued by or acceptable to the relevant taxing authority.

**19. ASSIGNMENT & SUCCESSORS. Lessee** shall not assign or sublease any right or interest in the Equipment, any Lease or any agreement that results therefrom, without the prior written consent of **XTRA Lease**. **XTRA Lease** shall have the right to assign any of its rights or interests in the Equipment, any Lease or any agreement that results therefrom, without obtaining **Lessee's** consent. For purposes of this Section 19, an assignment shall be deemed to have occurred if there has been a change in the control of **Lessee** or **Lessee's** business, whether by merger, consolidation or reorganization, the sale of a majority of the ownership of **Lessee** or **Lessee's** ultimate parent, or a sale, assignment or other transfer of all or substantially all of **Lessee's** assets. **Lessee** may not sublicense, assign, rent, disclose or provide the Software or access to the Communications Services to any third-party. Notwithstanding anything to the contrary contained herein, the Lease and the Standard Terms and Conditions shall inure to the benefit and be binding upon the parties, their heirs, successors, administrators, executors and assigns.

**20. LIENS.**
(a) **Lessee** shall keep the Equipment free from any liens, including, without limitation, mechanics' liens, storage, warehouse or other possessory liens, claims or encumbrances, attachments, rights of others and legal processes ("Liens") of creditors of **Lessee** or any other persons. **Lessee** shall promptly notify **XTRA Lease** upon receipt of notice of any such Liens affecting the Equipment and **Lessee** shall promptly defend at its own expense **XTRA Lease's** title to the Equipment from such Liens.

(b) Notwithstanding the parties' intention and express agreement that the Lease constitutes a valid lease of the Equipment, and solely to protect the rights of **XTRA Lease** in the Equipment in the event the Lease is determined by a court of competent jurisdiction to be a conditional sale of and/or financing arrangement as to the Equipment, **Lessee** hereby pledges, assigns and grants to **XTRA Lease** a continuing first priority security interest in and lien upon the Equipment and all proceeds (including proceeds of all insurance policies), which interest and lien shall be cross-collateralized with

5

each and every separate item of Equipment subject to the Lease and related schedules, in order to secure the prompt payment and performance, as and when due, of all Lessee's obligations, both now existing and hereinafter arising under this Lease. Lessee hereby agrees that XTRA Lease shall have all rights and remedies of a "secured party" under the Uniform Commercial Code and authorizes XTRA Lease to cause this Lease and/or any statements or other instruments in respect of this Lease showing the interest of XTRA Lease in the Equipment (including certificates of title or Uniform Commercial Code financing statements) to be filed or recorded, and grants XTRA Lease and its agents the right to execute Lessee's name thereto. Lessee also agrees to execute or cause the execution of such additional documents and do such other acts and things, including execution of applications and certificates of title naming XTRA Lease as a secured party and delivery of same to XTRA Lease, as XTRA Lease from time to time requests or deems necessary to establish and maintain a valid and perfected security interest in and lien upon the Equipment. To further secure payment to XTRA Lease of the obligations owed by Lessee, Lessee agrees that the Equipment subject to the Lease shall be cross-collateralized with the Equipment subject to any other Lease in which Lessee is a lessee.

## 21. DEFAULT.

(a) Lessee SHALL BE IN DEFAULT of the Lease: (i) if Lessee fails to comply with any of the terms or conditions of the Lease, including, without limitation, the retention of the Equipment for the Lease Term or the timely payment of all invoices; (ii) if any third-party credit support, including any guarantor or issuer of letter of credit, attempts to or does cancel the support or guaranty (or is otherwise in default under such support or guaranty); (iii) if Lessee is in default of any of the terms or conditions of any other agreement with XTRA Lease; (iv) if Lessee fails to maintain, or fails to provide XTRA Lease with proper evidence of, the insurance required by this Lease, or Lessee's insurance is canceled, reduced or lapses; (v) if Lessee fails to provide the adequate assurances under Section 16 hereof; or (vi) if Lessee becomes insolvent, or subject to any voluntary or involuntary bankruptcy proceeding (including acquiescence in the appointment of a trustee or receiver, or commencement of any dissolution or liquidation proceeding; hereafter individually or collectively referred to as a "Default").

(b) In addition to any rights or remedies available at law or in equity, upon a Default by Lessee, XTRA Lease shall have the right, at its option and without demand or notice to Lessee, to do any one or more of the following: (i) pay all amounts required to be paid or perform or cause to be performed all obligations required to be performed by Lessee under the Lease and charge Lessee as additional rent the amount paid or the reasonable value of the services performed therefore together with interest thereon at the rate described in Section 7 hereof; (ii) declare the entire balance of the remaining payments under the Lease immediately due and payable by acceleration and recover such amount as liquidated damages, the reasonableness of such damages being acknowledged and agreed to by Lessee; (iii) take immediate possession of all outstanding Equipment and Software, all of which is to be returned at Lessee's expense; (iv) immediately terminate Lessee's access to the Communication Services; (v) terminate the Lease (whereupon the terms and conditions shall continue to apply to the Equipment then in the possession or control of Lessee until its return); (vi) calculate and require Lessee to pay any collection costs incurred in recovery of any sums due or repossession of any Equipment including, without limitation, reasonable attorneys' fees; (vii) calculate and recover from Lessee any lost profits and damages as a "Lost Volume Seller" and/or "Lost Volume Lessor" (as those terms are defined and used in the Uniform Commercial Code) that XTRA Lease would have generated had the Lease not been prematurely cancelled; (viii) calculate and recover from Lessee any costs to transport and store the Equipment throughout the remainder of the Lease Term; and (ix) set-off and apply any amounts owing by XTRA Lease to or for the account of Lessee against any amounts owing by Lessee to or for the account of XTRA Lease, including, without limitation, any deposits, accruals, prepayments, overpayments, Estimated Charges, fees or otherwise. Lessee acknowledges and agrees that XTRA Lease is under no duty to mitigate damages resulting from Lessee's Default.

## 22. REPOSSESSION.

(a) In the event of Lessee's Default, and upon demand of XTRA Lease, Lessee shall immediately return all Equipment to XTRA Lease. If Lessee fails or refuses to immediately return all Equipment after demand by XTRA Lease, XTRA Lease shall have the right to enter upon any premises where the Equipment is located and take immediate possession of, and at Lessee's expense remove, the Equipment, and XTRA Lease shall be deemed to be Lessee's agent for such purposes. If XTRA Lease takes possession of the Equipment with property obtained in, upon or attached to the Equipment, XTRA Lease may take possession of such property and hold it in its own or public storage for the account and at the expense of Lessee upon thirty (30) days advance written notice to Lessee, dispose of such property in a commercially reasonable manner with no further liability. Lessee expressly

waives the benefits of any Applicable Law, now or hereafter enacted, exempting any leased property from replevin, distraint, levy or sale in any legal proceeding taken by XTRA Lease to enforce any right under the Lease.

(b) In the event of Lessee's Default, (i) XTRA Lease will be in danger of losing its Equipment unless immediate possession of the Equipment is obtained because XTRA Lease's Equipment is movable and readily marketable; and (ii) XTRA Lease will not have an adequate remedy at law to protect its rights in its unreturned Equipment. Therefore, Lessee agrees that in the event of Lessee's Default, XTRA Lease shall have the right, without prejudice to any other rights and remedies otherwise available to XTRA Lease at law or in equity, to obtain injunctive relief in order to prevent the continued use of the Equipment by Lessee and to require Lessee to immediately deliver possession of the Equipment to XTRA Lease.

## 23. INTELLECTUAL PROPERTY. XTRA Lease and/or its licensors reserve ownership of all Intellectual Property in and to the Equipment, Trailer Tracking Unit, Software, Communication Services and the XTRA Web Sites, and the Lease does not create any right of ownership in or to such materials in Lessee. For the purposes of this Section 23, "Intellectual Property" shall mean all proprietary interests of any kind or nature, including, without limitation interests pertaining to patent rights, copyrights, trade secrets, mask work rights, circuit layout rights, design rights, prototypes, models, source code, documentation, trade and service marks, and other similar rights throughout the world, however denominated and any amendments, additions or improvements made thereto.

## 24. BUSINESS CONDUCTED ELECTRONICALLY.

(a) Lessee agrees to conduct business with XTRA Lease electronically, and that except as otherwise specifically provided herein, an electronic signature on any notice or other communication required or permitted to be given hereunder, or pursuant or relating to any Lease, shall have the same force and effect as the use of manual signatures;

(b) Lessee agrees that in the event Lessee uses any web site of XTRA Lease, including, without limitation, xtracorp.com, xtralease.com, xtratrack.com, xtrainstall.com, and /or xtre.com (collectively, "XTRA Web Sites"), as a condition of such use, Lessee stipulates that while on XTRA Web Sites and where applicable terms and conditions on XTRA Web Sites so indicate, when Lessee clicks a button labeled "I Agree" or "I Accept", or when Lessee types "I Agree" or "I Accept" in a space marked for such an input by Lessee, Lessee will be manifesting and authenticating Lessee's assent to a binding contractual agreement incorporating the terms and provisions for which the button or input area is provided; and

(c) In any dispute hereunder, related to the Lease, or related to Lessee's use of XTRA Web Sites, Lessee stipulates that it will have the burden of proving that (i) any electronic manifestation of assent received by XTRA Lease is not attributable to Lessee; and (ii) Lessee did not have an opportunity to review any electronic terms and conditions posted on the XTRA Web Sites.

## 25. WAIVER. No waiver by XTRA Lease of any breach or Default hereunder, or omission or delay by XTRA Lease in exercising any of its rights hereunder, or course of dealing between XTRA Lease and Lessee shall operate as a waiver by XTRA Lease to subsequently require full compliance with the Lease or the Standard Terms and Conditions or as a waiver of any of XTRA Lease's rights or remedies hereunder.

## 26. ILLEGAL PAYMENTS. No bribes, illegal commissions, or other similar payments, whether direct or indirect, to the best of Lessee's knowledge, have been or will be made to any employee or agent of XTRA Lease or Lessee, or of their respective subsidiaries, in connection with the Lease.

## 27. ENTIRE AGREEMENT; CONFLICTS. The Lease, including the Standard Terms and Conditions, any long-term Equipment Lease Agreement and Schedules thereto, National Account Agreement, Short-term Rental Agreement, and Equipment Rental Agreement, supersedes all prior agreements, whether written or oral, between XTRA Lease and Lessee with respect to the rental or lease of the Equipment described therein, and constitutes a complete and exclusive statement of the terms of the agreement between XTRA Lease and Lessee with respect to the lease of the Equipment described therein. All Lease documents shall be read in a complementary manner. Except as may be provided in the Lease, the Standard Terms and Conditions shall take precedence over all other Lease documents.

## 28. AMENDMENTS. XTRA Lease reserves the right to change, upon thirty (30) days prior written notice, any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease and the Standard Terms and Conditions. No change to the Lease shall be effective unless in writing, executed by XTRA Lease's Vice President, Customer Financial Services or his designee who is located in XTRA Lease's home office in St. Louis, Missouri and delivered to Lessee pursuant to the notice provision hereto.

6

**29. NOTICES.** All notices and other communications required or permitted to be given hereunder, including those required for billing purposes, shall be in writing and shall be deemed given and made (i) if by personal delivery, on the date of delivery, (ii) if by a nationally recognized overnight courier, on the next day following deposit, and (iii) if by mail, on the third business day following deposit in the mail. Any notice or communication to **Lessee** shall be sent to the address set forth in the Lease, or such other address as may be designated by **Lessee** by written notice to **XTRA Lease**. In the case of **XTRA Lease**, any notice or communication shall be sent to XTRA Lease, 7911 Forsyth Boulevard, Suite 600, St. Louis, MO 63105, Attention: Vice President, Customer Financial Services. Any change of address by either party shall be communicated to the other in writing. Notwithstanding the above, **XTRA Lease** may provide the Lease, the Standard Terms and Conditions, invoices, notices and other communications to **Lessee** in an electronic format through the XTRA Web Sites or other means.

**30. CONFIDENTIALITY.** The confidentiality of the Lease, including without limitation the Use Charges applicable thereunder, shall be strictly maintained by **Lessee** and shall not be released or revealed to any third-party by **Lessee**.

**31. CHOICE OF LAW; VENUE; JURY TRIAL WAIVER.** The Lease and the Standard Terms and Conditions shall be governed by the internal substantive laws of the State of Missouri, without regard to conflicts of laws provisions. **Lessee** and **XTRA Lease** each hereby submit to the jurisdiction of the Circuit Court of St. Louis County, Missouri for purposes of adjudicating any action arising out of or related to the Lease, and hereby waive, to the fullest extent permitted by law, any objection to that venue for any action arising out of or related to the Lease. Any action arising out of the Lease may be properly filed in the Circuit Court of St. Louis County, Missouri; however, **XTRA Lease** reserves its right to bring suit in any other appropriate jurisdiction. **LESSEE AND XTRA LEASE EACH IRREVOCABLY WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING FOR ANY CLAIM, DISPUTE OR CONTROVERSY THAT IN ANY WAY ARISES FROM OR RELATES TO THE LEASE AND IN WHICH LESSEE AND XTRA LEASE ARE ADVERSE PARTIES.**

**32. SEVERABILITY.** If any term or provision hereof is declared to be illegal, invalid or unenforceable for any reason by a court of competent jurisdiction, such illegality, invalidity or unenforceability shall not affect the remaining terms and provisions hereof, which shall remain binding and enforceable.

7

# EXHIBIT B

**(Rental Agreements)**



# EQUIPMENT RENTAL AGREEMENT #079077171
3600 DEPOT ROAD, HAYWARD, CA 94545-2718 Phone #:(510)670-0181

**Return Location**
HAYWARD(79)
3600 DEPOT ROAD
HAYWARD, CA 94545-2718
Phone #: (510)670-0181

| Lessee Name & Address | Garage/Stored At |
|---|---|
| UNITED PROSPERITY GROUP, INC DBA THE<br>60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080-6515 | 60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080- |

Lessee's rental, lease, acceptance, possession, or use of this Equipment or any other XTRA LEASE Equipment and all of Lessee's transactions and dealings with XTRA LEASE are governed by the XTRA LEASE Standard Terms & Conditions.

**Phone #:** (650)871-2505 **Fax #:** (650)871-2507
**Customer #:** 4KH3G

**Equipment Utilized For**
Over the Road

**Insurance Information**

| Unit #: | OTRT F60076 |
|---|---|
| VIN #: | 3H3V281CXAT 135002 |
| License Plate #: | 2613254 |
| Plate State: | ME |
| Unit Description: | REEFER, 28-0, S-RIDE, OHD |
| | 2010 HYUNDAI |
| Reefer Serial #: | 6001054809 |
| CARB IDN: | 090835700 |
| CARB Compliance Thru Date: | 12/31/2016 |
| Unit Last DOT Inspection: | 02/2015 |

**Agent:** POLARIS RISK GROUP **Expires:** 9/17/2015

**Lessee shall pay for leased unit at a rate of**

| | |
|---|---|
| Reefer Hours - Actual | 1.5000 / Hour |
| Rental | 40.0000 / Day |
| Rental | 225.0000 / Week |
| Rental | 850.0000 / 4 Week |
| Mileage | 0.0300 / Mileage |
| Free Rental Days | 2.0000 / Day |
| Estimated Miles | 1800.000 / Billing Period |
| Est. Reefer Hours | 140.0000 / Billing Period |

**Miscellaneous Rates**

**P.O. #**
**Auth By:** Wayman Wong

**Minimum Term of** 1 Day

## CDW/FTW Options
Lessee's election to accept or decline the Collision Damage and Fire/Theft waiver("CDW") offered by XTRA LEASE is as indicated herein.

**Collision Damage:** Not Applicable    **Fire/Theft:** Not Applicable

Lessee shall be liable for the first $1,500 for each occurrence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). Notwithstanding Lessee's election to accept or decline CDW, upon ten(10) days prior written notice, XTRA LEASE, in its sole discretion, may discontinue providing CDW to Lessee.

## Outbound Inspection    Inspector: Bogler, Cory

| | |
|---|---|
| **Date Out:** | 03/04/2015 16:52 |
| **Registration:** | PRESENT |

**Tires**

| | | | |
|---|---|---|---|
| LOF | YOKO 12/32 | LOR | TIREREARLE |
| LIF | YOKO 12/32 | LIR | TIREREARLE |
| ROF | BRGS 15/32 | ROR | TIREREARRI |
| RIF | GDYR 10/32 | RIR | TIREREARRI |
| Size | 295/75R 22.5 | | |

**Brakes** FA 5/8 5/8 **RA** BRAK

**Hubodometer Out:** 138771

**Trailer Tracking MSN:** N/A

**Reefer Information**

| | |
|---|---|
| Fuel Level: | 8/8 Full |
| Engine Hours: | 799 |
| Elect. S. Hours Protected: | 6850 |

**California B.I.T. Inspection**

| | | | |
|---|---|---|---|
| Brake Adjustment: | P | Brake System: | P |
| Suspension: | P | Tires & Wheels: | P |
| Vehicle Connection Device: | P | | |

**Driver Signature**

**Customer Signature**

First Int.  Last Name

/ /
Signature          Date

## DAILY OR PRE-TRIP LESSEE/DRIVER SAFETY CHECK LIST

1. Maintain tire air pressure as indicated on tire side wall. Check for and repair flat tires. Check wheels and rims for damage. Torque lug nuts on all disc wheels to 450-500 foot pounds every 1,500 miles.
2. Check all brakes including trailer brake connections. Properly adjust brakes.
3. Check and maintain oil level on axles and hydraulic goosenecks.
4. Check all lighting devices, reflectors and other emergency equipment.
5. Check all coupling devices. Check that all safety pins, slider pins and connecting locks are in the locked position.
6. Every six months, torque U-bolts on air ride equipped trailers to 750 foot pounds and spring rides to 360-400 foot pounds.
7. Check forward bulkheads on flatbed trailers.
8. On refrigeration units:
   a) Check thermostat temperature at least every 4 hours during use.
   b) Maintain sufficient fuel in supply tank for continued operation.
   c) Check engine oil level and maintain at full mark.
   d) Start engine to charge battery at least every week for a minimum of two hours.
9. The last DOT Inspection was performed on the date indicated hereon next to the "Unit Last DOT Inspection" designation. DOT Inspection are due to be performed annually on or before the last day of the same month.
10. Inform **XTRA Lease** promptly if unit is lost, stolen or involved in an accident.

UNITED PROSPERITY GROUP, INC DBA THE PRODUCE COMPANY (4KH3G)    Page 1 of 3

Equipment Rental Agreement # 079077171



Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 65 of 89

B=Bent BR=Broken C=Cut CA=Check/Adjust H=Hole M=Missing O=Other P=Patch S=Scrape SEC=Section



| View | Zone | Condition | View | Zone | Condition | View | Zone | Condition |
|------|------|-----------|------|------|-----------|------|------|-----------|
| Front | | No Damage | Undr Crg | | No Damage | Int Floor | | No Damage |
| Left Side | | No Damage | Int Doors | | No Damage | Int Front | | No Damage |
| Right Side | | No Damage | Int Right | | No Damage | Int Roof | | No Damage |
| Rear | | No Damage | Int Left | | No Damage | | | |

**Note(s)/Comment(s)**

**Miscellaneous**

**Third Party Company:**     PUL

Case: 15-30897   Doc# 246   Filed: 06/06/16   Entered: 06/07/16 08:59:36   Page 66 of 89



# EQUIPMENT RENTAL AGREEMENT #079077171
3600 DEPOT ROAD, HAYWARD, CA 94545-2718 Phone #:(510)670-0181

**Return Location**
HAYWARD(79)
3600 DEPOT ROAD
HAYWARD, CA 94545-2718
Phone #: (510)670-0181

| Lessee Name/Address | Garage/Stored At |
|---|---|
| UNITED PROSPERITY GROUP, INC DBA THE<br>60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080-6515 | 60 AIRPORT BLVD<br>SOUTH SAN FRANCISCO, CA 94080- |

Lessee's rental, lease, acceptance, possession, or use of this Equipment or any other XTRA LEASE Equipment and all of Lessee's transactions and dealings with XTRA LEASE are governed by the XTRA LEASE Standard Terms & Conditions.

Phone #: (650)871-2505  Fax #: (650)871-2507

**Equipment Utilized For**
Over the Road

Customer #:  4KH3G

**Insurance Information**

| Unit #: | OTRT F60076 |
|---|---|
| VIN #: | 3H3V281CXAT 135002 |
| License Plate #: | 2613254 |
| Plate State: | ME |
| Unit Description: | REEFER, 28-0, S-RIDE, OHD |
| | 2010 HYUNDAI |
| Reefer Serial #: | 6001054809 |
| CARB IDN: | 090835700 |

Agent:  POLARIS RISK GROUP   Expires:   9/17/2015

**Lessee shall pay for leased unit at a rate of**

| | | |
|---|---|---|
| Reefer Hours - Actual | 1.5000 / Hour | |
| Rental | 40.0000 / Day | |
| Rental | 225.0000 / Week | |
| Rental | 850.0000 / 4 Week | |
| Mileage | 0.0300 / Mileage | |
| Free Rental Days | 2.0000 / Day | |
| Estimated Miles | 1800.000 / Billing Period | |
| Est. Reefer Hours | 140.0000 / Billing Period | |

**Miscellaneous Rates**

CARB Compliance Thru Date: 12/31/2016
Unit Last DOT Inspection:  02/2015

Minimum Term of  1 Day

P.O. #
Auth By:   Wayman Wong

## CDW/FTW Options
Lessee's election to accept or decline the Collision Damage and Fire/Theft waiver("CDW") offered by XTRA LEASE is as indicated herein.

Collision Damage:  Not Applicable       Fire/Theft:    Not Applicable

Lessee shall be liable for the first $1,500 for each occurence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). Notwithstanding Lessee's election to accept or decline CDW, upon ten(10) days prior written notice, XTRA LEASE, in its sole discretion, may discontinue providing CDW to Lessee.

| Outbound Inspection  Inspector: Bogler, Cory | |
|---|---|
| **Date Out:** | 03/04/2015 16:52 |
| **Registration:** | PRESENT |

| Tires | | | |
|---|---|---|---|
| LOF | YOKO 12/32 | LOR | TIRE REARLE |
| LIF | YOKO 12/32 | LIR | TIRE REARLE |
| ROF | BRGS 15/32 | ROR | TIRE REARRI |
| RIF | GDYR 10/32 | RIR | TIRE REARRI |
| Size | 295/75R 22.5 | | |

Brakes  FA 5/8 5/8   RA BRAK

Hubodometer Out:                                    138771

Trailer Tracking MSN:    N/A

**Reefer Information**

| Fuel Level: | 8/8 Full |
|---|---|
| Engine Hours: | 799 |
| Elect. S. Hours Protected: | 6850 |

**California B.I.T. Inspection**

| | | | |
|---|---|---|---|
| Brake Adjustment: | P | Brake System: | P |
| Suspension: | P | Tires & Wheels: | P |
| Vehicle Connection Device: | P | | |

**Driver Signature** | **Customer Signature**

Jay  Ravanell
First int.  Last Name

Signature   Date
3 /4/15

UNITED PROSPERITY GROUP, INC DBA THE PRODUCE        Page 1 of 2
COMPANY (4KH3G)
UNITED PROSPERITY GROUP, INC DBA THE PRODUCE        Page 3 of 3
COMPANY (4KH3G)

Equipment Rental Agreement # 079077171
Equipment Rental Agreement # 07907



Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 67 of 89



# EQUIPMENT RENTAL AGREEMENT #079077375

3600 DEPOT ROAD, HAYWARD, CA 94545-2718 Phone #:(510)670-0181

**Return Location**
HAYWARD(79)
3600 DEPOT ROAD
HAYWARD, CA 94545-2718
Phone #: (510)670-0181

Lessee's rental, lease, acceptance, possession, or use of this Equipment or any other XTRA LEASE Equipment and all of Lessee's transactions and dealings with XTRA LEASE are governed by the XTRA LEASE Standard Terms & Conditions.

| | |
|---|---|
| Unit #: | OTRT U66089 |
| VIN #: | 1UYVS2537CU 268802 |
| License Plate #: | 288479Y |
| Plate State: | ME |
| Unit Description: | REEFER, 53-0, A-RIDE, OHD |
| | 2012 UTILITY |
| Reefer Serial #: | 6001085695 |
| CARB IDN: | 112455255 |
| CARB Compliance Thru Date: | 12/31/2018 |
| Unit Last DOT Inspection: | 04/2015 |

**Lessee Name & Address**
UNITED PROSPERITY GROUP, INC DBA THE
60 AIRPORT BLVD
SOUTH SAN FRANCISCO, CA 94080-6515

**Phone #:** (650)871-2505 **Fax #:** (650)871-2507
**Customer #:** 4KH3G

**Insurance Information**
**Agent:** POLARIS RISK GROUP **Expires:** 9/17/2015

**Garage/Stored At**
60 AIRPORT BLVD
SOUTH SAN FRANCISCO, CA 94080-

**Equipment Utilized For**
Over the Road

**Lessee shall pay for leased unit at a rate of** | **Miscellaneous Rates**

| | |
|---|---|
| Reefer Hours - Actual | 1.5000 / Hour |
| Rental | 85.0000 / Day |
| Rental | 425.0000 / Week |
| Rental | 1350.000 / 4 Week |
| Mileage | 0.0400 / Mileage |
| Estimated Miles | 5.000 / Billing Period |
| Est. Reefer Hours | 140.0000 / Billing Period |

**P.O. #**
**Auth By:** Jason Ravanell

**Minimum Term of** 1 Day

## CDW/FTW Options

Lessee's election to accept or decline the Collision Damage and Fire/Theft waiver("CDW") offered by XTRA LEASE is as indicated herein.

**Collision Damage:** Not Applicable **Fire/Theft:** Not Applicable

Lessee shall be liable for the first $1,500 for each occurrence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). Notwithstanding Lessee's election to accept or decline CDW, upon ten(10) days prior written notice, XTRA LEASE, in its sole discretion, may discontinue providing CDW to Lessee.

## Outbound Inspection   Inspector: Bogler, Cory

| | |
|---|---|
| **Date Out:** | 05/13/2015 09:07 |
| **Registration:** | PRESENT |

**Tires**

| | | | |
|---|---|---|---|
| **LOF** | MICH 8/32 | **LOR** | MICH 6/32 |
| **LIF** | MICH 8/32 | **LIR** | MICH 7/32 |
| **ROF** | MICH 8/32 | **ROR** | MICH 5/32 |
| **RIF** | MICH 8/32 | **RIR** | MICH 6/32 |
| **Size** | 275/80R 22.5 | | |

**Brakes** FA 6/8 6/8   RA 6/8 6/8

**Hubodometer Out:** 68411

**Trailer Tracking MSN:** 121101785

**Reefer Information**

| | |
|---|---|
| Fuel Level: | 8/8 Full |
| Engine Hours: | 4762 |
| Elect. S. Hours Protected: | 4762 |

**California B.I.T. Inspection**

| | | | |
|---|---|---|---|
| Brake Adjustment: | P | Brake System: | P |
| Suspension: | P | Tires & Wheels: | P |
| Vehicle Connection Device: | P | | |

**Driver Signature**

Name: J RAVANELL
License #: XXXXXXXX

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 68 of 89



| View | Zone | Condition | View | Zone | Condition | View | Zone | Condition |
|------|------|-----------|------|------|-----------|------|------|-----------|
| Front | | No Damage | Undr Crg | | No Damage | Int Floor | | No Damage |
| Left Side | | See Above | Int Doors | | No Damage | Int Front | | No Damage |
| Right Side | | See Above | Int Right | | No Damage | Int Roof | | No Damage |
| Rear | | No Damage | Int Left | | No Damage | | | |

**Note(s)/Comment(s)**

**Miscellaneous**

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 69 of 89



# EQUIPMENT RENTAL AGREEMENT #079077545

3600 DEPOT ROAD, HAYWARD, CA 94545-2718 Phone #:(510)670-0181

**Return Location**
HAYWARD(79)
3600 DEPOT ROAD
HAYWARD, CA 94545-2718
Phone #: (510)670-0181

Lessee's rental, lease, acceptance, possession, or use of this Equipment or any other XTRA LEASE Equipment and all of Lessee's transactions and dealings with XTRA LEASE are governed by the XTRA LEASE Standard Terms & Conditions.

| | |
|---|---|
| **Unit #:** | OTRT U67786 |
| **VIN #:** | 1UYVS2530FU 377011 |
| **License Plate #:** | 2813630 |
| **Plate State:** | ME |
| **Unit Description:** | REEFER, 53-0, S-RIDE, OHD |
| | 2015 UTILITY |
| **Reefer Serial #:** | 6001172987 |
| **CARB IDN:** | 134275136 |
| **CARB Compliance Thru Date:** | 12/31/2100 |
| **Unit Last DOT Inspection:** | 04/2015 |

| **Lessee Name & Address** | **Garage/Stored At** |
|---|---|
| UNITED PROSPERITY GROUP, INC DBA THE | 60 AIRPORT BLVD |
| 60 AIRPORT BLVD | SOUTH SAN FRANCISCO, CA 94080- |
| SOUTH SAN FRANCISCO, CA 94080-6515 | |

| | **Equipment Utilized For** |
|---|---|
| **Phone #:** (650)871-2505  **Fax #:** (650)871-2507 | Over the Road |
| **Customer #:**  4KH3G | |

**Insurance Information**

| **Agent:** POLARIS RISK GROUP | | **Expires:** | 9/17/2015 |
|---|---|---|---|

| **Lessee shall pay for leased unit at a rate of** | **Miscellaneous Rates** |
|---|---|
| Reefer Hours - Actual | 1.5000 / Hour |
| Rental | 90.0000 / Day |
| Rental | 450.0000 / Week |
| Rental | 1395.0000 / 4 Week |
| Mileage | 0.0400 / Mileage |
| Estimated Miles | 1700.0000 / Billing Period |
| Est. Reefer Hours | 140.0000 / Billing Period |

| | **P.O. #** | |
|---|---|---|
| **Minimum Term of**  1 Day | **Auth By:** | Wayman Wong |

**CDW/FTW Options**

Lessee's election to accept or decline the Collision Damage and Fire/Theft waiver("CDW") offered by XTRA LEASE is as indicated herein.

**Collision Damage:**  Not Applicable          **Fire/Theft:**  Not Applicable

Lessee shall be liable for the first $1,500 for each occurence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). Notwithstanding Lessee's election to accept or decline CDW, upon ten(10) days prior written notice, XTRA LEASE, in its sole discretion, may discontinue providing CDW to Lessee.

**Outbound Inspection  Inspector:**  Bogler, Cory

| **Date Out:** | 06/12/2015 14:37 |
|---|---|
| **Registration:** | PRESENT |

**Tires**

| | | | |
|---|---|---|---|
| **LOF** | MICH 12/32 | **LOR** | MICH 12/32 |
| **LIF** | MICH 12/32 | **LIR** | MICH 12/32 |
| **ROF** | MICH 12/32 | **ROR** | MICH 12/32 |
| **RIF** | MICH 12/32 | **RIR** | MICH 12/32 |
| **Size** | 275/80R 22.5 | | |

**Brakes**  FA 7/8 7/8    RA 7/8 7/8

**Hubodometer Out:**                          5153

**Trailer Tracking MSN:**  121094224

**Reefer Information**

| | |
|---|---|
| Fuel Level: | 8/8 Full |
| Engine Hours: | 336 |
| Elect. S. Hours Protected: | 336 |

**California B.I.T. Inspection**

| | | | |
|---|---|---|---|
| Brake Adjustment: | P | Brake System: | P |
| Suspension: | P | Tires & Wheels: | P |
| Vehicle Connection Device: | P | | |

**Driver Signature**

| | |
|---|---|
| Name: | M MCCOY |
| License #: | XXXXXXXX |

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 70 of 89

Outbound Inspection (cont.)

B=Bent  BR=Broken  C=Cut  CA=Check/Adjust  H=Hole  M=Missing  O=Other  P=Patch  S=Scrape  SEC=Section



| View | Zone | Condition | View | Zone | Condition | View | Zone | Condition |
|------|------|-----------|------|------|-----------|------|------|-----------|
| Front | | No Damage | Undr Crg | | No Damage | Int Floor | | No Damage |
| Left Side | | No Damage | Int Doors | | No Damage | Int Front | | No Damage |
| Right Side | | No Damage | Int Right | | No Damage | Int Roof | | No Damage |
| Rear | | No Damage | Int Left | | No Damage | | | |

Note(s)/Comment(s)

Miscellaneous

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 71 of 89



## STANDARD TERMS AND CONDITIONS

These Standard Terms and Conditions apply to all transactions with XTRA Lease, including, without limitation, all leases or rentals of XTRA Lease Equipment, whether pursuant to a long-term Equipment Lease Agreement, National Account Agreement, Short-term Rental Agreement, Equipment Rental Agreement or any other agreement. THE STANDARD TERMS AND CONDITIONS CONTAIN A JURY TRIAL WAIVER WHICH MAY BE ENFORCED IN THE EVENT OF A DISPUTE BETWEEN XTRA LEASE AND LESSEE.

**1. DEFINITIONS.**

(a) **"Applicable Law"** means any federal, state, local or foreign law, statute, rule, regulation, order, judgment, opinion or ordinance applicable to the use, possession, operation or control of the Equipment, including, without limitation, the HDV Regulations and the TRU Regulations (both as defined in Section 17).

(b) **"Casualty Loss Value"** shall be equal to the present value of a unit of Equipment as determined by XTRA Lease in its sole discretion on the first day of the month during which the loss or destruction occurs.

(c) **"Communication Services"** means the two-way wireless tracking and mobile information management services provided to Lessee by or through XTRA Lease that utilize the communications network provided by third-party licensors of XTRA Lease.

(d) **"Default"** has the meaning as set out in Section 21.

(e) **"Equipment"** means the XTRA Lease semi-trailer, chassis, refrigerated trailer, or other over-the-road, cartage, or storage equipment together with the attached Trailer Tracking Unit and related sensors, if applicable.

(f) **"Equipment Lease Agreement"** means a true lease agreement between Lessee and XTRA Lease for the leasing of XTRA Lease Equipment by Lessee for a specified Lease Term and at specified Use Charges.

(g) **"Equipment Rental Agreement"** means the agreement provided to Lessee by XTRA Lease, in electronic or other format, whenever a unit of Equipment is picked up from or returned to an XTRA Lease location by Lessee or Lessee's Agent.

(h) **"Estimated Charges"** means periodic estimated payments of Use Charges which are payable at the end of the Lease.

(i) **"Intellectual Property"** has the meaning as set out in Section 23.

(j) **"Lease"** means any and all arrangements or agreements whereby Lessee leases or rents Equipment from XTRA Lease, including, without limitation, long-term Equipment Lease Agreements, National Account Agreements, Short-term Rental Agreements and Equipment Rental Agreements. All Leases are subject to and are deemed to incorporate the Standard Terms and Conditions, as amended from time to time.

(k) **"Lease Term"** means the agreed upon term of the Lease contained in an Equipment Lease Agreement or the agreed upon minimum rental term of a Short-term Rental Agreement as listed on the Equipment Rental Agreement.

(l) **"Lessee"** means the individual or entity that enters into a Lease with XTRA Lease. Where appropriate the term Lessee shall be deemed to include the term Lessee's Agent.

(m) **"Lessee's Agent"** means the driver or other representative who picks up, inspects, takes possession of, or returns a unit of Equipment on behalf of Lessee to an XTRA Lease location or to a designated cartage vendor, and/or who executes a Lease document on behalf of Lessee.

(n) **"National Account Agreement"** means a rate agreement between Lessee and XTRA Lease for the renting of Equipment by Lessee at specified Use Charges.

(o) **"Repair Standards"** means XTRA Lease's current repair standards which provide the requirements for repairs to Equipment, a copy of which can be obtained at http://www.xtralease.com.

(p) **"Short-term Rental Agreement"** means an agreement between Lessee and XTRA Lease for the renting of Equipment by Lessee at a specified rate and rental term as listed on the Equipment Rental Agreement.

(q) **"Software"** means (i) the software code that is embedded within the Trailer Tracking Unit, (ii) any other software provided to Lessee relating to the Trailer Tracking Unit directly or through Internet access, (iii) any user documentation provided to Lessee, and (iv) any subsequent versions or upgrades of software which XTRA Lease elects to provide to Lessee.

(r) **"Standard Terms and Conditions"** means the XTRA Lease Standard Terms and Conditions contained in this document, as amended by XTRA Lease from time to time.

(s) **"Trailer Tracking Unit"** means the product created by XTRA Lease's third-party licensor, which provides mobile communication, tracking, and other Equipment management services.

(t) **"Use Charges"** means the required payments to be made by Lessee to XTRA Lease for every day (including Saturdays, Sundays, and Holidays) Equipment is on lease or rent to Lessee whether or not such Equipment is in the use, possession, control or operation of Lessee. Use Charges shall include the rental rate set forth in the Lease plus any and all other charges, fees and all other amounts required to be paid by Lessee pursuant to the Lease.

(u) **"written"** or **"in writing"** shall mean in print copy format or in electronic format.

(v) **"XTRA Lease"** as used herein shall mean XTRA LLC, a Maine limited liability company (formerly known as XTRA, Inc.), XTRA Lease LLC, a Delaware limited liability company (formerly known as XTRA Lease, Inc. which was formerly known as Strick Lease, Inc.), GTR Rental LLC, a Delaware limited liability company (formerly known as CitiCapital Trailer Rental, Inc. and Associates Rental Systems, Inc., among others), AJF Warehouse Distributors, Inc., an Illinois corporation, Rentco Trailer Corporation, a Delaware corporation, as applicable, depending upon which entity holds title to the Equipment leased hereunder.

(w) **"XTRA Web Sites"** has the meaning as set out in Section 24.

**2. EQUIPMENT COVERED, TERM AND OWNERSHIP.** The specific Equipment covered by the Lease and the Lease Term shall be as set forth in the Lease. Upon expiration of the Lease Term, if Lessee maintains possession of the Equipment, XTRA Lease, in its sole discretion, may (a) upon thirty (30) days written notice to Lessee change any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease, as specified in such notice, or (b) demand Lessee's immediate return of the Equipment. Lessee's responsibilities under the Lease, including, without limitation, the payment of Use Charges, shall continue until all of the Equipment is returned to XTRA Lease. The Lease shall terminate upon the return of all Equipment subject to the Lease, except with respect to provisions contained in the Lease or the Standard Terms and Conditions intended to survive the termination of the Lease, including, without limitation, limitations of liability, indemnity, confidentiality, payment and billing, damage and repairs to Equipment, choice of law, venue, and jury trial waiver. Notwithstanding any other language contained herein or therein, neither the Lease nor any agreement that results therefrom conveys any ownership rights to Lessee and all right, title and interest in and to the Equipment is and shall remain with XTRA Lease.

**3. AUTHORITY & ACCEPTANCE.** By submitting or completing an XTRA Lease customer application, entering into a Lease with XTRA Lease, taking possession of Equipment from XTRA Lease, executing an Equipment Rental Agreement, completing payment of any invoices to XTRA Lease or completing any other transaction with XTRA Lease, Lessee and Lessee's Agents represent and warrant that they are authorized on behalf of Lessee and, if applicable, on behalf of those companies identified in a National Account Agreement as "Lessee's Affiliates Authorized to Rent Equipment", to enter such agreements and transactions with XTRA Lease and expressly acknowledge receipt and on-going acceptance of XTRA Lease's Standard Terms and Conditions as such Standard Terms and Conditions may be amended from time-to-time.

**4. DELIVERY, RECEIPT & DROPOFF.**

(a) As a condition precedent to Lessee's pick-up or return of Equipment at any XTRA Lease location, Lessee's Agent must (i) provide proof of identification to XTRA Lease in the form of a valid commercial driver's license, and (ii) sign XTRA Lease's Equipment Rental Agreement. Lessee acknowledges that Lessee's Agent has been authorized to pick-up from, return Equipment to, and/or accept delivery of Equipment from, XTRA Lease, and that the signature of Lessee's Agent on XTRA Lease's Equipment Rental Agreement shall bind Lessee to the terms of such Equipment Rental Agreement and the Standard Terms and Conditions, as amended from time to time.

(b) By taking possession of the Equipment, Lessee accepts the Equipment in the condition noted in the Equipment Rental Agreement and acknowledges receipt of the Equipment in good repair and working condition. Lessee shall have exclusive possession, control and use, and assumes complete responsibility for the condition, operation, inspection and maintenance of the

Equipment during the Lease. **Lessee** shall return the Equipment to **XTRA Lease** in the same condition noted in the Equipment Rental Agreement, normal wear excepted.

(c) If **Lessee** has requested **XTRA Lease** to arrange for a unit of Equipment to be delivered to or picked up from a location designated by **Lessee**, as a condition precedent to such delivery or pick-up, **Lessee's Agent** must sign **XTRA Lease's** Equipment Rental Agreement and/or other documentation provided by the cartage vendor. In the event of delivery of a unit of Equipment to **Lessee**, **XTRA Lease's** inspection of the Equipment at **XTRA Lease's** branch location prior to delivery of the Equipment to **Lessee** shall be conclusive evidence of the condition of the Equipment at the time of commencement of the Lease, and in the event of pick-up of Equipment from **Lessee**, **XTRA Lease's** inspection of the Equipment following delivery of the Equipment to **XTRA Lease's** branch location shall be conclusive evidence of the condition of the Equipment upon redelivery.

(d) **Lessee** shall redeliver a unit of Equipment at **Lessee's** expense to the Return Location specified in the unit's Equipment Rental Agreement, unless otherwise provided in the Lease. If **Lessee** returns a unit of Equipment to a branch other than its designated Return Location, **Lessee** shall pay **XTRA Lease's** then applicable drop fee as compensation for the costs associated with the failure to return the unit to its Return Location.

**5. COMMUNICATION SERVICES.** If a Trailer Tracking Unit is installed on a unit of Equipment rented or leased by **Lessee** from **XTRA Lease**, **XTRA Lease** hereby grants to **Lessee** a non-exclusive, non-transferable and limited sub-license to use the Software subject to the conditions and restrictions of the Lease and the Standard Terms and Conditions solely for the purpose of utilizing the Trailer Tracking Unit and related Communication Services to monitor Equipment leased from **XTRA Lease**. **Lessee** shall make no other use of the Software or Communications Services and shall not copy the Software or provide the Software or access to the Software to any third-party. The Software will be in object code form only, and will not include any source code or the right to use any source code. **Lessee** agrees that it will not reverse engineer, decompile, or disassemble the Trailer Tracking Unit or Software. **Lessee** agrees to use the Software only in connection with **Lessee's** use of the Communication Services. In addition, **XTRA Lease** grants to **Lessee** a non-exclusive, non-transferable, limited sub-license to access the Communication Services for use with the Trailer Tracking Unit in the United States, Mexico, and Canada. **XTRA Lease** reserves the right to terminate the Communication Services, and the sub-licenses granted pursuant to this Section 5, at any time on thirty (30) days advance notice to **Lessee**. **Lessee** acknowledges and understands that (1) it shall use all information provided via the Communication Services at **Lessee's** own risk, and (2) **Lessee** shall acquire no proprietary interest in any telephone number that may be assigned to **Lessee** for use with the Communication Services. **Lessee** acknowledges that disruption of Communication Services may occur from time to time for routine and emergency maintenance and other reasons beyond the control of **XTRA Lease**. **Lessee** shall have no remedy against **XTRA Lease**, any third-party licensor of **XTRA Lease**, or the underlying wireless services carrier, and **Lessee** hereby releases **XTRA Lease** and all of its licensors, and the underlying wireless services carrier from all liability relating to such disruption. If, and only if, Use Charges relating to the Communication Services are billed separately to **Lessee** as part of the total Use Charges for the Equipment, **Lessee's** sole remedy for any disruption or failure of the Communication Services shall be that portion of the Use Charges paid by **Lessee** for Communication Services relating to the period of service during which such failure or disruption occurred, provided that such disruption or failure is not corrected by **XTRA Lease** within thirty (30) days after receiving written notice from **Lessee** of such failure or disruption.

**6. ROADWATCH® SERVICE.** Unless otherwise specified in the Lease, **Lessee** may call **XTRA Lease's** RoadWatch® service to coordinate emergency repairs for units of Equipment subject to the Lease. Upon receiving a call from **Lessee** or **Lessee's Agent**, **XTRA Lease**, on behalf of **Lessee**, will (i) contact a third-party repair vendor to provide repair services to **Lessee**, and (ii) coordinate payment for any services provided by that third-party repair vendor to **Lessee**. Unless otherwise provided in the Lease, **XTRA Lease** will invoice **Lessee** for any repair services coordinated through the RoadWatch® service, along with a service fee. No warranty, express or implied, is made by **XTRA Lease** with respect to any services provided by a repair vendor coordinated through the RoadWatch® service, and **Lessee** hereby releases **XTRA Lease** from all liability in any way relating to the use of the RoadWatch® service, including, without limitation, any repairs provided by any repair vendor coordinated through the RoadWatch® service.

**7. PAYMENT.**
(a) **Lessee** agrees to pay all Use Charges for Equipment **Lessee** rents or leases from **XTRA Lease**. These Use Charges may include, but are not limited to:

(i) **Rental Charges.** **Lessee** shall pay **XTRA Lease** the rental charges for the rent or lease of a unit of Equipment, as specified in the Lease.

(ii) **Mileage Charges.** **Lessee** shall pay **XTRA Lease** mileage charges for actual miles traveled by a unit of Equipment as specified in the Lease. Miles traveled will be measured by a hubodometer attached to each unit of Equipment. A reading of the hubodometer will be taken by **XTRA Lease** at the time of a unit's delivery or pick-up, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit to **XTRA Lease**. In the event the hubodometer on a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a mileage charge based on the average miles traveled by similar units leased or rented by **Lessee** from **XTRA Lease** or the average miles traveled by similar units of Equipment leased or rented from **XTRA Lease** generally, as determined by **XTRA Lease** in its sole discretion.

(iii) **Refrigeration Unit Charges.** **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours used on any refrigerated unit of Equipment as specified in the Lease. Engine hours will be measured by an hour meter attached to each refrigerated unit of Equipment. A reading of the hour meter will be taken by **XTRA Lease** at the time of delivery to or pick-up of a unit of Equipment by **Lessee**, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. In the event the hour meter for a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours based on the average engine hours historically used on similar units of Equipment leased or rented from **XTRA Lease**, as determined by **XTRA Lease** in its sole discretion.

(iv) **Tire Wear.** **Lessee** shall pay **XTRA Lease** a charge for tire wear as specified in the Lease. The tread depth of each tire will be measured by **XTRA Lease** in thirty-two seconds (1/32nds) of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. Tire depth shall be measured at the lowest point of remaining tire tread.

(v) **Brake Wear.** **Lessee** shall pay **XTRA Lease** a charge for brake lining wear as specified in the Lease. The brake lining for each wheel end will be measured by **XTRA Lease** in one-eighth (1/8") of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**.

(b) **Lessee** shall pay Estimated Charges to **XTRA Lease** as specified in the Lease. **XTRA Lease** shall have the right to commence charging **Lessee** Estimated Charges under any Lease that does not specify an obligation of **Lessee** to pay Estimated Charges, or from time to time to increase Estimated Charges payable under a Lease, if **XTRA Lease** deems it necessary, in its sole discretion, in order to ensure **Lessee's** full performance of its obligation to pay any Use Charges pursuant to the terms of the Lease. **XTRA Lease** shall provide **Lessee** with written notice of its intent to initiate charging or increase Estimated Charges, and **Lessee** shall be required to pay the Estimated Charges as specified in such notice from the start of the billing period in which said notice was provided. **Lessee** shall pay **XTRA Lease** the amount of any shortfall, or **XTRA Lease** shall pay **Lessee** the amount of any overpayment, between the total Estimated Charges paid by **Lessee** during the Lease and the final amount of the Use Charges as determined upon redelivery of the Equipment.

(c) Use Charges shall commence on the date the Equipment is available for delivery to or pick-up by **Lessee**. Notwithstanding any other language contained in the Standard Terms and Conditions, Use Charges shall continue until the Equipment is returned to **XTRA Lease** at the Return Location set forth in the Lease, in the same condition as when received, normal wear excepted, or until payment is made of the Casualty Loss Value as provided herein.

(d) Use Charges are based on a twenty-eight (28) day billing period unless otherwise specified. Unless otherwise stated in the Lease, in the event of return of the Equipment to **XTRA Lease** prior to the expiration of the billing period in effect at the time of return, Use Charges for the final partial billing period shall be adjusted to the appropriate weekly and daily rate, as applicable.

(e) **XTRA Lease** shall periodically invoice **Lessee** for all Use Charges incurred pursuant to the Lease. **XTRA Lease** shall have the right to provide all invoices electronically via the XTRA Web Sites. **Lessee** shall pay all invoices within ten (10) days from the date of invoice.

(f) **Lessee** shall make all payments in U.S. currency to the lockbox address provided by **XTRA Lease** and **Lessee** shall not deliver payments directly to any **XTRA Lease** location. Overdue payments may be assessed interest equal to the lesser of 18% per annum or the maximum rate permitted by law. If **Lessee** provides **XTRA Lease** with a check, or authorizes **XTRA Lease** to collect payments through a pre-authorized payment, electronic payment, or any other form of payment that is returned due to insufficient funds, or payment is otherwise declined, **Lessee** shall be subject to and agrees to pay

XTRA Lease an additional processing fee of $100.00 for each such occurrence.

**8. MAINTENANCE AND USE OF EQUIPMENT.**

(a) Lessee is responsible for determining whether the Equipment it rents or leases from XTRA Lease is fit and sufficient for the designated purpose for which Lessee intends to utilize such Equipment.

(b) Lessee is responsible for the condition, operation, inspection and maintenance of the Equipment during the Lease. Lessee shall maintain the Equipment, at Lessee's own expense and in accordance with the Repair Standards, the Equipment in good condition, free from defects and fit for its designated purpose. Lessee shall return all Equipment to XTRA Lease in the same condition as when received, normal wear excepted.

(c) Lessee shall not (i) use the Equipment for the transportation or storage of any unprotected corrosive substances, trash, medical and/or solid waste and/or hazardous materials ("Hazardous Materials"), (ii) permit the Equipment to be contaminated by any Hazardous Materials, or (iii) violate any Applicable Law regarding the transportation of any Hazardous Materials. Lessee shall promptly notify XTRA Lease if it becomes aware of the use of the Equipment for such purposes, the contamination of the Equipment by any Hazardous Materials, or the violation of any Applicable Law regarding the transportation of any Hazardous Materials in the Equipment. If Lessee notifies XTRA Lease or XTRA Lease determines that Hazardous Materials contaminate, were placed in, or have damaged the Equipment, XTRA Lease may, in its sole discretion, (i) require Lessee to immediately pay XTRA Lease the Casualty Loss Value of the Equipment; (ii) require Lessee, at Lessee's sole expense to repair, restore and/or decontaminate the Equipment and provide proof of such repair, restoration and/or decontamination, including without limitation, methodology and pre and post decontamination sampling results and any other inspection or testing XTRA Lease deems necessary to perform; or (iii) repair, restore and/or decontaminate the Equipment, in which case Lessee shall be liable to XTRA Lease for the total estimated or actual cost to repair, restore and/or decontaminate the Equipment, as determined by XTRA Lease in its sole discretion.

(d) Lessee shall not remove, obscure, obliterate or otherwise alter any marks of identification on the Equipment. Prior to Lessee's return of the Equipment to XTRA Lease, all marks of identification or logos applied to the Equipment by or for Lessee shall be removed and the surface restored at Lessee's expense. Subject only to the provisions of Section 17(c) of the Standard Terms and Conditions, Lessee shall not make any structural alterations to the Equipment.

(e) Unless the terms of the Lease state otherwise, and except as provided below, upon Lessee making the Equipment available at an XTRA Lease location at six (6) month intervals or twenty five thousand (25,000) miles, whichever comes first, XTRA Lease agrees to conduct a periodic inspection of the Equipment in conformance with the requirements of 49 C.F.R. Part 396.17 and provide, at its expense, replacement tires, brakes, lights, lubricants and any other parts worn due to normal wear as needed; provided however, Lessee shall be responsible for all expenses relating to replacement tires, brakes, lights, lubricants and any other parts which are broken, inoperable or worn for reasons other than normal wear, including, without limitation, the action or inaction of Lessee. The foregoing shall not apply, and XTRA Lease shall have no obligation to perform periodic inspections, provide any replacement parts, or otherwise perform preventative maintenance on any units of Equipment (i) rented or leased under a Lease pursuant to which Lessee is charged for Tire Wear and Brake Wear or Lessee has assumed responsibility for performing all periodic inspections and preventative maintenance, (ii) which Lessee has not made available at an XTRA Lease location, or (iii) which are designated as storage trailers.

(f) Lessee shall return each unit of Equipment with tires of equal quality to the tires on the unit at the commencement of the Lease, as determined by XTRA Lease in its sole discretion. Lessee shall pay XTRA Lease the pro-rated value, on a replacement cost basis, of the lost remaining life, including a casing charge, for any tire returned in a damaged condition or replaced at a location other than an XTRA Lease location that is not returned to XTRA Lease. For purposes of the Standard Terms and Conditions, tire damage includes, but is not limited to, excessive wear, flat spotting, skid damage, abnormal wear due to equipment defect or improper maintenance or other damage that reduces the remaining useful life of the tire or its casing. A tire is excessively worn if its tread wear exceeds 1/32nds of an inch per ten thousand (10,000) miles traveled.

(g) Lessee is responsible for all damage to the Equipment and must notify XTRA Lease promptly of any potential mechanical failure or problem.

(h) If the Equipment provided to Lessee is designated to be utilized as a storage trailer, such Equipment is intended for storage use only and shall not be used to transport cargo, merchandise and/or freight over-the-road. If

Lessee, following initial delivery of such storage trailer, operates Equipment over-the-road in violation of the preceding sentence, Lessee shall be responsible for all drayage and road service charges and Lessee shall pay XTRA Lease a mileage charge of $.10 per mile traveled by such storage trailer following initial delivery to Lessee.

(i) Upon reasonable notice from XTRA Lease, Lessee shall promptly provide XTRA Lease with the current location of each unit of Equipment Lessee rents or leases from XTRA Lease and, if requested, access to such units at a mutually acceptable time and location.

**9. DAMAGE AND REPAIRS TO EQUIPMENT.**

(a) In the case of total loss of a unit of Equipment beyond economic repair for any reason, including theft, collision, confiscation, fire, destruction, natural disaster or any other total casualty, regardless of where it may have occurred and notwithstanding any amounts which may be paid or disputed by Lessee's insurance company, Lessee is responsible for and shall promptly pay XTRA Lease the Casualty Loss Value of such unit of Equipment. XTRA Lease reserves the right to determine whether a unit of Equipment has in fact suffered an event of total loss or damage beyond economic repair. Lessee's requests for Casualty Loss Value quotes shall in no way constitute notice to XTRA Lease that Lessee has suffered a total loss of a unit of Equipment.

(b) In case of partial loss or damage to any unit of Equipment regardless of where it may have occurred (except the Trailer Tracking Unit), Lessee shall make all repairs and replacements at Lessee's expense in accordance with the Repair Standards. Lessee shall not attempt to repair and shall return to XTRA Lease for repair all non-functioning or damaged Trailer Tracking Units. Lessee shall be liable to XTRA Lease for the total estimated or actual cost, as determined by XTRA Lease in its sole discretion, to repair any Equipment returned to XTRA Lease in a non-functioning or damaged condition or repaired in a manner that is not in compliance with the Repair Standards. XTRA Lease reserves the right to not repair any non-functioning or damaged Equipment, in which case Lessee shall remain responsible for the estimated cost of repairs, as determined by XTRA Lease in its sole discretion, regardless of whether the damaged Equipment is actually repaired. Lessee shall not be entitled to any refund of any estimated cost of repair paid by Lessee should the actual cost of repair in fact be less.

(c) Lessee shall maintain and upon written request, provide XTRA Lease with written descriptions of all maintenance work or repairs made to the Equipment. In accordance with the Repair Standards, Lessee shall use first class materials and parts in the repair and service of the Equipment. In addition to any other applicable warranty, Lessee agrees that it will, at its own expense, rectify, repair and replace any and all known defects or other conditions to the Equipment not in compliance with the Repair Standards, arising from defective or improper materials or workmanship furnished by it or its subcontractors.

**10. LIMITED WARRANTIES.** BY TAKING POSSESSION OF THE EQUIPMENT, LESSEE ACKNOWLEDGES RECEIPT OF THE EQUIPMENT IN GOOD REPAIR AND WORKING CONDITION, AND THAT THE EQUIPMENT IS FIT AND SUFFICIENT FOR LESSEE'S INTENDED USE. XTRA LEASE IS NOT A SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED IN THE UNIFORM COMMERCIAL CODE). NO WARRANTY, EXPRESS OR IMPLIED, IS MADE BY XTRA LEASE OF THE QUALITY OF DESIGN, MANUFACTURE, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES. LESSEE WAIVES ANY AND ALL CLAIMS AGAINST XTRA LEASE FOR ANY AND ALL LOSS OR LIABILITY (INCLUDING CARGO LOSS) RESULTING FROM ANY DEFECTS OR FAILURES OF DESIGN, MATERIALS, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES, EITHER LATENT OR PATENT. LESSEE WAIVES THE PROVISIONS OF ANY APPLICABLE LAW LIMITING OR PROHIBITING A GENERAL RELEASE WITH RESPECT TO ANY RELEASE OR WAIVER IN THE LEASE OR THE STANDARD TERMS AND CONDITIONS. XTRA LEASE AGREES TO EXTEND TO LESSEE ALL WARRANTIES, IF ANY, OFFERED BY THE MANUFACTURERS OF THE EQUIPMENT, TRAILER TRACKING UNIT, AND SOFTWARE AND BY THE WIRELESS SERVICE CARRIERS UNDERLYING THE COMMUNICATION SERVICES.

XTRA LEASE DISCLAIMS, AND LESSEE WAIVES, ALL OTHER WARRANTIES WITH RESPECT TO THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES, AND XTRA WEB SITES, WHETHER WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. EXCEPT FOR THE LIMITED WARRANTIES SET FORTH ABOVE IN THIS SECTION 10, THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES AND XTRA WEB SITES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 74 of 89

REPRESENTATION OR WARRANTY OF ANY KIND, FOR USE BY LESSEE AT ITS SOLE RISK.

**11. LESSEE'S INDEMNIFICATION OBLIGATIONS.**

**(A) LESSEE HEREBY AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE INDEMNIFIED PARTIES (AS DEFINED BELOW) FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITIES, OBLIGATIONS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) (COLLECTIVELY "CLAIMS"), IN ANY WAY ARISING OUT OF OR INCIDENT TO THE LEASE, OR THE USE, POSSESSION, MAINTENANCE, CONTROL OR CONDITION OF THE EQUIPMENT DURING THE LEASE, REGARDLESS OF WHETHER SUCH CLAIMS WERE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES, AND INCLUDING, WITHOUT LIMITATION, ANY AND ALL CLAIMS ARISING FROM OR INCIDENT TO: (I) THE ACTS OR OMISSIONS OF LESSEE, LESSEE'S AGENTS OR LESSEE'S ASSIGNEES; (II) THE PERFORMANCE, BREACH, OR DEFAULT OF THE LEASE BY LESSEE, OR THE ENFORCEMENT OF ANY OF THE TERMS OF THE LEASE BY XTRA LEASE; (III) THE DEATH OR INJURY TO ANY PERSON; (IV) DAMAGE TO ANY PROPERTY; (V) DAMAGE TO, OR ANY DAMAGE OR INJURY RESULTING FROM, ANY CARGO PLACED ON OR CONTAINED IN THE EQUIPMENT; (VI) THE VIOLATION OR ALLEGED VIOLATION OF ANY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, ANY FAILURE OR ALLEGED FAILURE TO USE, OPERATE, MAINTAIN OR CONTROL THE EQUIPMENT IN COMPLIANCE WITH APPLICABLE LAW; (VII) ANY TAXES AND ASSESSMENTS, INCLUDING WITHOUT LIMITATION ALL IMPORT AND CUSTOMS DUTIES AND ALL WITHHOLDING, PROPERTY, SALES AND/OR USE TAXES, AND ALL PENALTIES; (VIII) ANY FINES, TOLLS, USER FEES, TRAFFIC AND PARKING VIOLATIONS, TOWING AND STORAGE EXPENSES, AND ANY OTHER SIMILAR FINES, FEES OR CHARGES; (IX) THE USE OF THE SOFTWARE, COMMUNICATION SERVICES OR XTRA WEB SITES; AND (X) THE USE, FAILURE TO USE OR INABILITY TO USE THE TRAILER TRACKING UNIT, INCLUDING, WITHOUT LIMITATION, THE INABILITY TO USE THE ACCESS TELEPHONE NUMBER FOR THE TRAILER TRACKING UNIT.**

**(B) FOR PURPOSES OF THE STANDARD TERMS AND CONDITIONS, THE TERM "INDEMNIFIED PARTIES" SHALL REFER TO (I) XTRA LEASE, ITS AFFILIATES AND ITS AND THEIR SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, LICENSORS AND AGENTS, AND (II) XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING UNIT AND SOFTWARE AND THE UNDERLYING WIRELESS SERVICE CARRIER SUPPLYING SERVICES TO XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING SOFTWARE, AND THEIR AFFILIATES, SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, AND AGENTS.**

**(C) LESSEE SHALL NOT SETTLE OR COMPROMISE ANY CLAIM AGAINST THE INDEMNIFIED PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR WHICH LESSEE HAS ASSUMED THE DEFENSE OF THE INDEMNIFIED PARTIES, WITHOUT THE PRIOR WRITTEN CONSENT OF XTRA LEASE. LESSEE SHALL REIMBURSE THE INDEMNIFIED PARTIES FOR ANY EXPENSE INCURRED, INCLUDING ATTORNEYS' FEES, TO DEFEND ANY ACTION WHICH LESSEE IS REQUIRED TO DEFEND PURSUANT TO THE STANDARD TERMS AND CONDITIONS. THE PROVISIONS OF THIS SECTION 11 SHALL SURVIVE THE TERMINATION OF THE LEASE.**

**12. LIMITATION OF LIABILITY.**

(a) Under no circumstances shall XTRA Lease or its licensors be liable for any incidental, indirect, special, consequential, exemplary or punitive damages of any kind, whether or not resulting from the negligence of XTRA Lease or its licensors, and including, without limitation, any lost profits, business failure or interruption damages, or any damages associated with lost or damaged cargo. In no event shall XTRA Lease's total liability to Lessee exceed the amount of Use Charges paid by Lessee during the three (3) months preceding the event that gave rise to the claim or action.

(b) Lessee expressly understands and agrees that it has no contractual relationship whatsoever with the underlying wireless service carrier and that Lessee is not a third-party beneficiary of any agreement with XTRA Lease's third-party Trailer Tracking licensor and/or the underlying wireless service carrier. In addition, Lessee expressly understands and agrees that the underlying wireless service carrier shall have no legal, equitable or other liability of any kind to Lessee. In any event, regardless of the form of the action, whether for breach of contract, warranty, negligence, strict liability in tort or otherwise, Lessee hereby waives any and all claims against the underlying wireless service carrier from all such liability, provided, however, that if and only if, Use Charges relating to the Communication Services are billed separately to Lessee as part of the total Use Charges for the Equipment, then Lessee's exclusive remedy and the total liability of tha underlying

wireless service carrier arising in any way in connection with the Lease for any cause whatsoever including, without limitation, any failure or disruption of service provided hereunder, is limited to payment of damages in an amount equal to the portion of the Use Charges to Lessee for the services relating to the period of service during which said damages occur.

**13. INSURANCE & CDW.**

(a) Minimum levels of insurance covering the Equipment shall be maintained by Lessee, at Lessee's expense, with a licensed insurance carrier with an A.M. Best rating of not less than B+ and shall include:

(i) All risk insurance covering physical loss of or damage to the Equipment from any cause whatsoever. XTRA Lease shall be named a loss payee;

(ii) Comprehensive Automobile Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million combined single limit or $1 million bodily injury and $250,000 property damage. XTRA Lease must be shown as an additional insured; and

(iii) Comprehensive General Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, or damage to the property of any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million general aggregate or $1 million each occurrence and include contractual liability coverage and/or endorsement. XTRA Lease must be shown as an additional insured.

(b) Policies of insurance shall be valid and in force until the Equipment is returned to XTRA Lease. Lessee shall provide XTRA Lease with certificate(s) of insurance evidencing the required coverage prior to delivery or acceptance of any Equipment, and thereafter with certified copies of the insurance policies as may be requested by XTRA Lease. Such certificates shall contain a requirement that XTRA Lease receive thirty (30) days prior written notice of cancellation or material change to Lessee's insurance policies. All policies of insurance must carry deductible limits acceptable to XTRA Lease. If requested by XTRA Lease, Lessee shall file a claim with its insurance carrier for any lost or stolen units of Equipment. Insolvency or failure by Lessee's insurance carrier to provide coverage for any and all loss, claim, liability or damage arising out of the Lease shall not relieve Lessee of any of its obligations set forth in the Lease. Nothing contained in these insurance requirements is to be construed as limiting the extent of Lessee's liability under the Lease. Lessee is solely responsible for ensuring that it maintains the minimum levels of financial responsibility required by Applicable Law.

(c) The insurance requirements of this Section 13 may be satisfied in whole or in part by a self-insurance program maintained by Lessee which is acceptable to XTRA Lease, provided however XTRA Lease shall be named as an additional loss payee and/or additional insured under such program including umbrella policies, if any, which may be a part thereof. Lessee shall provide to XTRA Lease evidence of such self-insurance program upon XTRA Lease's request together with a copy of Lessee's most recent financial statements, which shall be satisfactory to XTRA Lease.

(d) Lessee can fulfill its obligation to provide the all risk insurance required in Section 13(a)(i) hereof, by purchasing the Collision Damage, Fire and Theft Waiver Options ("CDW") offered by XTRA Lease. In the event Lessee has elected the CDW option, Lessee hereby acknowledges that CDW (i) is a damage waiver program, (ii) is not an all risk insurance program covering physical loss of or damage to the Equipment for the benefit of Lessee, and (iii) is intended solely (A) to reimburse XTRA Lease for any repairs required for any unit of Equipment returned to XTRA Lease in a damaged condition, subject to applicable deductible or (B) to pay XTRA Lease the Casualty Loss Value of any unit of Equipment which was to be returned to XTRA Lease upon termination of the Lease and such unit of Equipment is a total loss by theft, confiscation, fire, destruction, damage beyond economic repair or any other total casualty; and in addition to the terms set forth therein, the benefits of such coverage will not be available to Lessee unless each of the following conditions have been met: (v) Lessee is in compliance with all terms and conditions of the Lease, including current on all payments; (w) all casualty loss or damage to the unit of Equipment must have occurred in the United States or Canada; (x) such damage or loss was not the result of Lessee's negligence and/or failure to maintain proper care and control of such unit of Equipment; (y) Lessee shall have promptly notified XTRA Lease in writing and obtained a police report of any loss or damage to any unit of Equipment as soon as practicable, and in any case, not later than 72 hours after the occurrence of such casualty loss or damage, and shall have delivered promptly to XTRA Lease a copy of the applicable police report; and (z) Lessee shall have provided to XTRA Lease any additional documentation it may request relating

4

to the casualty loss or damage and comply with any other requirements of **XTRA Lease**. Oral requests for quotes on casualty loss or damaged Equipment shall not constitute the required notice under this Section 13(d). **Lessee** shall be liable for the first $1,500 for each occurrence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). In addition, **Lessee** hereby agrees that Use Charges will continue to accrue with regard to such Equipment until **Lessee** has paid the required deductible. CDW shall terminate immediately upon any Default by **Lessee** under the Lease. **XTRA Lease**, in its sole discretion, may discontinue providing CDW to **Lessee** on ten (10) days prior written notice.

**14. SECURITY DEPOSIT.** As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, a security deposit in amount determined by **XTRA Lease**, may be required and, if required, shall be delivered to **XTRA Lease** by **Lessee** prior to **Lessee** taking possession of any Equipment. Such security deposit may be used to offset any amounts due and owing by **Lessee** to **XTRA Lease** pursuant to the Lease. The security deposit, or any balance thereof, if any, shall be returned to **Lessee** after all of the Equipment leased hereunder has been returned to **XTRA Lease** and after deduction of any amounts due and owing by **Lessee** to **XTRA Lease**, including, without limitation, all unpaid Use Charges and any repair or replacement expenses.

**15. LETTER OF CREDIT.** As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, **Lessee** may be required to obtain from a financial institution acceptable to **XTRA Lease** an irrevocable letter of credit for the benefit of **XTRA Lease** in an amount determined by **XTRA Lease**. If required, **Lessee** agrees to maintain such letter of credit in place until all of the Equipment leased hereunder shall have been returned to **XTRA Lease** and **Lessee** shall have fully complied with all of its obligations hereunder, including the payment of all Use Charges, repair or replacement expenses and any other amount due and owing to **XTRA Lease** hereunder. In addition, the failure by **Lessee** to extend the letter of credit or to provide a substitute letter of credit acceptable to **XTRA Lease** at least thirty (30) days prior to the expiration date of the letter of credit shall constitute an event of Default under the Lease and shall entitle **XTRA Lease** to immediately draw down the full amount available under the letter of credit. The letter of credit shall be issued in the form approved by **XTRA Lease**.

**16. ADEQUATE ASSURANCES.** During the term of any Lease, **XTRA Lease**, in its sole discretion, may require that **Lessee** immediately enter into reasonable security arrangements with **XTRA Lease**. Such security arrangements may include, but are not limited to, providing a security deposit, letter of credit, or the payment of Estimated Charges sufficient to protect **XTRA Lease** from all risk of loss. Failure by **Lessee** to comply with any of the terms of this provision shall constitute a Default of the Lease and **XTRA Lease** shall be entitled to all rights and remedies provided by Section 21(b) herein.

**17. LAWS, RULES AND REGULATIONS.**
(a) For each unit of Equipment, **XTRA Lease** will provide a motor vehicle registration and license plate for registration in a jurisdiction of **XTRA Lease's** choosing, together with any required renewals. **Lessee** shall be solely responsible for all other registrations, licenses, license plates, and operating permits that may be required for **Lessee** to use, possess, operate or control the Equipment during the Lease.

(b) **Lessee** shall be solely responsible for (i) complying with Applicable Law, including, without limitation, all federal and state anti-pollution and environmental, transportation compliance, safety, and inspection requirements; (ii) any modification required to be made to the Equipment to comply with Applicable Law; and (iii) any fines, tolls, user fees, traffic and parking violations, towing and storage expenses and other similar fines, fees or charges relating to the Equipment during the Lease. **XTRA Lease** shall charge **Lessee**, and **Lessee** agrees to pay **XTRA lease**, for any fines, tolls, user fees, traffic or parking violations, towing and storage expenses and other fines, fees, penalties, or charges relating to the Equipment during the Lease, plus an administrative fee.

(c) Sections 95300-95311 of Title 17 of the California Code of Regulations governs the operation of 53-foot or longer box-type trailers in the State of California (the "HDV Regulations"). **Lessee** is solely responsible for complying with the HDV Regulations, as they may be amended from time to time, in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the HDV Regulations; (ii) complying with any reporting obligations under the HDV Regulations associated with the operation of the Equipment in the State of California; and (iii) verifying that any Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the HDV Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee**

shall not permit Equipment that does not comply with the HDV Regulations to be operated in the State of California. **Lessee** shall have the right to make modifications to the Equipment to comply with the requirements of the HDV Regulations; provided, however, that (i) any modifications made to install aerodynamic devices on Equipment are made in accordance with the recommendations and standards set by the manufacturer of the aerodynamic device, and (ii) unless otherwise agreed to by **XTRA Lease**, **Lessee** shall be responsible for removing any modifications **Lessee** makes to the Equipment prior to **Lessee's** return of the Equipment to **XTRA Lease**.

THE LESSEE OF THIS BOX-TYPE TRAILER UNDERSTANDS THAT WHEN USING A HEAVY-DUTY TRACTOR TO PULL A 53-FOOT OR LONGER BOX-TYPE TRAILER ON A HIGHWAY WITHIN CALIFORNIA, THE BOX-TYPE TRAILER MUST BE COMPLIANT WITH SECTIONS 95300-95311, TITLE 17, CALIFORNIA CODE OF REGULATIONS, AND THAT IT IS THE RESPONSIBILITY OF THE LESSEE TO ENSURE THIS BOX-TYPE TRAILER IS COMPLIANT. THE REGULATIONS MAY REQUIRE THIS TRAILER TO HAVE LOW ROLLING RESISTANCE TIRES AND AERODYNAMIC TECHNOLOGIES THAT ARE U.S. ENVIRONMENTAL PROTECTION AGENCY VERIFIED SMARTWAY TECHNOLOGIES PRIOR TO CURRENT OR FUTURE USE IN CALIFORNIA.

(d) Section 2477 of Title 13 of the California Code of Regulations governs the operation of refrigerated units of Equipment in the State of California (the "TRU Regulations"). It is a violation of the TRU Regulations to operate any refrigerated unit of Equipment in the State of California that does not comply with the TRU Regulations, as they may be amended from time to time. **Lessee** shall be solely responsible for complying with the TRU Regulations in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the TRU Regulations; provided, that **Lessee** shall obtain **XTRA Lease's** approval prior to modifying any Equipment to comply with the TRU Regulations; (ii) complying with any reporting obligations under the TRU Regulations associated with the operation of refrigerated units of Equipment in the State of California; and (iii) verifying that any refrigerated unit of Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the TRU Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee** shall not permit a refrigerated unit of Equipment that does not comply with the TRU Regulations to be operated in the State of California.

**18. TAXES.** All taxes and assessments, including without limitation all import and customs duties and all withholding, property, sales and/or use taxes, and all penalties or other charges or fees arising out of or incident to the use, possession or control of the Equipment by **Lessee** prior to its return to **XTRA Lease**, shall be the responsibility of **Lessee**. In order to avoid the obligation to remit any applicable withholding, property, sales and/or use tax to **XTRA Lease**, **Lessee** must provide a duly authorized exemption certificate issued by or acceptable to the relevant taxing authority.

**19. ASSIGNMENT & SUCCESSORS.** **Lessee** shall not assign or sublease any right or interest in the Equipment, any Lease or any agreement that results therefrom, without the prior written consent of **XTRA Lease**. **XTRA Lease** shall have the right to assign any of its rights or interests in the Equipment, any Lease or any agreement that results therefrom, without obtaining **Lessee's** consent. For purposes of this Section 19, an assignment shall be deemed to have occurred if there has been a change in the control of **Lessee** or **Lessee's** business, whether by merger, consolidation or reorganization, the sale of a majority of the ownership of **Lessee** or **Lessee's** ultimate parent, or a sale, assignment or other transfer of all or substantially all of **Lessee's** assets. **Lessee** may not sublicense, assign, rent, disclose or provide the Software or access to the Communications Services to any third-party. Notwithstanding anything to the contrary contained herein, the Lease and the Standard Terms and Conditions shall inure to the benefit and be binding upon the parties, their heirs, successors, administrators, executors and assigns.

**20. LIENS.**
(a) **Lessee** shall keep the Equipment free from any liens, including, without limitation, mechanics' liens, storage, warehouse or other possessory liens, claims or encumbrances, attachments, rights of others and legal processes ("Liens") of creditors of **Lessee** or any other persons. **Lessee** shall promptly notify **XTRA Lease** upon receipt of notice of any such Liens affecting the Equipment and **Lessee** shall promptly defend at its own expense **XTRA Lease's** title to the Equipment from such Liens.

(b) Notwithstanding the parties' intention and express agreement that the Lease constitutes a valid lease of the Equipment, and solely to protect the rights of **XTRA Lease** in the Equipment in the event the Lease is determined by a court of competent jurisdiction to be a conditional sale of and/or financing arrangement as to the Equipment, **Lessee** hereby pledges, assigns and grants to **XTRA Lease** a continuing first priority security interest in and lien upon the Equipment and all proceeds (including proceeds of all insurance policies), which interest and lien shall be cross-collateralized with

5

each and every separate item of Equipment subject to the Lease and related schedules, in order to secure the prompt payment and performance, as and when due, of all of Lessee's obligations, both now existing and hereinafter arising under this Lease. Lessee hereby agrees that XTRA Lease shall have all rights and remedies of a "secured party" under the Uniform Commercial Code and authorizes XTRA Lease to cause this Lease and/or any statements or other instruments in respect of this Lease showing the interest of XTRA Lease in the Equipment (including certificates of title or Uniform Commercial Code financing statements) to be filed or recorded, and grants XTRA Lease and its agents the right to execute Lessee's name thereto. Lessee also agrees to execute or cause the execution of such additional documents and do such other acts and things, including execution of applications and certificates of title naming XTRA Lease as a secured party and delivery of same to XTRA Lease, as XTRA Lease from time to time requests or deems necessary to establish and maintain a valid and perfected security interest in and lien upon the Equipment. To further secure payment to XTRA Lease of the obligations owed by Lessee, Lessee agrees that the Equipment subject to the Lease shall be cross-collateralized with the Equipment subject to any other Lease in which Lessee is a lessee.

### 21. DEFAULT.

(a) Lessee SHALL BE IN DEFAULT of the Lease: (i) if Lessee fails to comply with any of the terms or conditions of the Lease, including, without limitation, the retention of the Equipment for the Lease Term or the timely payment of all invoices; (ii) if any third-party credit support, including any guarantor or issuer of letter of credit, attempts to or does cancel the support or guaranty (or is otherwise in default under such support or guaranty); (iii) if Lessee is in default of any of the terms or conditions of any other agreement with XTRA Lease; (iv) if Lessee fails to maintain, or fails to provide XTRA Lease with proper evidence of, the insurance required by this Lease, or Lessee's insurance is canceled, reduced or lapses; (v) if Lessee fails to provide the adequate assurances under Section 16 hereof; or (vi) if Lessee becomes insolvent, or subject to any voluntary or involuntary bankruptcy proceeding (including acquiescence in the appointment of a trustee or receiver, or commencement of any dissolution or liquidation proceeding; hereafter individually or collectively referred to as a "Default").

(b) In addition to any rights or remedies available at law or in equity, upon a Default by Lessee, XTRA Lease shall have the right, at its option and without demand or notice to Lessee, to do any one or more of the following: (i) pay all amounts required to be paid or perform or cause to be performed all obligations required to be performed by Lessee under the Lease and charge Lessee as additional rent the amount paid or the reasonable value of the services performed therefore together with interest thereon at the rate described in Section 7 hereof; (ii) declare the entire balance of the remaining payments under the Lease immediately due and payable by acceleration and recover such amount as liquidated damages, the reasonableness of such damages being acknowledged and agreed to by Lessee; (iii) take immediate possession of all outstanding Equipment and Software, all of which is to be returned at Lessee's expense; (iv) immediately terminate Lessee's access to the Communication Services; (v) terminate the Lease (whereupon the terms and conditions shall continue to apply to the Equipment then in the possession or control of Lessee until its return); (vi) calculate and require Lessee to pay any collection costs incurred in recovery of any sums due or repossession of any Equipment including, without limitation, reasonable attorneys' fees; (vii) calculate and recover from Lessee any lost profits and damages as a "Lost Volume Seller" and/or "Lost Volume Lessor" (as those terms are defined and used in the Uniform Commercial Code) that XTRA Lease would have generated had the Lease not been prematurely cancelled; (viii) calculate and recover from Lessee any costs to transport and store the Equipment throughout the remainder of the Lease Term; and (ix) set-off and apply any amounts owing by XTRA Lease to or for the account of Lessee against any amounts owing by Lessee to or for the account of XTRA Lease, including, without limitation, any deposits, accruals, prepayments, overpayments, Estimated Charges, fees or otherwise. Lessee acknowledges and agrees that XTRA Lease is under no duty to mitigate damages resulting from Lessee's Default.

### 22. REPOSSESSION.

(a) In the event of Lessee's Default, and upon demand of XTRA Lease, Lessee shall immediately return all Equipment to XTRA Lease. If Lessee fails or refuses to immediately return all Equipment after demand by XTRA Lease, XTRA Lease shall have the right to enter upon any premises where the Equipment is located and take immediate possession of, and at Lessee's expense remove, the Equipment, and XTRA Lease shall be deemed to be Lessee's agent for such purposes. If XTRA Lease takes possession of the Equipment with property contained in, upon or attached to the Equipment, XTRA Lease may take possession of such property and hold it in its own or public storage for the account and at the expense of Lessee upon thirty (30) days advance written notice to Lessee, dispose of such property in a commercially reasonable manner with no further liability. Lessee expressly

waives the benefits of any Applicable Law, now or hereafter enacted, exempting any leased property from replevin, distraint, levy or sale in any legal proceeding taken by XTRA Lease to enforce any right under the Lease.

(b) In the event of Lessee's Default, (i) XTRA Lease will be in danger of losing its Equipment unless immediate possession of the Equipment is obtained because XTRA Lease's Equipment is movable and readily marketable; and (ii) XTRA Lease will not have an adequate remedy at law to protect its rights in its unreturned Equipment. Therefore, Lessee agrees that in the event of Lessee's Default, XTRA Lease shall have the right, without prejudice to any other rights and remedies otherwise available to XTRA Lease at law or in equity, to obtain injunctive relief in order to prevent the continued use of the Equipment by Lessee and to require Lessee to immediately deliver possession of the Equipment to XTRA Lease.

### 23. INTELLECTUAL PROPERTY. XTRA Lease and/or its licensors reserve ownership of all Intellectual Property in and to the Equipment, Trailer Tracking Unit, Software, Communication Services and the XTRA Web Sites, and the Lease does not create any right of ownership in or to such materials in Lessee. For the purposes of this Section 23, "Intellectual Property" shall mean all proprietary interests of any kind or nature, including, without limitation interests pertaining to patent rights, copyrights, trade secrets, mask work rights, circuit layout rights, design rights, prototypes, models, source code, documentation, trade and service marks, and other similar rights throughout the world, however denominated and any amendments, additions or improvements made thereto.

### 24. BUSINESS CONDUCTED ELECTRONICALLY.

(a) Lessee agrees to conduct business with XTRA Lease electronically, and that except as otherwise specifically provided herein, an electronic signature on any notice or other communication required or permitted to be given hereunder, or pursuant or relating to any Lease, shall have the same force and effect as the use of manual signatures;

(b) Lessee agrees that in the event Lessee uses any web site of XTRA Lease, including, without limitation, xtracorp.com, xtralease.com, xtratrack.com, xtrainstall.com, and /or xtra.com (collectively, "XTRA Web Sites"), as a condition of such use, Lessee stipulates that while on XTRA Web Sites and where applicable terms and conditions on XTRA Web Sites so indicate, when Lessee clicks a button labeled "I Agree" or "I Accept", or when Lessee types "I Agree" or "I Accept" in a space marked for such an input by Lessee, Lessee will be manifesting and authenticating Lessee's assent to a binding contractual agreement incorporating the terms and provisions for which the button or input area is provided; and

(c) In any dispute hereunder, related to the Lease, or related to Lessee's use of XTRA Web Sites, Lessee stipulates that it will have the burden of proving that (i) any electronic manifestation of assent received by XTRA Lease is not attributable to Lessee; and (ii) Lessee did not have an opportunity to review any electronic terms and conditions posted on the XTRA Web Sites.

### 25. WAIVER. No waiver by XTRA Lease of any breach or Default hereunder, or omission or delay by XTRA Lease in exercising any of its rights hereunder, or course of dealing between XTRA Lease and Lessee shall operate as a waiver by XTRA Lease to subsequently require full compliance with the Lease or the Standard Terms and Conditions or as a waiver of any of XTRA Lease's rights or remedies hereunder.

### 26. ILLEGAL PAYMENTS. No bribes, illegal commissions, or other similar payments, whether direct or indirect, to the best of Lessee's knowledge, have been or will be made to any employee or agent of XTRA Lease or Lessee, or of their respective subsidiaries, in connection with the Lease.

### 27. ENTIRE AGREEMENT; CONFLICTS. The Lease, including the Standard Terms and Conditions, any long-term Equipment Lease Agreement and Schedules thereto, National Account Agreement, Short-term Rental Agreement, and Equipment Rental Agreement, supersedes all prior agreements, whether written or oral, between XTRA Lease and Lessee with respect to the rental or lease of the Equipment described therein, and constitutes a complete and exclusive statement of the terms of the agreement between XTRA Lease and Lessee with respect to the lease of the Equipment described therein. All Lease documents shall be read in a complementary manner. Except as may be provided in the Lease, the Standard Terms and Conditions shall take precedence over all other Lease documents.

### 28. AMENDMENTS. XTRA Lease reserves the right to change, upon thirty (30) days prior written notice, any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease and the Standard Terms and Conditions. No change to the Lease shall be effective unless in writing, executed by XTRA Lease's Vice President, Customer Financial Services or his designee who is located in XTRA Lease's home office in St. Louis, Missouri and delivered to Lessee pursuant to the notice provision hereto.

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 77 of 89

**29. NOTICES.** All notices and other communications required or permitted to be given hereunder, including those required for billing purposes, shall be in writing and shall be deemed given and made (i) if by personal delivery, on the date of delivery, (ii) if by a nationally recognized overnight courier, on the next day following deposit, and (iii) if by mail, on the third business day following deposit in the mail. Any notice or communication to **Lessee** shall be sent to the address set forth in the Lease, or such other address as may be designated by **Lessee** by written notice to **XTRA Lease**. In the case of **XTRA Lease**, any notice or communication shall be sent to XTRA Lease, 7911 Forsyth Boulevard, Suite 600, St. Louis, MO 63105, Attention: Vice President, Customer Financial Services. Any change of address by either party shall be communicated to the other in writing. Notwithstanding the above, **XTRA Lease** may provide the Lease, the Standard Terms and Conditions, invoices, notices and other communications to **Lessee** in an electronic format through the XTRA Web Sites or other means.

**30. CONFIDENTIALITY.** The confidentiality of the Lease, including without limitation the Use Charges applicable thereunder, shall be strictly maintained by **Lessee** and shall not be released or revealed to any third-party by **Lessee**.

**31. CHOICE OF LAW; VENUE; JURY TRIAL WAIVER.** The Lease and the Standard Terms and Conditions shall be governed by the internal substantive laws of the State of Missouri, without regard to conflicts of laws provisions. **Lessee** and **XTRA Lease** each hereby submit to the jurisdiction of the Circuit Court of St. Louis County, Missouri for purposes of adjudicating any action arising out of or related to the Lease, and hereby waive, to the fullest extent permitted by law, any objection to that venue for any action arising out of or related to the Lease. Any action arising out of the Lease may be properly filed in the Circuit Court of St. Louis County, Missouri; however, **XTRA Lease** reserves its right to bring suit in any other appropriate jurisdiction. **LESSEE AND XTRA LEASE EACH IRREVOCABLY WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING FOR ANY CLAIM, DISPUTE OR CONTROVERSY THAT IN ANY WAY ARISES FROM OR RELATES TO THE LEASE AND IN WHICH LESSEE AND XTRA LEASE ARE ADVERSE PARTIES.**

**32. SEVERABILITY.** If any term or provision hereof is declared to be illegal, invalid or unenforceable for any reason by a court of competent jurisdiction, such illegality, invalidity or unenforceability shall not affect the remaining terms and provisions hereof, which shall remain binding and enforceable.

7

## EXHIBIT C

**(Terms and Conditions)**



## STANDARD TERMS AND CONDITIONS

**These Standard Terms and Conditions apply to all transactions with XTRA Lease, including, without limitation, all leases or rentals of XTRA Lease Equipment, whether pursuant to a long-term Equipment Lease Agreement, National Account Agreement, Short-term Rental Agreement, Equipment Rental Agreement or any other agreement. THE STANDARD TERMS AND CONDITIONS CONTAIN A JURY TRIAL WAIVER WHICH MAY BE ENFORCED IN THE EVENT OF A DISPUTE BETWEEN XTRA LEASE AND LESSEE.**

**1. DEFINITIONS.**

(a) **"Applicable Law"** means any federal, state, local or foreign law, statute, rule, regulation, order, judgment, opinion or ordinance applicable to the use, possession, operation or control of the Equipment, including, without limitation, the HDV Regulations and the TRU Regulations (both as defined in Section 17).

(b) **"Casualty Loss Value"** shall be equal to the present value of a unit of Equipment as determined by **XTRA Lease** in its sole discretion on the first day of the month during which the loss or destruction occurs.

(c) **"Communication Services"** means the two-way wireless tracking and mobile information management services provided to **Lessee** by or through **XTRA Lease** that utilize the communications network provided by third-party licensors of **XTRA Lease**.

(d) **"Default"** has the meaning as set out in Section 21.

(e) **"Equipment"** means the **XTRA LEASE** semi-trailer, chassis, refrigerated trailer, or other over-the-road, cartage, or storage equipment together with the attached Trailer Tracking Unit and related sensors, if applicable.

(f) **"Equipment Lease Agreement"** means a true lease agreement between **Lessee** and **XTRA Lease** for the leasing of **XTRA Lease** Equipment by **Lessee** for a specified Lease Term and at specified Use Charges.

(g) **"Equipment Rental Agreement"** means the agreement provided to **Lessee** by **XTRA Lease**, in electronic or other format, whenever a unit of Equipment is picked up from or returned to an **XTRA Lease** location by **Lessee** or **Lessee's Agent**.

(h) **"Estimated Charges"** means periodic estimated payments of Use Charges which are payable at the end of the Lease.

(i) **"Intellectual Property"** has the meaning as set out in Section 23.

(j) **"Lease"** means any and all arrangements or agreements whereby **Lessee** leases or rents Equipment from **XTRA Lease**, including, without limitation, long-term Equipment Lease Agreements, National Account Agreements, Short-term Rental Agreements and Equipment Rental Agreements. All Leases are subject to and are deemed to incorporate the Standard Terms and Conditions, as amended from time to time.

(k) **"Lease Term"** means the agreed upon term of the Lease contained in an Equipment Lease Agreement or the agreed upon minimum rental term of a Short-term Rental Agreement as listed on the Equipment Rental Agreement.

(l) **"Lessee"** means the individual or entity that enters into a Lease with **XTRA Lease**. Where appropriate the term **Lessee** shall be deemed to include the term **Lessee's Agent**.

(m) **"Lessee's Agent"** means the driver or other representative who picks up, inspects, takes possession of, or returns a unit of Equipment on behalf of **Lessee** to an **XTRA Lease** location or to a designated cartage vendor, and/or who executes a Lease document on behalf of **Lessee**.

(n) **"National Account Agreement"** means a rate agreement between **Lessee** and **XTRA Lease** for the renting of Equipment by **Lessee** at specified Use Charges.

(o) **"Repair Standards"** means **XTRA Lease's** current repair standards which provide the requirements for repairs to Equipment, a copy of which can be obtained at http://www.xtralease.com.

(p) **"Short-term Rental Agreement"** means an agreement between **Lessee** and **XTRA Lease** for the renting of Equipment by **Lessee** at a specified rate and rental term as listed on the Equipment Rental Agreement.

(q) **"Software"** means (i) the software code that is embedded within the Trailer Tracking Unit, (ii) any other software provided to **Lessee** relating to the Trailer Tracking Unit directly or through Internet access, (iii) any user documentation provided to **Lessee**, and (iv) any subsequent versions or upgrades of software which **XTRA Lease** elects to provide to **Lessee**.

(r) **"Standard Terms and Conditions"** means the **XTRA Lease** Standard Terms and Conditions contained in this document, as amended by **XTRA Lease** from time to time.

(s) **"Trailer Tracking Unit"** means the product created by **XTRA Lease's** third-party licensor, which provides mobile communication, tracking, and other Equipment management services.

(t) **"Use Charges"** means the required payments to be made by **Lessee** to **XTRA Lease** for every day (including Saturdays, Sundays, and Holidays) Equipment is on lease or rent to **Lessee** whether or not such Equipment is in the use, possession, control or operation of **Lessee**. Use Charges shall include the rental rate set forth in the Lease plus any and all other charges, fees and all other amounts required to be paid by **Lessee** pursuant to the Lease.

(u) **"written"** or **"in writing"** shall mean in print copy format or in electronic format.

(v) **"XTRA Lease"** as used herein shall mean XTRA LLC, a Maine limited liability company (formerly known as XTRA, Inc.), XTRA Lease LLC, a Delaware limited liability company (formerly known as XTRA Lease, Inc. which was formerly known as Strick Lease, Inc.), GTR RENTAL LLC, a Delaware limited liability company (formerly known as CitiCapital Trailer Rental, Inc. and Associates Rental Systems, Inc., among others), AJF Warehouse Distributors, Inc., an Illinois corporation, Rentco Trailer Corporation, a Delaware corporation, as applicable, depending upon which entity holds title to the Equipment leased hereunder.

(w) **"XTRA Web Sites"** has the meaning as set out in Section 24.

**2. EQUIPMENT COVERED, TERM AND OWNERSHIP.** The specific Equipment covered by the Lease and the Lease Term shall be as set forth in the Lease. Upon expiration of the Lease Term, if **Lessee** maintains possession of the Equipment, **XTRA Lease**, in its sole discretion, may (a) upon thirty (30) days written notice to **Lessee** change any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease, as specified in such notice, or (b) demand **Lessee's** immediate return of the Equipment. **Lessee's** responsibilities under the Lease, including, without limitation, the payment of Use Charges, shall continue until all of the Equipment is returned to **XTRA Lease**. The Lease shall terminate upon the return of all Equipment subject to the Lease, except with respect to provisions contained in the Lease or the Standard Terms and Conditions intended to survive the termination of the Lease, including, without limitation, limitations of liability, indemnity, confidentiality, payment and billing, damage and repairs to Equipment, choice of law, venue, and jury trial waiver. Notwithstanding any other language contained herein or therein, neither the Lease nor any agreement that results therefrom conveys any ownership rights to **Lessee** and all right, title and interest in and to the Equipment is and shall remain with **XTRA Lease**.

**3. AUTHORITY & ACCEPTANCE.** By submitting or completing an **XTRA Lease** customer application, entering into a Lease with **XTRA Lease**, taking possession of Equipment from **XTRA Lease**, executing an Equipment Rental Agreement, completing payment of any invoices to **XTRA Lease** or completing any other transaction with **XTRA Lease**, **Lessee** and **Lessee's Agents** represent and warrant that they are authorized on behalf of **Lessee** and, if applicable, on behalf of those companies identified in a National Account Agreement as "Lessee's Affiliates Authorized to Rent Equipment", to enter such agreements and transactions with **XTRA Lease** and expressly acknowledge receipt and on-going acceptance of **XTRA Lease's** Standard Terms and Conditions as such Standard Terms and Conditions may be amended from time-to-time.

**4. DELIVERY, RECEIPT & DROPOFF.**

(a) As a condition precedent to **Lessee's** pick-up or return of Equipment at any **XTRA Lease** location, **Lessee's Agent** must (i) provide proof of identification to **XTRA Lease** in the form of a valid commercial driver's license, and (ii) sign **XTRA Lease's** Equipment Rental Agreement. **Lessee** acknowledges that **Lessee's Agent** has been authorized to pick-up from, return Equipment to, and/or accept delivery of Equipment from, **XTRA Lease**, and that the signature of **Lessee's Agent** on **XTRA Lease's** Equipment Rental Agreement shall bind **Lessee** to the terms of such Equipment Rental Agreement and the Standard Terms and Conditions, as amended from time to time.

(b) By taking possession of the Equipment, **Lessee** accepts the Equipment in the condition noted in the Equipment Rental Agreement and acknowledges receipt of the Equipment in good repair and working condition. **Lessee** shall have exclusive possession, control and use, and assumes complete responsibility for the condition, operation, inspection and maintenance of the

Case: 15-30897   Doc# 246   Filed: 06/06/16   Entered: 06/07/16 08:59:36   Page 80 of 89

Equipment during the Lease. **Lessee** shall return the Equipment to **XTRA Lease** in the same condition noted in the Equipment Rental Agreement, normal wear excepted.

(c) If **Lessee** has requested **XTRA Lease** to arrange for a unit of Equipment to be delivered to or picked up from a location designated by **Lessee**, as a condition precedent to such delivery or pick-up, **Lessee** must sign **XTRA Lease's** Equipment Rental Agreement and/or other documentation provided by the cartage vendor. In the event of delivery of a unit of Equipment to **Lessee**, **XTRA Lease's** inspection of the Equipment at **XTRA Lease's** branch location prior to delivery of the Equipment to **Lessee** shall be conclusive evidence of the condition of the Equipment at the time of commencement of the Lease, and in the event of pick-up of Equipment from **Lessee**, **XTRA Lease's** inspection of the Equipment following delivery of the Equipment to **XTRA Lease's** branch location shall be conclusive evidence of the condition of the Equipment upon redelivery.

(d) **Lessee** shall redeliver a unit of Equipment at **Lessee's** expense to the Return Location provided in the unit's Equipment Rental Agreement, unless otherwise provided in the Lease. If **Lessee** returns a unit of Equipment to a branch other than its designated Return Location, **Lessee** shall pay **XTRA Lease's** then applicable drop fee as compensation for the costs associated with the failure to return the unit to its Return Location.

## 5. COMMUNICATION SERVICES.
If a Trailer Tracking Unit is installed on a unit of Equipment rented or leased by **Lessee** from **XTRA Lease**, **XTRA Lease** hereby grants to **Lessee** a non-exclusive, non-transferable and limited sub-license to use the Software subject to the conditions and restrictions of the Lease and the Standard Terms and Conditions solely for the purpose of utilizing the Trailer Tracking Unit and related Communication Services to monitor Equipment leased from **XTRA Lease**. **Lessee** shall make no other use of the Software or Communications Services and shall not copy the Software or provide the Software or access to the Software to any third-party. The Software will be in object code form only, and will not include any source code or the right to use any source code. **Lessee** agrees that it will not reverse engineer, decompile, or disassemble the Trailer Tracking Unit or Software. **Lessee** agrees to use the Software only in connection with **Lessee's** use of the Communication Services. In addition, **XTRA Lease** grants to **Lessee** a non-exclusive, non-transferable, limited sub-license to access the Communication Services for use with the Trailer Tracking Unit in the United States, Mexico, and Canada. **XTRA Lease** reserves the right to terminate the Communication Services, and the sub-licenses granted pursuant to this Section 5, at any time on thirty (30) days advance notice to **Lessee**. **Lessee** acknowledges and understands that (1) it shall use all information provided via the Communication Services at **Lessee's** own risk, and (2) **Lessee** shall acquire no proprietary interest in any telephone number that may be assigned to **Lessee** for use with the Communication Services. **Lessee** acknowledges that disruption of Communication Services may occur from time to time for routine and emergency maintenance and other reasons beyond the control of **XTRA Lease**. **Lessee** shall have no remedy against **XTRA Lease**, any third-party licensor of **XTRA Lease**, or the underlying wireless services carrier, and **Lessee** hereby releases **XTRA Lease** and all of its licensors, and the underlying wireless services carrier from all liability relating to such disruption. If, and only if, Use Charges relating to the Communication Services are billed separately to **Lessee** as part of the total Use Charges for the Equipment, **Lessee's** sole remedy for any disruption or failure of the Communication Services shall be that portion of the Use Charges paid by **Lessee** for Communication Services relating to the period of service during which such failure or disruption occurred, provided that such disruption or failure is not corrected by **XTRA Lease** within thirty (30) days after receiving written notice from **Lessee** of such failure or disruption.

## 6. ROADWATCH® SERVICE.
Unless otherwise specified in the Lease, **Lessee** may call **XTRA Lease's** RoadWatch® service to coordinate emergency repairs for units of Equipment subject to the Lease. Upon receiving a call from **Lessee** or **Lessee's Agent**, **XTRA Lease**, on behalf of **Lessee**, will (i) contact a third-party repair vendor to provide repair services to **Lessee**, and (ii) coordinate payment for any services provided by that third-party repair vendor to **Lessee**. Unless otherwise provided in the Lease, **XTRA Lease** will invoice **Lessee** for any repair services coordinated through the RoadWatch® service, along with a service fee. No warranty, express or implied, is made by **XTRA Lease** with respect to any services provided by a repair vendor coordinated through the RoadWatch® service, and **Lessee** hereby releases **XTRA Lease** from all liability in any way relating to the use of the RoadWatch® service, including, without limitation, any repairs provided by any repair vendor coordinated through the RoadWatch® service.

## 7. PAYMENT.
(a) **Lessee** agrees to pay all Use Charges for Equipment **Lessee** rents or leases from **XTRA Lease**. These Use Charges may include, but are not limited to:

(i) Rental Charges. **Lessee** shall pay **XTRA Lease** the rental charges for the rent or lease of a unit of Equipment, as specified in the Lease.

(ii) Mileage Charges. **Lessee** shall pay **XTRA Lease** mileage charges for actual miles traveled by a unit of Equipment as specified in the Lease. Miles traveled will be measured by a hubodometer attached to each unit of Equipment. A reading of the hubodometer will be taken by **XTRA Lease** at the time of a unit's delivery or pick-up, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit to **XTRA Lease**. In the event the hubodometer on a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a mileage charge based on the average miles traveled by similar units leased or rented by **Lessee** from **XTRA Lease** or the average miles traveled by similar units of Equipment leased or rented from **XTRA Lease** generally, as determined by **XTRA Lease** in its sole discretion.

(iii) Refrigeration Unit Charges. **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours used on any refrigerated unit of Equipment as specified in the Lease. Engine hours will be measured by an hour meter attached to each refrigerated unit of Equipment. A reading of the hour meter will be taken by **XTRA Lease** at the time of delivery to or pick-up of a unit of Equipment by **Lessee**, and a similar reading will be taken by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. In the event the hour meter for a unit of Equipment is missing or fails to function properly, **Lessee** shall pay **XTRA Lease** a refrigeration charge for engine hours based on the average engine hours historically used on similar units of Equipment leased or rented from **XTRA Lease**, as determined by **XTRA Lease** in its sole discretion.

(iv) Tire Wear. **Lessee** shall pay **XTRA Lease** a charge for tire wear as specified in the Lease. The tread depth of each tire will be measured by **XTRA Lease** in thirty-two seconds (1/32nds) of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**. Tire depth shall be measured at the lowest point of remaining tire tread.

(v) Brake Wear. **Lessee** shall pay **XTRA Lease** a charge for brake lining wear as specified in the Lease. The brake lining for each wheel end will be measured by **XTRA Lease** in one-eighth (1/8") of an inch increments at the time of delivery to or pick-up by **Lessee**. A similar measurement will be made by **XTRA Lease** upon redelivery of the unit of Equipment to **XTRA Lease**.

(b) **Lessee** shall pay Estimated Charges to **XTRA Lease** as specified in the Lease. **XTRA Lease** shall have the right to commence charging **Lessee** Estimated Charges under any Lease that does not specify an obligation of **Lessee** to pay Estimated Charges, or from time to time to increase Estimated Charges payable under a Lease, if **XTRA Lease** deems it necessary, in its sole discretion, in order to ensure **Lessee's** full performance of its obligation to pay any Use Charges pursuant to the terms of the Lease. **XTRA Lease** shall provide **Lessee** with written notice of its intent to initiate charging or increase Estimated Charges, and **Lessee** shall be required to pay the Estimated Charges as specified in such notice from the start of the billing period in which said notice was provided. **Lessee** shall pay **XTRA Lease** the amount of any shortfall, or **XTRA Lease** shall pay **Lessee** the amount of any overpayment, between the total Estimated Charges paid by **Lessee** during the Lease and the final amount of the Use Charges as determined upon redelivery of the Equipment.

(c) Use Charges shall commence on the date the Equipment is available for delivery to or pick-up by **Lessee**. Notwithstanding any other language contained in the Standard Terms and Conditions, Use Charges shall continue until the Equipment is returned to **XTRA Lease** at the Return Location set forth in the Lease, in the same condition as when received, normal wear excepted, or until payment is made of the Casualty Loss Value as provided herein.

(d) Use Charges are based on a twenty-eight (28) day billing period unless otherwise specified. Unless otherwise stated in the Lease, in the event of return of the Equipment to **XTRA Lease** prior to the expiration of the billing period in effect at the time of return, Use Charges for the final partial billing period shall be adjusted to the appropriate weekly and daily rate, as applicable.

(e) **XTRA Lease** shall periodically invoice **Lessee** for all Use Charges incurred pursuant to the Lease. **XTRA Lease** shall have the right to provide all invoices electronically via the XTRA Web Sites. **Lessee** shall pay all invoices within ten (10) days from the date of invoice.

(f) **Lessee** shall make all payments in U.S. currency to the lockbox address provided by **XTRA Lease** and **Lessee** shall not deliver payments directly to any **XTRA Lease** location. Overdue payments may be assessed interest equal to the lesser of 18% per annum or the maximum rate permitted by law. If **Lessee** provides **XTRA Lease** with a check, or authorizes **XTRA Lease** to collect payments through a pre-authorized payment, electronic payment, or any other form of payment that is returned due to insufficient funds, or payment is otherwise declined, **Lessee** shall be subject to and agrees to pay

2

XTRA Lease an additional processing fee of $100.00 for each such occurrence.

## 8. MAINTENANCE AND USE OF EQUIPMENT.

(a) Lessee is responsible for determining whether the Equipment it rents or leases from XTRA Lease is fit and sufficient for the designated purpose for which Lessee intends to utilize such Equipment.

(b) Lessee is responsible for the condition, operation, inspection and maintenance of the Equipment during the Lease. Lessee shall maintain the Equipment, at Lessee's own expense and in accordance with the Repair Standards, the Equipment in good condition, free from defects and fit for its designated purpose. Lessee shall return all Equipment to XTRA Lease in the same condition as when received, normal wear excepted.

(c) Lessee shall not (i) use the Equipment for the transportation or storage of any unprotected corrosive substances, trash, medical and/or solid waste and/or hazardous materials ("Hazardous Materials"), (ii) permit the Equipment to be contaminated by any Hazardous Materials, or (iii) violate any Applicable Law regarding the transportation of any Hazardous Materials. Lessee shall promptly notify XTRA Lease if it becomes aware of the use of the Equipment for such purposes, the contamination of the Equipment by any Hazardous Materials, or the violation of any Applicable Law regarding the transportation of any Hazardous Materials in the Equipment. If Lessee notifies XTRA Lease or XTRA Lease determines that Hazardous Materials contaminate, were placed in, or have damaged the Equipment, XTRA Lease may, in its sole discretion, (i) require Lessee to immediately pay XTRA Lease the Casualty Loss Value of the Equipment; (ii) require Lessee, at Lessee's sole expense to repair, restore and/or decontaminate the Equipment and provide proof of such repair, restoration and/or decontamination, including without limitation, methodology and pre and post decontamination sampling results and any other inspection or testing XTRA Lease deems necessary to perform; or (iii) repair, restore and/or decontaminate the Equipment, in which case Lessee shall be liable to XTRA Lease for the total estimated or actual cost to repair, restore and/or decontaminate the Equipment, as determined by XTRA Lease in its sole discretion.

(d) Lessee shall not remove, obscure, obliterate or otherwise alter any marks of identification on the Equipment. Prior to Lessee's return of the Equipment to XTRA Lease, all marks of identification or logos applied to the Equipment by or for Lessee shall be removed and the surface restored at Lessee's expense. Subject only to the provisions of Section 17(c) of the Standard Terms and Conditions, Lessee shall not make any structural alterations to the Equipment.

(e) Unless the terms of the Lease state otherwise, and except as provided below, upon Lessee making the Equipment available at an XTRA Lease location at six (6) month intervals or twenty five thousand (25,000) miles, whichever comes first, XTRA Lease agrees to conduct a periodic inspection of the Equipment in conformance with the requirements of 49 C.F.R. Part 396.17 and provide, at its expense, replacement tires, brakes, lights, lubricants and any other parts worn due to normal wear as needed; provided however, Lessee shall be responsible for all expenses relating to replacement tires, brakes, lights, lubricants and any other parts which are broken, inoperable or worn for reasons other than normal wear, including, without limitation, the action or inaction of Lessee. The foregoing shall not apply, and XTRA Lease shall have no obligation to perform periodic inspections, provide any replacement parts, or otherwise perform preventative maintenance on any units of Equipment (i) rented or leased under a Lease pursuant to which Lessee is charged for Tire Wear and Brake Wear or Lessee has assumed responsibility for performing all periodic inspections and preventative maintenance, (ii) which Lessee has not made available at an XTRA Lease location, or (iii) which are designated as storage trailers.

(f) Lessee shall return each unit of Equipment with tires of equal quality to the tires on the unit at the commencement of the Lease, as determined by XTRA Lease in its sole discretion. Lessee shall pay XTRA Lease the pro-rated value, on a replacement cost basis, of the lost remaining life, including a casing charge, for any tire returned in a damaged condition or replaced at a location other than an XTRA Lease location that is not returned to XTRA Lease. For purposes of the Standard Terms and Conditions, tire damage includes, but is not limited to, excessive wear, flat spotting, skid damage, abnormal wear due to equipment defect or improper maintenance or other damage that reduces the remaining useful life of the tire or its casing. A tire is excessively worn if its tread wear exceeds 1/32nds of an inch per ten thousand (10,000) miles traveled.

(g) Lessee is responsible for all damage to the Equipment and must notify XTRA Lease promptly of any potential mechanical failure or problem.

(h) If the Equipment provided to Lessee is designated to be utilized as a storage trailer, such Equipment is intended for storage use only and shall not be used to transport cargo, merchandise and/or freight over-the-road. If

Lessee, following initial delivery of such storage trailer, operates Equipment over-the-road in violation of the preceding sentence, Lessee shall be responsible for all drayage and road service charges and Lessee shall pay XTRA Lease a mileage charge of $.10 per mile traveled by such storage trailer following initial delivery to Lessee.

(i) Upon reasonable notice from XTRA Lease, Lessee shall promptly provide XTRA Lease with the current location of each unit of Equipment Lessee rents or leases from XTRA Lease and, if requested, access to such units at a mutually acceptable time and location.

## 9. DAMAGE AND REPAIRS TO EQUIPMENT.

(a) In the case of total loss of a unit of Equipment beyond economic repair for any reason, including theft, collision, confiscation, fire, destruction, natural disaster or any other total casualty, regardless of where it may have occurred and notwithstanding any amounts which may be paid or disputed by Lessee's insurance company, Lessee is responsible for and shall promptly pay XTRA Lease the Casualty Loss Value of such unit of Equipment. XTRA Lease reserves the right to determine whether a unit of Equipment has in fact suffered an event of total loss or damage beyond economic repair. Lessee's requests for Casualty Loss Value quotes shall in no way constitute notice to XTRA Lease that Lessee has suffered a total loss of a unit of Equipment.

(b) In case of partial loss or damage to any unit of Equipment regardless of where it may have occurred (except the Trailer Tracking Unit), Lessee shall make all repairs and/or replacements at Lessee's expense in accordance with the Repair Standards. Lessee shall not attempt to repair and shall return to XTRA Lease for repair all non-functioning or damaged Trailer Tracking Units. Lessee shall be liable to XTRA Lease for the total estimated or actual cost, as determined by XTRA Lease in its sole discretion, to repair any Equipment returned to XTRA Lease in a non-functioning or damaged condition or repaired in a manner that is not in compliance with the Repair Standards. XTRA Lease reserves the right to not repair any non-functioning or damaged Equipment, in which case Lessee shall remain responsible for the estimated cost of repairs, as determined by XTRA Lease in its sole discretion, regardless of whether the damaged Equipment is actually repaired. Lessee shall not be entitled to any refund of any estimated cost of repair paid by Lessee should the actual cost of repair in fact be less.

(c) Lessee shall maintain and upon written request, provide XTRA Lease with written descriptions of all maintenance work or repairs made to the Equipment. In accordance with the Repair Standards, Lessee shall use first class materials and parts in the repair and service of the Equipment. In addition to any other applicable warranty, Lessee agrees that it will, at its own expense, rectify, repair and replace any and all known defects or other conditions to the Equipment not in compliance with the Repair Standards, arising from defective or improper materials or workmanship furnished by it or its subcontractors.

## 10. LIMITED WARRANTIES. BY TAKING POSSESSION OF THE EQUIPMENT, LESSEE ACKNOWLEDGES RECEIPT OF THE EQUIPMENT IN GOOD REPAIR AND WORKING CONDITION, AND THAT THE EQUIPMENT IS FIT AND SUFFICIENT FOR LESSEE'S INTENDED USE. XTRA LEASE IS NOT A SUPPLIER OR MANUFACTURER (AS SUCH TERMS ARE DEFINED OR USED IN THE UNIFORM COMMERCIAL CODE). NO WARRANTY, EXPRESS OR IMPLIED, IS MADE BY XTRA LEASE OF THE QUALITY OF DESIGN, MANUFACTURE, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES. LESSEE WAIVES ANY AND ALL CLAIMS AGAINST XTRA LEASE FOR ANY AND ALL LOSS OR LIABILITY (INCLUDING CARGO LOSS) RESULTING FROM ANY DEFECTS OR FAILURES OF DESIGN, MATERIALS, CONDITION OR FITNESS FOR ANY PARTICULAR USE OF THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATIONS SERVICES, OR XTRA WEB SITES, EITHER LATENT OR PATENT. LESSEE WAIVES THE PROVISIONS OF ANY APPLICABLE LAW LIMITING OR PROHIBITING A GENERAL RELEASE WITH RESPECT TO ANY RELEASE OR WAIVER IN THE LEASE OR THE STANDARD TERMS AND CONDITIONS. XTRA LEASE AGREES TO EXTEND TO LESSEE ALL WARRANTIES, IF ANY, OFFERED BY THE MANUFACTURERS OF THE EQUIPMENT, TRAILER TRACKING UNIT, AND SOFTWARE AND BY THE WIRELESS SERVICE CARRIERS UNDERLYING THE COMMUNICATION SERVICES.

XTRA LEASE DISCLAIMS, AND LESSEE WAIVES, ALL OTHER WARRANTIES WITH RESPECT TO THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES, AND XTRA WEB SITES, WHETHER WRITTEN, ORAL, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. EXCEPT FOR THE LIMITED WARRANTIES SET FORTH ABOVE IN THIS SECTION 10, THE EQUIPMENT, TRAILER TRACKING UNIT, SOFTWARE, COMMUNICATION SERVICES AND XTRA WEB SITES ARE PROVIDED ON AN "AS IS" BASIS, WITHOUT

3

REPRESENTATION OR WARRANTY OF ANY KIND, FOR USE BY LESSEE AT ITS SOLE RISK.

## 11. LESSEE'S INDEMNIFICATION OBLIGATIONS.

(A) LESSEE HEREBY AGREES TO INDEMNIFY, DEFEND, AND HOLD HARMLESS THE INDEMNIFIED PARTIES (AS DEFINED BELOW) FROM AND AGAINST ANY AND ALL CLAIMS, LOSSES, LIABILITIES, OBLIGATIONS AND EXPENSES (INCLUDING REASONABLE ATTORNEYS' FEES) (COLLECTIVELY "CLAIMS"), IN ANY WAY ARISING OUT OF OR INCIDENT TO THE LEASE, OR THE USE, POSSESSION, MAINTENANCE, CONTROL OR CONDITION OF THE EQUIPMENT DURING THE LEASE, REGARDLESS OF WHETHER SUCH CLAIMS WERE CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OF ANY OF THE INDEMNIFIED PARTIES, AND INCLUDING, WITHOUT LIMITATION, ANY AND ALL CLAIMS ARISING FROM OR INCIDENT TO: (I) THE ACTS OR OMISSIONS OF LESSEE, LESSEE'S AGENTS OR LESSEE'S ASSIGNEES; (II) THE PERFORMANCE, BREACH, OR DEFAULT OF THE LEASE BY LESSEE, OR THE ENFORCEMENT OF ANY OF THE TERMS OF THE LEASE BY XTRA LEASE; (III) THE DEATH OR INJURY TO ANY PERSON; (IV) DAMAGE TO ANY PROPERTY; (V) DAMAGE TO, OR ANY DAMAGE OR INJURY RESULTING FROM, ANY CARGO PLACED ON OR CONTAINED IN THE EQUIPMENT; (VI) THE VIOLATION OR ALLEGED VIOLATION OF ANY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, ANY FAILURE OR ALLEGED FAILURE TO USE, OPERATE, MAINTAIN OR CONTROL THE EQUIPMENT IN COMPLIANCE WITH APPLICABLE LAW; (VII) ANY TAXES AND ASSESSMENTS, INCLUDING WITHOUT LIMITATION ALL IMPORT AND CUSTOMS DUTIES AND ALL WITHHOLDING, PROPERTY, SALES AND/OR USE TAXES, AND ALL PENALTIES; (VIII) ANY FINES, TOLLS, USER FEES, TRAFFIC AND PARKING VIOLATIONS, TOWING AND STORAGE EXPENSES, AND ANY OTHER SIMILAR FINES, FEES OR CHARGES; (IX) THE USE OF THE SOFTWARE, COMMUNICATION SERVICES OR XTRA WEB SITES; AND (X) THE USE, FAILURE TO USE OR INABILITY TO USE THE TRAILER TRACKING UNIT, INCLUDING, WITHOUT LIMITATION, THE INABILITY TO USE THE ACCESS TELEPHONE NUMBER FOR THE TRAILER TRACKING UNIT.

(B) FOR PURPOSES OF THE STANDARD TERMS AND CONDITIONS, THE TERM "INDEMNIFIED PARTIES" SHALL REFER TO (I) XTRA LEASE, ITS AFFILIATES AND ITS AND THEIR SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, LICENSORS AND AGENTS, AND (II) XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING UNIT AND SOFTWARE AND THE UNDERLYING WIRELESS SERVICE CARRIER SUPPLYING SERVICES TO XTRA LEASE'S THIRD-PARTY LICENSOR OF THE TRAILER TRACKING SOFTWARE, AND THEIR AFFILIATES, SUCCESSORS, ASSIGNS, EMPLOYEES, OFFICERS, DIRECTORS, AND AGENTS.

(C) LESSEE SHALL NOT SETTLE OR COMPROMISE ANY CLAIM AGAINST THE INDEMNIFIED PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CLAIM FOR WHICH LESSEE HAS ASSUMED THE DEFENSE OF THE INDEMNIFIED PARTIES, WITHOUT THE PRIOR WRITTEN CONSENT OF XTRA LEASE. LESSEE SHALL REIMBURSE THE INDEMNIFIED PARTIES FOR ANY EXPENSE INCURRED, INCLUDING ATTORNEYS' FEES, TO DEFEND ANY ACTION WHICH LESSEE IS REQUIRED TO DEFEND PURSUANT TO THE STANDARD TERMS AND CONDITIONS. THE PROVISIONS OF THIS SECTION 11 SHALL SURVIVE THE TERMINATION OF THE LEASE.

## 12. LIMITATION OF LIABILITY.

(a) Under no circumstances shall XTRA Lease or its licensors be liable for any incidental, indirect, special, consequential, exemplary or punitive damages of any kind, whether or not resulting from the negligence of XTRA Lease or its licensors, and including, without limitation, any lost profits, business failure or interruption damages, or any damages associated with lost or damaged cargo. In no event shall XTRA Lease's total liability to Lessee exceed the amount of Use Charges paid by Lessee during the three (3) months preceding the event that gave rise to the claim or action.

(b) Lessee expressly understands and agrees that it has no contractual relationship whatsoever with the underlying wireless service carrier and that Lessee is not a third-party beneficiary of any agreement with XTRA Lease's third-party Trailer Tracking licensor and/or the underlying wireless service carrier. In addition, Lessee expressly understands and agrees that the underlying wireless service carrier shall have no legal, equitable or other liability of any kind to Lessee. In any event, regardless of the form of the action, whether for breach of contract, warranty, negligence, strict liability in tort or otherwise, Lessee hereby waives any and all claims against the underlying wireless service carrier from all such liability, provided, however, that if and only if, Use Charges relating to the Communication Services are billed separately to Lessee as part of the total Use Charges for the Equipment, then Lessee's exclusive remedy and the total liability of the underlying

wireless service carrier arising in any way in connection with the Lease for any cause whatsoever including, without limitation, any failure or disruption of service provided hereunder, is limited to payment of damages in an amount equal to the portion of the Use Charges to Lessee for the services relating to the period of service during which said damages occur.

## 13. INSURANCE & CDW.

(a) Minimum levels of insurance covering the Equipment shall be maintained by Lessee, at Lessee's expense, with a licensed insurance carrier with an A.M. Best rating of not less than B+ and shall include:

(i) All risk insurance covering physical loss of or damage to the Equipment from any cause whatsoever. XTRA Lease shall be named a loss payee;

(ii) Comprehensive Automobile Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million combined single limit or $1 million bodily injury and $250,000 property damage. XTRA Lease must be shown as an additional insured; and

(iii) Comprehensive General Liability coverage protecting XTRA Lease from and against all loss and damage it may sustain or suffer because of death of or injury to any person, or damage to the property of any person, as a result of the use, possession, maintenance or control of the Equipment by Lessee. Coverage must be primary and non-contributory and include minimum limits of $1 million general aggregate or $1 million each occurrence and include contractual liability coverage and/or endorsement. XTRA Lease must be shown as an additional insured.

(b) Policies of insurance shall be valid and in force until the Equipment is returned to XTRA Lease. Lessee shall provide XTRA Lease with certificate(s) of insurance evidencing the required coverage prior to delivery or acceptance of any Equipment, and thereafter with certified copies of the insurance policies as may be requested by XTRA Lease. Such certificates shall contain a requirement that XTRA Lease receive thirty (30) days prior written notice of cancellation or material change to Lessee's insurance policies. All policies of insurance must carry deductible limits acceptable to XTRA Lease. If requested by XTRA Lease, Lessee shall file a claim with its insurance carrier for any lost or stolen units of Equipment. Insolvency or failure by Lessee's insurance carrier to provide coverage for any and all loss, claim, liability or damage arising out of the Lease shall not relieve Lessee of any of its obligations set forth in the Lease. Nothing contained in these insurance requirements is to be construed as limiting the extent of Lessee's liability under the Lease. Lessee is solely responsible for ensuring that it maintains the minimum levels of financial responsibility required by Applicable Law.

(c) The insurance requirements of this Section 13 may be satisfied in whole or in part by a self-insurance program maintained by Lessee which is acceptable to XTRA Lease, provided however XTRA Lease shall be named as an additional loss payee and/or additional insured under such program including umbrella policies, if any, which may be a part thereof. Lessee shall provide to XTRA Lease evidence of such self-insurance program upon XTRA Lease's request together with a copy of Lessee's most recent financial statements, which shall be satisfactory to XTRA Lease.

(d) Lessee can fulfill its obligation to provide the all risk insurance required in Section 13(a)(i) hereof, by purchasing the Collision Damage, Fire and Theft Waiver Options ("CDW") offered by XTRA Lease. In the event Lessee has elected the CDW option, Lessee hereby acknowledges that CDW (i) is a damage waiver program, (ii) is not an all risk insurance program covering physical loss of or damage to the Equipment for the benefit of Lessee, and (iii) is intended solely (A) to reimburse XTRA Lease for any repairs required for any unit of Equipment returned to XTRA Lease in a damaged condition, subject to applicable deductible or (B) to pay XTRA Lease the Casualty Loss Value of any unit of Equipment which was to be returned to XTRA Lease upon termination of the Lease and such unit of Equipment is a total loss by theft, confiscation, fire, destruction, damage beyond economic repair or any other total casualty; and in addition to the terms set forth therein, the benefits of such coverage will not be available to Lessee unless each of the following conditions have been met: (v) Lessee is in compliance with all terms and conditions of the Lease, including current on all payments; (w) all casualty loss or damage to the unit of Equipment must have occurred in the United States or Canada; (x) such damage or loss was not the result of Lessee's negligence and/or failure to maintain proper care and control of such unit of Equipment; (y) Lessee shall have promptly notified XTRA Lease in writing and obtained a police report of any loss or damage to any unit of Equipment as soon as practicable, and in any case, not later than 72 hours after the occurrence of such casualty loss or damage, and shall have delivered promptly to XTRA Lease a copy of the applicable police report; and (z) Lessee shall have provided to XTRA Lease any additional documentation it may request relating

4

to the casualty loss or damage and comply with any other requirements of **XTRA Lease**. Oral requests for quotes on casualty loss or damaged Equipment shall not constitute the required notice under this Section 13(d). **Lessee** shall be liable for the first $1,500 for each occurrence of damage to or loss of any unit (or the first $5,000 in the case of refrigerated or specialty Equipment). In addition, **Lessee** hereby agrees that Use Charges will continue to accrue with regard to such Equipment until **Lessee** has paid the required deductible. CDW shall terminate immediately upon any Default by **Lessee** under the Lease. **XTRA Lease**, in its sole discretion, may discontinue providing CDW to **Lessee** on ten (10) days prior written notice.

### 14. SECURITY DEPOSIT.
As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, a security deposit in an amount determined by **XTRA Lease**, may be required and, if required, shall be delivered to **XTRA Lease** by **Lessee** prior to **Lessee** taking possession of any Equipment. Such security deposit may be used to offset any amounts due and owing by **Lessee** to **XTRA Lease** pursuant to the Lease. The security deposit, or any balance thereof, if any, shall be returned to **Lessee** after all of the Equipment leased hereunder has been returned to **XTRA Lease** and after deduction of any amounts due and owing by **Lessee** to **XTRA Lease**, including, without limitation, all unpaid Use Charges and any repair or replacement expenses.

### 15. LETTER OF CREDIT.
As a condition precedent to **XTRA Lease** entering into the Lease and to **XTRA Lease** making the Equipment available to **Lessee**, and as security for the full performance by **Lessee** of its obligations hereunder, **Lessee** may be required to obtain from a financial institution acceptable to **XTRA Lease** an irrevocable letter of credit for the benefit of **XTRA Lease** in an amount determined by **XTRA Lease**. If required, **Lessee** agrees to maintain such letter of credit in place until all of the Equipment leased hereunder shall have been returned to **XTRA Lease** and **Lessee** shall have fully complied with all of its obligations hereunder, including the payment of all Use Charges, repair or replacement expenses and any other amount due and owing to **XTRA Lease** hereunder. In addition, the failure by **Lessee** to extend the letter of credit or to provide a substitute letter of credit acceptable to **XTRA Lease** at least thirty (30) days prior to the expiration date of the letter of credit shall constitute an event of Default under the Lease and shall entitle **XTRA Lease** to immediately draw down the full amount available under the letter of credit. The letter of credit shall be issued in the form approved by **XTRA Lease**.

### 16. ADEQUATE ASSURANCES.
During the term of any Lease, **XTRA Lease**, in its sole discretion, may require that **Lessee** immediately enter into reasonable security arrangements with **XTRA Lease**. Such security arrangements may include, but are not limited to, providing a security deposit, letter of credit, or the payment of Estimated Charges sufficient to protect **XTRA Lease** from all risk of loss. Failure by **Lessee** to comply with any of the terms of this provision shall constitute a Default of the Lease and **XTRA Lease** shall be entitled to all rights and remedies provided by Section 21(b) herein.

### 17. LAWS, RULES AND REGULATIONS.
(a) For each unit of Equipment, **XTRA Lease** will provide a motor vehicle registration and license plate for registration in a jurisdiction of **XTRA Lease**'s choosing, together with any required renewals. **Lessee** shall be solely responsible for all other registrations, licenses, license plates, and operating permits that may be required for **Lessee** to use, possess, operate or control the Equipment during the Lease.

(b) **Lessee** shall be solely responsible for (i) complying with Applicable Law, including, without limitation, all federal and state anti-pollution and environmental, transportation compliance, safety, and inspection requirements; (ii) any modification required to be made to the Equipment to comply with Applicable Law; and (iii) any fines, tolls, user fees, traffic and parking violations, towing and storage expenses and other similar fines, fees or charges relating to the Equipment during the Lease. **XTRA Lease** shall charge **Lessee**, and **Lessee** agrees to pay **XTRA lease**, for any fines, tolls, user fees, traffic or parking violations, towing and storage expenses and other fines, fees, penalties, or charges relating to the Equipment during the Lease, plus an administrative fee.

(c) Sections 95300-95311 of Title 17 of the California Code of Regulations governs the operation of 53-foot or longer box-type trailers in the State of California (the "HDV Regulations"). **Lessee** is solely responsible for complying with the HDV Regulations, as they may be amended from time to time, in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the HDV Regulations; (ii) complying with any reporting obligations under the HDV Regulations associated with the operation of the Equipment in the State of California; and (iii) verifying that any Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the HDV Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee**

shall not permit Equipment that does not comply with the HDV Regulations to be operated in the State of California. **Lessee** shall have the right to make modifications to the Equipment to comply with the requirements of the HDV Regulations; provided, however, that (i) any modifications made to install aerodynamic devices on Equipment are made in accordance with the recommendations and standards set by the manufacturer of the aerodynamic device, and (ii) unless otherwise agreed to by **XTRA Lease**, **Lessee** shall be responsible for removing any modifications **Lessee** makes to the Equipment prior to **Lessee**'s return of the Equipment to **XTRA Lease**.

**THE LESSEE OF THIS BOX-TYPE TRAILER UNDERSTANDS THAT WHEN USING A HEAVY-DUTY TRACTOR TO PULL A 53-FOOT OR LONGER BOX-TYPE TRAILER ON A HIGHWAY WITHIN CALIFORNIA, THE BOX-TYPE TRAILER MUST BE COMPLIANT WITH SECTIONS 95300-95311, TITLE 17, CALIFORNIA CODE OF REGULATIONS, AND THAT IT IS THE RESPONSIBILITY OF THE LESSEE TO ENSURE THIS BOX-TYPE TRAILER IS COMPLIANT. THE REGULATIONS MAY REQUIRE THIS TRAILER TO HAVE LOW ROLLING RESISTANCE TIRES AND AERODYNAMIC TECHNOLOGIES THAT ARE U.S. ENVIRONMENTAL PROTECTION AGENCY VERIFIED SMARTWAY TECHNOLOGIES PRIOR TO CURRENT OR FUTURE USE IN CALIFORNIA.**

(d) Section 2477 of Title 13 of the California Code of Regulations governs the operation of refrigerated units of Equipment in the State of California (the "TRU Regulations"). It is a violation of the TRU Regulations to operate any refrigerated unit of Equipment in the State of California that does not comply with the TRU Regulations, as they may be amended from time to time. **Lessee** shall be solely responsible for complying with the TRU Regulations in conducting operations in the State of California, including, without limitation, (i) the cost of any modification required to be made to the Equipment to comply with the TRU Regulations; provided, that **Lessee** shall obtain **XTRA Lease**'s approval prior to modifying any Equipment to comply with the TRU Regulations; (ii) complying with any reporting obligations under the TRU Regulations associated with the operation of refrigerated units of Equipment in the State of California; and (iii) verifying that any refrigerated unit of Equipment that **Lessee** has rented or leased from **XTRA Lease** complies with the TRU Regulations prior to the operation of that unit of Equipment in the State of California. **Lessee** shall not permit a refrigerated unit of Equipment that does not comply with the TRU Regulations to be operated in the State of California.

### 18. TAXES.
All taxes and assessments, including without limitation all import and customs duties and all withholding, property, sales and/or use taxes, and all penalties or other charges or fees arising out of or incident to the use, possession or control of the Equipment by **Lessee** prior to its return to **XTRA Lease**, shall be the responsibility of **Lessee**. In order to avoid the obligation to remit any applicable withholding, property, sales and/or use tax to **XTRA Lease**, **Lessee** must provide a duly authorized exemption certificate issued by or acceptable to the relevant taxing authority.

### 19. ASSIGNMENT & SUCCESSORS.
**Lessee** shall not assign or sublease any right or interest in the Equipment, any Lease or any agreement that results therefrom, without the prior written consent of **XTRA Lease**. **XTRA Lease** shall have the right to assign any of its rights or interests in the Equipment, any Lease or any agreement that results therefrom, without obtaining **Lessee's** consent. For purposes of this Section 19, an assignment shall be deemed to have occurred if there has been a change in the control of **Lessee** or **Lessee's** business, whether by merger, consolidation or reorganization, the sale of a majority of the ownership of **Lessee** or **Lessee's** ultimate parent, or a sale, assignment or other transfer of all or substantially all of **Lessee's** assets. **Lessee** may not sublicense, assign, rent, disclose or provide the Software or access to the Communications Services to any third-party. Notwithstanding anything to the contrary contained herein, the Lease and the Standard Terms and Conditions shall inure to the benefit and be binding upon the parties, their heirs, successors, administrators, executors and assigns.

### 20. LIENS.
(a) **Lessee** shall keep the Equipment free from any liens, including, without limitation, mechanics' liens, storage, warehouse or other possessory liens, claims or encumbrances, attachments, rights of others and legal processes ("Liens") of creditors of **Lessee** or any other persons. **Lessee** shall promptly notify **XTRA Lease** upon receipt of notice of any such Liens affecting the Equipment and **Lessee** shall promptly defend at its own expense **XTRA Lease's** title to the Equipment from such Liens.

(b) Notwithstanding the parties' intention and express agreement that the Lease constitutes a valid lease of the Equipment, and solely to protect the rights of **XTRA Lease** in the Equipment in the event the Lease is determined by a court of competent jurisdiction to be a conditional sale of and/or financing arrangement as to the Equipment, **Lessee** hereby pledges, assigns and grants to **XTRA Lease** a continuing first priority security interest in and lien upon the Equipment and all proceeds (including proceeds of all insurance policies), which interest and lien shall be cross-collateralized with

5

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 84 of 89

each and every separate item of Equipment subject to the Lease and related schedules, in order to secure the prompt payment and performance, as and when due, of all of **Lessee's** obligations, both now existing and hereinafter arising under this Lease. **Lessee** hereby agrees that **XTRA Lease** shall have all rights and remedies of a "secured party" under the Uniform Commercial Code and authorizes **XTRA Lease** to cause this Lease and/or any statements or other instruments in respect of this Lease showing the interest of **XTRA Lease** in the Equipment (including certificates of title or Uniform Commercial Code financing statements) to be filed or recorded, and grants **XTRA Lease** and its agents the right to execute **Lessee's** name thereto. **Lessee** also agrees to execute or cause the execution of such additional documents and do such other acts and things, including execution of applications and certificates of title naming **XTRA Lease** as a secured party and delivery of same to **XTRA Lease**, as **XTRA Lease** from time to time requests or deems necessary to establish and maintain a valid and perfected security interest in and lien upon the Equipment. To further secure payment to **XTRA Lease** of the obligations owed by **Lessee**, **Lessee** agrees that the Equipment subject to the Lease shall be cross-collateralized with the Equipment subject to any other Lease in which **Lessee** is a lessee.

## 21. DEFAULT.

(a) **Lessee SHALL BE IN DEFAULT** of the Lease: (i) if **Lessee** fails to comply with any of the terms or conditions of the Lease, including, without limitation, the retention of the Equipment for the Lease Term or the timely payment of all invoices; (ii) if any third-party credit support, including any guarantor or issuer of letter of credit, attempts to or does cancel the support or guaranty (or is otherwise in default under such support or guaranty); (iii) if **Lessee** is in default of any of the terms or conditions of any other agreement with **XTRA Lease**; (iv) if **Lessee** fails to maintain, or fails to provide **XTRA Lease** with proper evidence of, the insurance required by this Lease, or Lessee's insurance is canceled, reduced or lapses; (v) if **Lessee** fails to provide the adequate assurances under Section 16 hereof; or (vi) if **Lessee** becomes insolvent, or subject to any voluntary or involuntary bankruptcy proceeding (including acquiescence in the appointment of a trustee or receiver, or commencement of any dissolution or liquidation proceeding; hereafter individually or collectively referred to as a "Default").

(b) In addition to any rights or remedies available at law or in equity, upon a Default by **Lessee**, **XTRA Lease** shall have the right, at its option and without demand or notice to **Lessee**, to do any one or more of the following: (i) pay all amounts required to be paid or perform or cause to be performed all obligations required to be performed by **Lessee** under the Lease and charge **Lessee** as additional rent the amount paid or the reasonable value of the services performed therefore together with interest thereon at the rate described in Section 7 hereof; (ii) declare the entire balance of the remaining payments under the Lease immediately due and payable by acceleration and recover such amount as liquidated damages, the reasonableness of such damages being acknowledged and agreed to by **Lessee**; (iii) take immediate possession of all outstanding Equipment and Software, all of which is to be returned at **Lessee's** expense; (iv) immediately terminate **Lessee's** access to the Communication Services; (v) terminate the Lease (whereupon the terms and conditions shall continue to apply to the Equipment then in the possession or control of **Lessee** until its return); (vi) calculate and require **Lessee** to pay any collection costs incurred in recovery of any sums due or repossession of any Equipment including, without limitation, reasonable attorneys' fees; (vii) calculate and recover from **Lessee** any lost profits and damages as a "Lost Volume Seller" and/or "Lost Volume Lessor" (as those terms are defined and used in the Uniform Commercial Code) that **XTRA Lease** would have generated had the Lease not been prematurely cancelled; (viii) calculate and recover from **Lessee** any costs to transport and store the Equipment throughout the remainder of the Lease Term; and (ix) set-off and apply any amounts owing by **XTRA Lease** to or for the account of **Lessee** against any amounts owing by **Lessee** to or for the account of **XTRA Lease**, including, without limitation, any deposits, accruals, prepayments, overpayments, Estimated Charges, fees or otherwise. **Lessee** acknowledges and agrees that **XTRA Lease** is under no duty to mitigate damages resulting from **Lessee's** Default.

## 22. REPOSSESSION.

(a) In the event of **Lessee's** Default, and upon demand of **XTRA Lease**, **Lessee** shall immediately return all Equipment to **XTRA Lease**. If **Lessee** fails or refuses to immediately return all Equipment after demand by **XTRA Lease**, **XTRA Lease** shall have the right to enter upon any premises where the Equipment is located and take immediate possession of, and at **Lessee's** expense remove, the Equipment, and **XTRA Lease** shall be deemed to be **Lessee's** agent for such purposes. If **XTRA Lease** takes possession of the Equipment with property contained in, upon or attached to the Equipment, **XTRA Lease** may take possession of such property and hold it in its own or public storage for the account and at the expense of **Lessee** upon thirty (30) days advance written notice to **Lessee**, dispose of such property in a commercially reasonable manner with no further liability. **Lessee** expressly

waives the benefits of any Applicable Law, now or hereafter enacted, exempting any leased property from replevin, distraint, levy or sale in any legal proceeding taken by **XTRA Lease** to enforce any right under the Lease.

(b) In the event of **Lessee's** Default, (i) **XTRA Lease** will be in danger of losing its Equipment unless immediate possession of the Equipment is obtained because **XTRA Lease's** Equipment is movable and readily marketable; and (ii) **XTRA Lease** will not have an adequate remedy at law to protect its rights in its unreturned Equipment. Therefore, **Lessee** agrees that in the event of **Lessee's** Default, **XTRA Lease** shall have the right, without prejudice to any other rights and remedies otherwise available to **XTRA Lease** at law or in equity, to obtain injunctive relief in order to prevent the continued use of the Equipment by **Lessee** and to require **Lessee** to immediately deliver possession of the Equipment to **XTRA Lease**.

## 23. INTELLECTUAL PROPERTY. XTRA Lease and/or its licensors reserve

ownership of all Intellectual Property in and to the Equipment, Trailer Tracking Unit, Software, Communication Services and the XTRA Web Sites, and the Lease does not create any right of ownership in or to such materials in **Lessee**. For the purposes of this Section 23, "Intellectual Property" shall mean all proprietary interests of any kind or nature, including, without limitation interests pertaining to patent rights, copyrights, trade secrets, mask work rights, circuit layout rights, design rights, prototypes, models, source code, documentation, trade and service marks, and other similar rights throughout the world, however denominated and any amendments, additions or improvements made thereto.

## 24. BUSINESS CONDUCTED ELECTRONICALLY.

(a) **Lessee** agrees to conduct business with **XTRA Lease** electronically, and that except as otherwise specifically provided herein, an electronic signature on any notice or other communication required or permitted to be given hereunder, or pursuant or relating to any Lease, shall have the same force and effect as the use of manual signatures;

(b) **Lessee** agrees that in the event **Lessee** uses any web site of **XTRA Lease**, including, without limitation, xtracorp.com, xtralease.com, xtratrack.com, xtrainstall.com, and /or xlra.com (collectively, "XTRA Web Sites"), as a condition of such use, **Lessee** stipulates that while on XTRA Web Sites and where applicable terms and conditions on XTRA Web Sites so indicate, when **Lessee** clicks a button labeled "I Agree" or "I Accept", or when **Lessee** types "I Agree" or "I Accept" in a space marked for such an input by **Lessee**, **Lessee** will be manifesting and authenticating **Lessee's** assent to a binding contractual agreement incorporating the terms and provisions for which the button or input area is provided; and

(c) In any dispute hereunder, related to the Lease, or related to **Lessee's** use of XTRA Web Sites, **Lessee** stipulates that it will have the burden of proving that (i) any electronic manifestation of assent received by **XTRA Lease** is not attributable to **Lessee**; and (ii) **Lessee** did not have an opportunity to review any electronic terms and conditions posted on the XTRA Web Sites.

## 25. WAIVER. No waiver by XTRA Lease of any breach or Default hereunder,

or omission or delay by **XTRA Lease** in exercising any of its rights hereunder, or course of dealing between **XTRA Lease** and **Lessee** shall operate as a waiver by **XTRA Lease** to subsequently require full compliance with the Lease or the Standard Terms and Conditions or as a waiver of any of **XTRA Lease's** rights or remedies hereunder.

## 26. ILLEGAL PAYMENTS. No bribes, illegal commissions, or other similar

payments, whether direct or indirect, to the best of **Lessee's** knowledge, have been or will be made to any employee or agent of **XTRA Lease** or **Lessee**, or of their respective subsidiaries, in connection with the Lease.

## 27. ENTIRE AGREEMENT; CONFLICTS. The Lease, including the Standard

Terms and Conditions, any long-term Equipment Lease Agreement and Schedules thereto, National Account Agreement, Short-term Rental Agreement, and Equipment Rental Agreement, supersedes all prior agreements, whether written or oral, between **XTRA Lease** and **Lessee** with respect to the rental or lease of the Equipment described therein, and constitutes a complete and exclusive statement of the terms of the agreement between **XTRA Lease** and **Lessee** with respect to the lease of the Equipment described therein. All Lease documents shall be read in a complementary manner. Except as may be provided in the Lease, the Standard Terms and Conditions shall take precedence over all other Lease documents.

## 28. AMENDMENTS. XTRA Lease reserves the right to change, upon thirty

(30) days prior written notice, any term or provision of the Lease, including, without limitation, the Use Charges to be paid under the Lease and the Standard Terms and Conditions. No change to the Lease shall be effective unless in writing, executed by **XTRA Lease's** Vice President, Customer Financial Services or his designee who is located in **XTRA Lease's** home office in St. Louis, Missouri and delivered to **Lessee** pursuant to the notice provision hereto.

Case: 15-30897   Doc# 246   Filed: 06/06/16   Entered: 06/07/16 08:59:36   Page 85 of 89

**29. NOTICES.** All notices and other communications required or permitted to be given hereunder, including those required for billing purposes, shall be in writing and shall be deemed given and made (i) if by personal delivery, on the date of delivery, (ii) if by a nationally recognized overnight courier, on the next day following deposit, and (iii) if by mail, on the third business day following deposit in the mail. Any notice or communication to **Lessee** shall be sent to the address set forth in the Lease, or such other address as may be designated by **Lessee** by written notice to **XTRA Lease**. In the case of **XTRA Lease**, any notice or communication shall be sent to XTRA Lease, 7911 Forsyth Boulevard, Suite 600, St. Louis, MO 63105, Attention: Vice President, Customer Financial Services. Any change of address by either party shall be communicated to the other in writing. Notwithstanding the above, **XTRA Lease** may provide the Lease, the Standard Terms and Conditions, invoices, notices and other communications to **Lessee** in an electronic format through the XTRA Web Sites or other means.

**30. CONFIDENTIALITY.** The confidentiality of the Lease, including without limitation the Use Charges applicable thereunder, shall be strictly maintained by **Lessee** and shall not be released or revealed to any third-party by **Lessee**.

**31. CHOICE OF LAW; VENUE; JURY TRIAL WAIVER.** The Lease and the Standard Terms and Conditions shall be governed by the internal substantive laws of the State of Missouri, without regard to conflicts of laws provisions. **Lessee** and **XTRA Lease** each hereby submit to the jurisdiction of the Circuit Court of St. Louis County, Missouri for purposes of adjudicating any action arising out of or related to the Lease, and hereby waive, to the fullest extent permitted by law, any objection to that venue for any action arising out of or related to the Lease. Any action arising out of the Lease may be properly filed in the Circuit Court of St. Louis County, Missouri; however, **XTRA Lease** reserves its right to bring suit in any other appropriate jurisdiction. **LESSEE AND XTRA LEASE EACH IRREVOCABLY WAIVE THEIR RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING FOR ANY CLAIM, DISPUTE OR CONTROVERSY THAT IN ANY WAY ARISES FROM OR RELATES TO THE LEASE AND IN WHICH LESSEE AND XTRA LEASE ARE ADVERSE PARTIES.**

**32. SEVERABILITY.** If any term or provision hereof is declared to be illegal, invalid or unenforceable for any reason by a court of competent jurisdiction, such illegality, invalidity or unenforceability shall not affect the remaining terms and provisions hereof, which shall remain binding and enforceable.

Case: 15-30897    Doc# 246    Filed: 06/06/16    Entered: 06/07/16 08:59:36    Page 86 of 89

# EXHIBIT "3"

**Terms With Respect to Assumption of**

**First Priority Secured Claim of Umpqua Bank[1]**

1. Pursuant to the sale approved by the Order to which this document is attached, Umpqua Bank shall continue to hold a first priority lien on all accounts receivable, inventory and equipment owned by Purchaser (with the exception of any existing purchase-money liens on existing equipment).

2. Purchaser and its principals, Soo Ming Yee and Wayman Wong (collectively, the "Purchaser Parties"), shall execute all documents ("Documents") reasonably requested by Umpqua Bank (including promissory note, security agreement, business loan agreement or shall execute loan ("Loan") assumption documents allowing assumption of the existing Loan between Debtor and Umpqua Bank), whichever is requested of the Purchaser Parties by Umpqua Bank. The documents shall evidence Purchaser's obligations to Umpqua Bank, pursuant to the assumption of the Loan, which is further evidenced by Umpqua Bank's filed Proof of Claim on September 3, 2015 in the Debtor's bankruptcy proceedings. The Loan amount is $292,959.58, per the filed proof of claim and shall be adjusted to reflect any fees, interest and costs which have accrued since the filing of the proof of claim, with credit given for any payments received by Umpqua Bank since the filing of the proof of claim. Purchaser shall continue to make all required payments now due to Umpqua under the Loan and shall otherwise be bound by and shall comply with, all terms and conditions of the Loan that now exist, notwithstanding that the Loan Documents are not yet signed.

3. The principals of Purchaser, Soo Ming Yee and Wayman Wong (the "Principals"), shall guaranty the obligations owing by Purchaser to Umpqua Bank and shall execute any standard form guarantees presented by Umpqua. It is acknowledged that the guarantees are to secure a business purpose loan to Purchaser. The guarantees shall be secured the principal residences of each of the Principals.

4. The Loan Documents to be executed by the Purchaser Parties shall be presented by Umpqua to the Purchaser Parties within 45 days from the date of the entry of this Order allowing the sale of the business to Purchaser, notwithstanding that the sale has occurred before the Loan Documents are presented to the Purchaser Parties. However, it shall be an obligation of the Purchaser Parties to sign such Loan and guaranty documents and it shall be a default of the Purchaser Parties if they do not comply with such obligations by returning the Loan Documents presented by Umpqua Bank or if the Purchaser Parties do not continue to comply with the Loan obligations which were in effect between Umpqua and the Debtor, prior to the sale approved herein. All of the foregoing is subject to the Purchaser Parties' right to review the Loan Documents presented and agree to the terms set forth therein to the extent inconsistent with the current terms and agreement of the parties. In the event of a default by Purchaser or the Principals, Umpqua Bank shall be allowed to take all

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or in the Asset Purchase Agreement.

rights allowed under this Order and under state and federal law to enforce its rights to payment of the entire amounts owing on the Loan, against the assets transferred to Purchaser as specified in Par. 5 below, subject to Purchaser Parties' rights to respond thereto and defend the proceeding. The delay in the presentation of the Loan and guaranty documents is necessitated by the expedited sale date requested by the Debtor.

5. Effective immediately upon the entry of the this Order, Umpqua Bank shall have a first position lien on all existing and any after acquired property ("Purchaser Property") owned by Purchaser, including that purchased from Debtor pursuant to this Order, including but not limited to all Chattel Paper, Accounts Receivable, General Intangibles, Equipment and any accessions, additions, replacements and substitutions related to the forgoing (including insurance and general intangibles and other accounts proceeds), owned by Purchaser as of the date of this Order or hereafter obtained by Purchaser. In the event that there is a default by Purchaser under any condition of this Order, Umpqua shall be allowed to immediately proceed with its rights and remedies against Purchaser Property, pursuant to the default on its Loan and in accordance with its 1st position lien on Purchaser assets, as defined in this Paragraph 5, and against the guarantors without further order, but subject to the Purchaser Parties' right to respond to and defend such proceedings. Umpqua may record the Order as evidence of its rights.